UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
NOV 12 2014
PRO SE OFFICE

Ann Margaret Legrã

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

**COMPLAINT FOR EMPLOYMENT DISCRIMINATION**

Dawn Boursiquot and the NYC Board of Education of the City School District of the City of New York.

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. Typically, the company or organization named in your charge to the Equal Employment Opportunity Commission should be named as a defendant. Addresses should not be included here.)*

Jury Trial: ☒ Yes ☐ No *(check one)*

14 CV 9245

This action is brought for discrimination in employment pursuant to: *(check only those that apply)*

X Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).
***NOTE:** In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

X Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 - 634.
***NOTE:** In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.*

X Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 - 12117.
***NOTE:** In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue Letter from the Equal Employment Opportunity Commission.*

X New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic chacteristics, marital status).

X New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131 (actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status).

X Retaliation.

X Other acts *(specify)*: Harrassment.

*Note: Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.*

B. It is my best recollection that the alleged discriminatory acts occurred on: 2011-2012-2013-2014 school years.
Date(s)

C. I believe that defendant(s) *(check one)*:

X is still committing these acts against me.

___ is not still committing these acts against me.

D. Defendant(s) discriminated against me based on my *(check only those that apply and explain)*:

- ☒ race Hispanic ☐ color ___
- ☒ gender/sex Female ☒ religion Christian
- ☒ national origin Cuban, Puerto Rican
- ☒ age. My date of birth is 03-27-70 *(Give your date of birth only if you are asserting a claim of age discrimination.)*
- ☒ disability or perceived disability, asthma *(specify)*

E. The facts of my case are as follow *(attach additional sheets as necessary)*:

Violation of state city Civil Rights acts. Age discrimination act, Americans with disabilities act, and Equal pay act.

*Note: As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, the New York State Division of Human Rights or the New York City Commission on Human Rights.*

## III. Exhaustion of Federal Administrative Remedies:

A. It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding defendant's alleged discriminatory conduct on: June 16, 2014 *(Date)*.

B. The Equal Employment Opportunity Commission *(check one)*:

___ has not issued a Notice of Right to Sue letter.

_X_ issued a Notice of Right to Sue letter, which I received on ____________ *(Date)*.

*Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.*

C. Only litigants alleging age discrimination must answer this Question.

Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding defendant's alleged discriminatory conduct *(check one)*:

___ 60 days or more have elapsed.

_X_ less than 60 days have elapsed.

## IV. Relief:

WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, and costs, as follows: ____________________

*(Describe relief sought, including amount of damages, if any, and the basis for such relief.)*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 12th day of November, 2014

Signature of Plaintiff [signature]

Address 1214 15th st Floor 2
FORT LEE, NJ
07024

Telephone Number (917) 862-7932

Fax Number *(if you have one)* ____________

EEOC Form 161 (11/09)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

To: **Ann Legra**
**1214 15th St**
**2nd Floor**
**Ft Lee, NJ 07024**

From: **New York District Office**
**33 Whitehall Street**
**5th Floor**
**New York, NY 10004**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **846-2014-22758** | **John Douglass, Supervisory Investigator** | **(212) 336-3765** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

Kevin J. Berry
**Kevin J. Berry,**
**District Director**

8/6/14
*(Date Mailed)*

Enclosures(s)

cc: **Robin Singer, Esq.**
**Associate Counsel - Office of Legal Services**

The reasons for my claim of employment discrimination are as follow:

- The principal Dawn Boursiquot and the assistant principal Kevin Goodman,

a) created a hostile, difficult, intolerable working environment

b) Targeted my pay. By making mistakes in the calculations of attendance, vacation pay, support payments and accumulation of inaccurate attendance codes in the Cumulative attendance reserve records.

c) discrimination against my disability as not providing me with the proper accomodation as stated in my accomodation decision. Excessive inquiries regarding my medical records to my physicians

d) Used threats and derragotory language creating a hostile and offensive work enviromment. Harrased and threatened me during the 2011-2012 and 2012-2013 sc years.

Jan 31, 2013 - Left home early due to [illegible]. Mr. Kevin Goodman covered my class. He asked me for lesson plans. He never returned my lesson planning composition book.

February 7, 2013 - Mr. Goodman covered and gave a substitute teacher to all of the first grade teachers with the exception of myself. I wrote a letter to Mr. Goodman February [illegible]

Sept. 2012 - June 2013 Used my classroom for lab sites to utilize the work in my classroom.

Sept. 2011 - June 2013 Given excessive letters to file and disciplinary conferences and disciplinary conferences. These [illegible] resulted in the file.

May 5, 2012 - Kevin Goodman Disciplinary letter to file

Dec. 13, 2012 - Disciplinary letter from Mr. Goodman

Jan 15, 2013 - Disciplinary meeting from Mr. Goodman

Jan. 16, 2013 Disciplinary letter by Mr. Goodman

January 18, 2013 - pre-observation conference scheduling

[illegible] 23, 2013 - pre-observation conference by Mr. Goodman

THE UNIVERSITY OF THE STATE OF NEW YORK
THE STATE EDUCATION DEPARTMENT
TEACHER TENURE HEARING UNIT

14 CV 9245

-----------------------------------------------------------------------x

In the Matter of the Disciplinary Proceeding between

THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK a/k/a THE NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE"),

Complainant-Employer,

- against -

ANN LEGRA,

Respondent-Tenured Teacher-Employee.

Pursuant to Education Law Section 3020-a

-----------------------------------------------------------------------X

SED Case Number: 23257

**REVISED AWARD OF EUGENE S. GINSBERG HEARING OFFICER**

**AWARD**

I, the undersigned Hearing Officer, having been appointed, reviewed the Specifications, heard the proofs of the parties, carefully considered the evidence and arguments presented, do hereby Award as follows:

Teacher, Ann Legra, is suspended for forty-five (45) days, without pay, and

I retain jurisdiction to consider and determine any dispute of the parties arising from the foregoing.

Date: May 14, 2013

EUGENE S. GINSBERG, Hearing Officer
300 Garden City Plaza (5th floor)
Garden City, New York 11530
(516) 746-9307

ESG/D961308v1A/MESG/C99999

I, Eugene S, Ginsberg do hereby affirm that I am the Hearing Officer in the foregoing

matter and that this document, which I have executed on this date, is my Revised Award, issued

in compliance with all applicable laws, rules and agreements.

Date:   May 14, 2014

EUGENE S. GINSBERG, Hearing Officer

THE UNIVERSITY OF THE STATE OF NEW YORK
THE STATE EDUCATION DEPARTMENT
TEACHER TENURE HEARING UNIT

----------------------------------------------------------------------X

In the Matter of the Disciplinary Proceeding between

SED Case Number: 23257

THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK a/k/a THE NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE"),

Complainant-Employer,

- against -

ANN LEGRA,

Respondent-Tenured Teacher-Employee.

Pursuant to Education Law Section 3020-a

----------------------------------------------------------------------X

**REVISED OPINION OF EUGENE S. GINSBERG HEARING OFFICER**

**APPEARANCES:**

**For the DOE:**
Courtenaye Jackson-Chase, General Counsel
By: Denice M. Szekely, Esq.

**For United Federation of Teachers, Local 2, AFT, AFL-CIO ("UFT")**
Richard E. Casagrande, General Counsel
By: Michael J. DelPiano, Esq.

**Hearings:**

Held at DOE, 49-51 Chambers Street, New York, New York 10007 on: November 26 (Pre-Hearing Conference), December 13 and 16, 2013; January 13, 16, 21, 22, 24 and 27, February 10, 11, 14, 24, 26 and 28, March 3, and 5, 2014.

**Post Hearing Submissions:**

From UFT – March 5 and 12, 2014 – Memorandum and cases.

From DOE – March 11, 2014 – cases.

**Hearing Closed**

March 20, 2014 upon receipt of final copy of transcript ("T").

INDEX TO CONTENTS

| | Page |
|---|---|
| Appearances | 1 |
| Index to Substantive Referenced and Excerpted: | |
| Transcript Testimony | 2 |

| Witness | Pages |
|---|---|
| Dawn Boursiquot<br>Principal | 12-16, 20-29, 91-98 |
| Kevin Goodman<br>Assistant Principal | 33-65, 72-79, 102-105 |
| Tania Serratty<br>Math Coach | 65, 66 |
| Nilda Francisco<br>Literacy Coach | 66-70, 100-102 |
| Yris Vargas<br>School Payroll Secretary | 133-143 |
| Marc Bush<br>Director, NYS Assessment | 143-145 |
| Ann Legra<br>Respondent Teacher | 17-20, 30-32, 79-83, 107-120.<br>145-148, 160-163 |
| Jose A Rodriquez<br>UFT Chapter Leader and<br>ESL Teacher | 88-91 |
| Michael J. DelPiano, Esq.<br>Counsel for Respondent<br>Teacher | 16, 22, 33, 70-71, 83-87, 148-150,<br>163-166, 168-171, 191 |
| Denice M. Szekely, Esq.<br>Counsel for DOE | 17, 191, 192 |

| Exhibits | 2-5 |
|---|---|

| | Pages |
|---|---|
| Joint | |
| 1 | 52 |
| DOE # | |
| 1. | 6, 7 |
| 3. | 11, 12, 53 |
| 4. | 29 |
| 5. | 20, 25, 31 |
| 6. | 91, 115 |
| 7. | 128-133, 135, 139-141 |
| 9. | 126, 127 |

The penalty now conforms to Education Law §3020-a4 (Post hearing procedures) "a" which includes:

> In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, suspension for a fixed time without pay, or dismissal.

I understand you will be able to submit the Revised Opinion and Award in TEACH. I could not because it was "closed".

Your cooperation and assistance is much appreciated

Very truly yours,

Eugene S. Ginsberg

ESG/mat
Attachment
C. tenure@mail.nysed.gov

**Eugene S. Ginsberg**
Attorney-At-Law
Arbitrator-Mediator-Fact-Finder

300 Garden City Plaza (5th Floor)
Garden City, New York 11530-3324
Tel: (516) 746-9307
Tel: (516) 393-8232

Fax: (516) 393-8282
E-Mail: Esginsberg@aol.com
Website: eugenesginsberg.com

May 15, 2014

***via e-mail ccarroll@mail.nysed.gov***
Ms. Clare Carroll
Education Finance Specialist I
NYS Education Department
OSPRA Unit/Teacher Tenure Unit
89 Washington Avenue, Room 981 EBA
Albany, New York 12234

**Re: Revised Opinion and Award**
**Ann M. Legra**
**SED Case No. 23257**

Dear Ms. Carroll:

Pursuant to our telephone conversation today, sent herewith is a Revised Opinion (188 pages) and a Revised Award (2 pages) dated May 14, 2014.

These are to replace the Opinion and Award, dated May 8, 2014, submitted via TEACH.

The changes are:

A. In the Opinion, on page 1 - The addition of "Revised" and on page 188 - the deletion of reference to "fine", increase of suspension from thirty (30) to forty-five (45) days and change of date to May 14, 2014.

B. In the Award, the addition of "Revised", deletion of references to "fine" and change of date as May 14, 2014.

| | |
|---|---|
| 10. | 150, 151 |
| 11. | 28 |
| 12. | 166 |
| 13. | 151 |
| 14. | 152 |
| 15. | 152, 153 |
| 16. | 30, 32, 98, 99 |
| 17. | 121, 122 |
| 18. | 98, 99 |
| 19.B. | 115 |
| C. | 33, 50, 105, 106 |
| 20 | 72, 80, 81, 86, 117 |
| 21.B. | 105, 106, 118 |
| 22. | 153, 154 |
| 23. | 154, 155 |
| 24. | 50, 122 |
| 28. | 156 |
| 29. | 156, 157 |
| 30. | 122 |
| 31. | 122-125 |
| 32. | 157 |
| 33. | 157 |
| 34. | 125, 126 |
| 35. | 126, 127 |
| 36. | 99 |
| 38. | 158 |
| 39. | 158, 159 |
| 40. | 159 |
| 41. | 159 |
| 42. | 159, 160 |
| 46. | 127, 128 |
| 48. | 132 |

| UFT # | | Pages |
|---|---|---|
| R1. | | 23 |
| R6. | | 115 |
| R7. | | 114 |
| R11. | | 106 |
| R12. | | 64, 81, 83 |
| R13. | | 88 |
| R14. | | 16 |
| R16. | | 30, 32 |
| R20. | | 72, 117 |
| R21. | | 118 |
| R22. | | 87 |
| R30.A. | | 182 |
| B. | | 182 |
| C. | | 182 |
| D. | | 182 |
| E. | | 183 |
| F. | | 183 |
| H. | | 142, 183 |
| I. | | 183 |
| J. | | 183 |
| K. | | 183 |
| R.32 | | 160, 161 |
| R33. | | 161 |
| R35. | | 161 |
| R36. | | |
| R37A. | | 162 |
| B. | | 163 |
| R39. | | 146 |
| Specifications | 6 | |
| Appointment and Background | 7 | |
| Exhibits | 8-11 | |
| Evidence | 11 | |
| A. Specification "1)" | | |
| a. | 11 | |
| b. | 20 | |
| c. | 33 | |
| d. | 72 | |
| e. | 91 | |
| B. Specification "5)" | 98 | |
| C. Specification "6)" | 105 | |
| D. Specification "7)" | 109 | |
| E. Specification "8)" | 120 | |
| F. Specification "9)" | 126 | |

G.      Specification "10)"
        a.                                      150
        b.                                      166
        c.                                      166
Discussion                                      167
Comments, Conclusions and Findings             171
A.      Specification 1a                        171
B.      Specification 1b                        171, 172
C.      Specification 1c                        172, 173
D.      Specification 1d                        173, 174
E.      Specification 1e                        174, 175
F.      Specification 5                         175-177
G.      Specification 6                         177, 178
H.      Specification 7                         178
I.      Specification 8                         178, 179
J.      Specification 9                         179-181
K.      Specification 10a                       181, 182
L.      Specification 10b                       182, 183
M.      Specification 10c                       183

Summary of Findings                            183-188
Disciplinary Penalty                           188

**SPECIFICATIONS**

**INTRODUCTION**

The New York City Department of education brings this action, pursuant to Education law §3020-a, against Ann Legra, for her failures in the nature of incompetent and inefficient service, neglect of duty, insubordination, unwillingness and/or inability to follow procedures and carry out normal duties, and engaging in misconduct, during the...2011-2012 and 2012-2013 school years. Ann Legra (hereinafter referred to as the "Respondent") under file number 2201183...entered the New York City Department of Education in 1990. Respondent is a tenured teacher assigned to PS 173, located at 306 For Washington Avenue, New York, New York within District 6, and holds a "Common Branches Pre K-6" license.

1) During the 2011-2012, and 2012-2013 academic years, Respondent failed to properly, adequately and/or effectively plan and/or execute lessons, as observed on each of the following dates.

   a. May 9, 2012;
   b. November 30, 2012;
   c. February 1, 2013;
   d. March 21, 2013; and
   e. June 4, 2013.

   (At the Pre-Hearing Conference counsel for the Parties agreed to delete referenced to the 2010-2011 academic year, numbers 2, 3 and 4.)

5) Respondent demonstrated a lack of professionalism and/or neglected her duties, in that she failed to timely, completely and/or properly conduct and/or maintain running records, as referenced in letter dated June 22, 2012.

6) Respondent demonstrated a lack of professional fitness, neglected her duties, and/or used poor judgment, in that Respondent failed to timely, properly, adequately and/or effectively supervise students in her charge during the 2012-2013 academic year.

7) Respondent demonstrated a lack of professionalism and/or neglected her duties in that she failed to timely, properly, adequately, and/or effectively plan and/or submit lesson plans during the 2012-2013 academic year.

8) Respondent demonstrated a lack of professionalism and/or neglected her duties, in that she failed to timely, completely and/or properly display and/or update her classroom environment during the 2012-2013 academic year.

9) Respondent was excessively late and/or absent during the 2012-2013 academic year.

10) During the...2011-2012 and 2012-2013 academic years, Respondent failed to attend and/or accept professional development and assistance meetings with supervisors, and/or accept and/or heed advice, counsel, instruction, remedial professional development and/or recommendations regarding:

   a. The elements of effective lesson planning/execution.
   b. Classroom management; and
   c. Production/maintenance of required records/documents.

THE FOREGOING CONSTITUTES:

1. Just cause for disciplinary action under Education Law §3020-a;
2. Insubordination;
3. Incompetence and/or inefficient service;
4. Conduct prejudicial to the good order, efficiency or discipline of the service;
5. Conduct unbecoming Respondent's position or conduct prejudicial to the good order, efficiency, or discipline of the service;
6. Substantial cause rendering Respondent unfit to properly perform obligations to the service;
7. Misconduct;
8. Neglect of duty; and
9. Just cause for termination.

DATED: October 9, 2013

**APPOINTMENT AND BACKGROUND**

On November 12, 2013 I was appointed as the Hearing Officer for this case.

At the Pre-Hearing, in person, conference, on November 26, 2013 Counsel for DOE consented to the motion of UFT Counsel to dismiss references related to the 2010-2011 academic year. This resulted in deletion of specifications 2, 3 and 4 and a reference in number 10, thereto.

During the hearing the following Exhibits were submitted and accepted into evidence.

**EXHIBITS**

**JOINT**

1. Agreement between The Board of Education of the City School District of the City of New York, and United Federation of Teachers Local 2, American Federation of Teachers, AFL-CIO, covering Teachers – October 13, 2007 – October 31, 2009, including Appendices A through L, (166 pages), (Collective Bargaining Agreement, or "CBA").
2. June 27, 2008 letter to Chancellor Joel I. Klein from President of UFT, Randi Weingarten (5 pages).
3. April 15, 2010 letter to Michael Mulgrew, President of UFT, from Chancellor Joel I. Klein (8 pages).

**DOE**

1. Specifications, dated October 9, 2013 (3 pages).
2. Bill of Particulars, dated October 9, 2013 (5 pages).
3. June 21, 2012 Observation (on May 9, 2012) by Principal Dawn J. Boursiquot (3).
4. June 22, 2012 Annual Professional Performance Review and Report, for period 9/6/2011 to 6/30/2012 by Principal Dawn J. Boursiquot (2 pages).
5. December 17, 2012 Observation (on November 30, 2012) by Principal Dawn J. Boursiquot, with Receipt (4 pages).
6. June 21, 2013 Observation (on June 4, 2013) by Principal Dawn J. Boursiquot and Assistant Principal Kevin Goodman (5 pages).
7. June 17, 2013 letter to Respondent from Principal Dawn J. Boursiquot, with ten pages of attachments (12 pages).
8. June 21, 2013 Annual Professional Performance Review and Report, for period 9/4/2012 to 6/30/2013, by Principal Dawn J. Boursiquot (2 pages).
9. September 5, 2012 agenda for Faculty Meeting, with attendance sheet (2 pages).
10. February 7, 2013 letter to Classroom Teachers from Principal Dawn J. Boursiquot, with Receipt (2 pages).
12. November 18, 2011 letter to Teachers re: Portfolio Components from Assistant Principal Kevin Goodman (and others) (2 pages).
13. February 2012 memo to Respondent from Principal Dawn J. Boursiquot.
14. October 19, 2012 Agenda for Grade 1 Math Meeting.
15. January 17, 2013 memo to Respondent regarding visit.
16. Package of "The Week Ahead" memo's to PS 173 Community, from 9/11/2011 – 6/12/2012 (70 pages).
17. January 25, 2012 e-mail from Assistant Principal Kevin Goodman to Respondent (2 pages).
18. June 22, 2012 letter from Assistant Principal Kevin Goodman to Respondent.

19.A. February 1, 2013 letter to Respondent from Assistant Principal Kevin Goodman.
  B. February 4, 2013 e-mail to Respondent from Assistant Principal Kevin Goodman.
  C. Observation of 2/1/2013 by Assistant Principal Kevin Goodman (5 pages).

20. April 10, 2013 Observation of 3/21/2013 by Assistant Principal Kevin Goodman (4 pages).

21.A.    January 15, 2013 letter to Respondent from Assistant Principal Kevin Goodman.

B.    January 22, 2013 letter to Respondent from Assistant Principal Kevin Goodman.

22.    September 22, 2011 e-mail to Respondent (and others) from Assistant Principal Kevin Goodman (2 pages).

23.    September 28, 2011 time period sheets (log) to Respondent.

24.    November 8, 2011 Class Environment Checklist draft.

28.    May 7, 2012 letter to K-2 Teachers from Assistant Principal Kevin Goodman.

29.    October 2012 letter to Teachers from Assistant Principal Kevin Goodman.

30.    November 6, 2012 schedule and attendance sheet (2 pages).

31.    November 13, 2012 letter to Faculty and Staff from Assistant Principal Kevin Goodman (3 pages).

32.    December 14, 2012 letter to Respondent from Assistant Principal Kevin Goodman.

33.    January 17, 2013 agenda and attendance sheet for Grade 1 meeting.

34.    February 11, 2013 e-mail to Respondent from Assistant Principal Kevin Goodman (2 pages).

35.    May 23, 2013 Grade 1 Agenda with attendance sheet (2 pages).

36.    Undated "Big Ideas to Hold on to...".

38.    October 10, 2012 Planning meeting notes.

39.    January 31, 2013 Agenda for 1st Grade Literacy meeting.

40.    January 17, 2013 Notes (2 pages).

41.    February 12, 2013 Notes (2 pages).

42.    February 2013 Demo lesson report.

44.    November 9, 2012 Record Receipt Confirmation.

45.    October 23, 2013 copy of Records Receipt Confirmation.

46.    May 7, 2013 e-mail to Respondent from Office of Assessment.

47.    9/5/2000 Summary of Changes to Regulation, #C-601 (9 pages).

48.    May 8, 2013 e-mail to Principal Dawn J. Boursiquot from Viv Ellis.

**UFT**

R1.    September 13, 2010 The Week Ahead to Staff (3 pages).

R3.    December 2, 2011 Kindergarten Component list.

R4.    February 6, 2012 revised assessment schedule to all Kindergarten Teachers from Tania Serratty.

R5.    February 13, 2013 e-mail from Respondent to Assistant Principal Kevin Goodman and February 11, 2013 e-mail from Assistant Principal Kevin Goodman to Respondent.

R6.    February 4, 2013 e-mail from Respondent to Assistant Principal Kevin Goodman and January 18, 2013 e-mail from Assistant Principal Kevin Goodman to Respondent.

R7.    February 9, 2013 e-mail from Respondent to Assistant Principal Kevin Goodman and January 18, 2013 e-mail from Assistant Principal Kevin Goodman to Respondent [same as in R6.].

R8.    June 14, 2013 e-mail from Principal Dawn J. Boursiquot to Assistant Principal Kevin Goodman and June 13, 2013 e-mail from Respondent to Principal Dawn J. Boursiquot (2 pages).

R9.    December 16, 2012 e-mail from Principal Dawn J. Boursiquot to Respondent and December 14, 2012 e-mail from Respondent to Principal Dawn J. Boursiquot.

R10.    November 12, 2012 e-mail from Respondent to Principal Dawn J. Boursiquot.

R11.   January 22, 2013 letter to Assistant Principal Kevin Goodman from Respondent.

R12.   April 11, 2013 e-mails to Assistant Principal Kevin Goodman from Respondent (2 pages).

R13.   2012-2013 School Survey Report (15 pages).

R14.   May 5, 2012 e-mail from Assistant Principal Kevin Goodman to Monique Knight.

R15.   February 4, 2013 e-mail from Respondent to Assistant Principal Kevin Goodman and January 18, 2013 e-mail from Assistant Principal Kevin Goodman to Respondent.

R16.   February 4, 2013 e-mail from Respondent to Mayra Cruz.

R17.   Kindergarten Data Report (2 pages).

R19.   January 18, 2013 letter from Assistant Principal Kevin Goodman and Respondent.

R20.   Comprehensive Inquiry Report for Jayleen, dated March 18 and 20, 2013 by Respondent (2 pages).

R21    Comprehensive Inquiry Report for Respondent, dated March 20, 2013 by Respondent (3 pages).

R22.   May 20, 2013 letter to Principal Dawn J. Boursiquot from Respondent (2 pages).

R23.   Comprehensive Injury Report for Respondent, dated May 21, 2013 by Respondent (2 pages).

R24.   Running Record Placement Chart of Respondent.

R25.   Sight Word Placement Chart of Respondent – March, April and May, 2013.

R26.   December 2012 Sight Word Placement Chart of Respondent.

R27.   December 2012 Running Record Placement Chart of Respondent.

R28.   First Grade Performance Assessment Data of Four Tables (4 pages).

R29.   June 2013 Class Profile of Respondent (2 pages).

R30.A.   January 8, 2013 Absence Request of Respondent with rejection by Principal Dawn J. Boursiquot.

B.   January 22, 2013 Absence Request of Respondent with rejection by Principal Dawn J. Boursiquot.

C.   January 28, 2013 Medical letter from Ana Guerra, M.D. (Manhattan Physicians Group) for Respondent.

D.   February 21, 2013 Medical note from (illegible) for a doctor's appointment, (Manhattan Physicians Group).

E.   Summons of Jose Morel for February 28, 2013 appearance before Support Magistrate in Family Court.

F.   March 1, 2013 Medical note from (illegible) for a nurse visit (Manhattan Physicians Group) for Respondent.

H.   May 6, 2013 e-mail from Office of Assessment to Respondent regarding attendance at ELA Section B.

I.   May 14, 2013 Medical letter from Tamara Pinkhasova, M.D. (Manhattan Physicians Group) for Respondent.

J.   Summons of Jose Nelson Morel for June 3, 2013 appearance before Support Magistrate in Family Court.

K.   June 12, 2013 Medical note from Trisha Samuel, R.N. coordinator (Manhattan Physicians Group) for Respondent.

R31.   June 3, 2013 Mathematics Workshop outline of Respondent (2 pages).

R32.   May 9, 2012 Reader's Workshop outline of Respondent (3 pages).

R33.   February 1, 2013 letter from Assistant Principal Kevin Goodman to Respondent.

R34.   Amended February 4, 2013 letter from Assistant Principal Kevin Goodman to Respondent.

R35.   April 12, 2013 e-mail from Principal Dawn J. Boursiquot to Respondent.

R36.    On My Own questions.

R37.A.    Monday, May 20 and Tuesday, May 21 handwritten lesson plans (4 pages).

B.    May 2013 and June 2013 First Grade calendar sheets (2 pages).

R39.    June 18, 2013 e-mail to Principal Dawn J. Boursiquot from Respondent.

R42.A.    March 7, 2013 e-mail to Respondent from Office of Assessment regarding Scoring Session A – ELA on April 22-23, April 29 – May 1.

B.    March 7, 2013 e-mail to Respondent from Office of Assessment regarding Scoring Sessions B-ELA on May 2-May 3, May 6-May 8.

As reflected, on the first page, both parties were represented by counsel in this proceeding. They had a full and fair opportunity to offer documentary and testimonial evidence, cross-examine witnesses, argue their respective positions, as well as submit court, arbitral and hearing officer decisions, opinions and awards.

The foregoing have been fully considered in the preparation and issuance of this opinion and award.

The DOE called as witnesses:  Dawn Boursiquot, Principal; Tania Serratty, Math Coach; Kevin Goodman, Assistant Principal; Nilda Francisco, Literacy Coach; Marc Bush, Director New York State Assessment; and Yris Vargas, School Secretary.

The UFT called as witnesses:  Jose A. Rodriguez, UFT Chapter Leader and ESL teacher; and Respondent, Ann Legra.

The closing arguments of Counsel were presented on March 5, 2014 and are reflected in the Transcript for that hearing day, ending with Page 1902.

## EVIDENCE

A.    The DOE's evidence relating to the five observations in Specification "1)" [page 6, above], are:

a.    May 9, 2012 - DOE 3 an Observation of a kindergarten class and testimony of Principal Boursiquot in support.

The Principal testified her "first" concern "was her ability to manage the classroom and to assure that the children were safe," and her second concern "was her instructional practices inside the classroom" [T55.L24 and T56.L2]. She testified that the areas of concern of student safety, classroom environment and instruction were not stated in any priority of order [T305.L11]. This was illustrated by her "lack of planning, to delivery coherent instructions to students" [T58.L23] and "an instance where she did not, was unable to provide a lesson plan" [T59.L17] which needed "to be in writing" [T60.L7].

Referencing her Observation (DOE 3) she also testified "The teacher had not assigned partners to children and it took away time from instruction" [T106.L10].

> Well, one thing was that, you know, there was no partners, you know, and that's really [T116.L24]. Because during every workshop model, instructions, instructional piece, there is going to be an opportunity where the children are going to be asked to turn and talk to their partner to discuss certain questions that might be posed, okay? So that was one big indicator, that was one thing that I noted [T116.L24, T117.L2].

"The plan that she submitted, right, indicated that it would be a shared reading" [T108.L2] "the children all have to have a copy of the book, which they did not" [L7], it could be "only one copy of the book" [L21], "there was confusion about the distinction between read aloud, a guided reading and a shared reading" [T111.L9]. and "this was something that I certainly would not have expected" [L17].

The Observation (DOE 3) included, on page 2

> Then you gather 5 students at the rug and take a small 6"X6" Xeroxed book and hold it up to do, what appears to be a read-aloud or perhaps guided reading. Not all of the students had a copy of the *book.* The readers you were with are level B readers. Your lesson plan indicated Shared Reading.

The Principal testified "Level B readers are readers who are not really decoding words, all right. Their strategy for figuring out words is mostly based on memory and because the books have a lot of repetition" [T112.L24, T113.L2]

The Principal testified:

> ...it would certainly have an adverse impact if done improperly, if you're not providing strategies or directing children properly in a guided reading, they're not going to move up in reading levels. If they're not matched up with the correct books, they're not going to go up in reading levels. And if you're just reading a book to them aloud with no, you know, in the name of doing a read aloud with no strategy or skill identified, then it's almost for no purpose, other than just hearing a story. [T112.L6]
>
> ...I could not identify where children were learning, when they were set off to do, they didn't seem to know what they were supposed to do. And those factors helped me make a decision that there was no teaching really happening and it was unsatisfactory teaching with what was done...
>
> That there was no learning really happening in that classroom. The children were already familiar with a story. They didn't really know what they had to do. And I don't know the value of what Ms. Legra was doing with the children. [T121.L6, 17]

The Principal testified she "first became concerned about Ms. Legra's performance...(f)rom the very beginning of the school year" [T214.L11] and the "formal observation...was conducted May 9th...the written report was...completed on June 21st...(and) presented...June 25th" [T215.L6, 16, 20] "essentially the end of the school year". [T216.L12]

The Principal testified during cross examination: that her "main concern about Ms. Legra was her ability to manage her classroom and insure children were safe" [T203.L4]...she did not issue any letters covered in these proceedings that had anything to do with what was going on in her classroom [T205.L6, 12, 17]...her "classroom wasn't always unsafe [T206.L17]

The Principal's testimony on cross examination also included

233

Q. You also talked about the children's behavior in the class that day. You said essentially there was some commotion and confusion with the students. Correct?
A. Yes.
Q. And you also said that Ann, excuse me, Ms. Legra made attempts to try to quiet the children down.
A. Yes.
Q. And but the children who are kindergarteners didn't listen to her immediately, correct?
A. Correct
Q. Do kindergarteners always become quiet immediately when they're told to quiet down?
A. Usually in our school, yes. Yes.
Q. Usually they immediately quiet down?
A. Yes.
Q. Is there-
A. [Interposing] Because-

234

Q. -never a chance that the children may take a couple of times to get them to quiet down?
A. By May of kindergarten, the children have routines in place and they have a relationship with their teacher, that they know that when the teacher is speaking, they've got to calm down.
Q. So it never happens. It never happens that the children always calm down and quiet down when their teacher tells them to.
A. I'm sorry, is that a question? I mean, can you repeat that?
Q. I'm asking, so you're saying that it never happens, that children don't quiet down immediately.
A. I didn't say it never happens.
Q. So it's possible that this happens often.
A. No, it's not. It's possible that it could happen. It doesn't-it's not possible that it happens often. By May in most classrooms, in kindergarten, in this school, the-in my school, the children know that when they're at a certain area and they're receiving instruction, they're listening to

their teacher.

235

Q. But even the best teacher may have to tell their children to quiet down more than once. Isn't that correct?
A. That's true, yes.
Q. So it's not automatic that someone doesn't have control over their classroom if the children don't quiet down immediately.
A. No, that's not-no. Okay.
Q. You also stated that because it wasn't an airtight lesson by Ms. Legra, that that's what caused the students to misbehave, correct?
A. That's part of it, yes.
Q. Even with an airtight lesson by the greatest teacher that's ever existed, is it possible that kindergarteners still would misbehave?
A. It is possible. It is possible

248

Q. And you also stated that the students didn't have assigned partners, correct?
A. Correct.
Q. Do students always do everything with their assigned partner?
A. No, but they all-all students have assigned partners in the classrooms in our school.
Q. So it's possible that these students had assigned partners.
A. There was no evidence that the children had assigned partners.
Q. But Ms. Legra's assignment to them was to partner up, not go to their assigned partner, correct?
A. And that creates chaos in the classroom, because they didn't know who their partner was, which was what I stated before.
Q. But does that mean that they didn't have assigned partners?
A. Exactly.
THE HEARING OFFICER: Do I gather you, you're not talking about the first line on the second page. And it's your comment about Ms. Legra, she said to the students, "go back to your seats and work with

249

a partner and try to figure out what your characters are thinking." That's the reference you're talking about, that's where the partner comes in. And you're taking that to mean they should have had an assigned partner and should have worked with the partner. So I gather that's your reading of-
THE WITNESS: [Interposing] No, there's two different instances here where we're talking about partners. One is that when they were at the rug and she was handing out the bubble sticks-
THE HEARING OFFICER: [Interposing] Right.
THE WITNESS: -or whatever. And then one when they went back to their seats. Partners usually are at the same table.
THE HEARING OFFICER: And so to you the phrase "partner" means the prior assigned partner, as opposed to what counsel seems to be asking, go work with "a partner," not necessarily "the partner." Am I understanding the difference that you're making here?
MR. DEL PIANO: Yes.
THE HEARING OFFICER: Okay, all right. Thank you.

On May 5, 2012 Assistant Principal Goodman stated in an e-mail:

> The week following your visit on the 30" was eventful, with some K teachers *finally* being called out for neglecting their professional obligations. The "crackdown" will continue this week [R14].

This Exhibit was admitted over objection by DOE [T1057-1067]. The record contains no rebuttal to it and I consider the contents accurate.

Counsel for Respondent argued

1819

...that the observation occurred four days after Respondent's Exhibit 14, when they decided that there was going to be a crackdown. Clearly there was a predisposition to find that Ms. Legra wouldn't do a good job on this lesson.

Counsel for the DOE argued

1874

...Now
the crackdown on teachers that is noted in

1875

Respondent's Exhibit 14, I believe, number one, Mr. Goodman was never asked on cross-examination about that email. Number two, the email states that he is going to call teachers out for their professional--for neglecting their professional duties. That is his job as a supervisor.

Respondent's testimony on direct examination included

1131

Q. I want to turn your attention to partners in your classroom. What if any requirement is there for students to have assigned partners in your classroom?
A. There are various ways that you can use partners, especially during the literacy block. Partners will do various types of reading. They can do an echo reading. They can do a teacher reading. There are various ways to develop literacy skills.
Q. What if any rules are there at PS 173 about having an assigned partner for the school year?
A. There aren't any.
Q. What is the ability of students in your class during the '11-'12 school year to change partners?
A. I will change them all the time.
Q. And what if anything did you do to

1132

determine which students would be partners with each other?
A. In different ways I would have to at this time-children that worked with me on a one-to-one basis were not at the level that they were expected to be according to their educational plan. So because I was getting students that were challenging I needed to place these someone that was a higher reading level for example.
Q. And when if ever would you allow students to select their own partners?
A. If for any reason they weren't getting

along, which happens, and they wanted to read with someone that maybe was their friend, I would place them with that-with that child. If I thought that they were-there would be any benefit from a partnership, maybe competitive, that I knew that they were competitive partnership, then that would happen.
Q. Do you recall that whether during this activity your students had to work with an assigned partner or if they could choose a partner?
A. During this activity they had their assigned partners. They had assigned partners.
Q. Would the students have known who

1133

their partners were ahead of time?
A. There was a chart posted, yes.
Q. Do you recall whether you had recently changed the student partnerships?
A. I don't recall.
Q. On the second page of Department's Exhibit 3 there is a sentence that states, "At the rug, the students crowd around and chaos erupts when determining partners." Do you know what this is in reference to?
A. Yes. There is always the child that's going to want to go to their friend for whatever reason, but that tends to happen a lot in lower grades. That could have been the possibility. I don't recall.
Q. Do you recall whether there was chaos erupting at this time?
A. Chaos is a very strong word. No, there wasn't chaos.
Q. What was happening during this time period?
A. Well, children had to go back to their seats to work with a partner in order to look at the expressions, the pictures, to try to figure out and

1134

talk amongst each other what their character in their books were thinking.
Q. And what purpose, if any, did you have for having the students do this task with a partner?
A. Well, if there was an error a correction would occur. And they also had the

opportunity to talk about what they were supposed to-what the task was.

1138

Q. Do you recall what other students in the classroom were supposed to be doing during this time?
A. During-well, they were working with partners.
Q. What if anything would you have done to discipline students walking around the room?
A. Well, I would have given them warnings. The first, second, three strikes you're out. I don't think anyone would have been walking around the room at this time.
Q. Looking at the paragraph while you were at the carpet, Ms. Boursiquot had written that students were off task and roaming around the room, Talking and noisy. What is your recollection of what

1139

the students were doing during this time period?
A. The students were working with their partner.
Q. Do you recall whether they were roaming around the room?
A. No, they were not.
Q. Looking at the second bullet point in the area instruction for improvement, it references professional development that you had received during the-well, it just references professional development that you had received. Do you recall whether you had any one-on-one professional development during the 2011-2012 school year?
A. Yes.
Q. And what do you recall?
A. I recall that after a grade meeting with Monique she went into my classroom during an-after lunch, when it was not literacy time. She went in after lunch and showed me how to conduct notes on a particular student.

1140

A. Well, you keep certain records on their literacy of where the child is, a deficient skill that you noticed, and what your next steps would

be in correcting that skill while you're working with that student or that group.
Q. Do you recall whether you had any individual professional development in the area of classroom management during the 2011-2012 school year?
A. No.
Q. No you don't recall or no-
A. [Interposing] no, I do not.
Q. The last sentence of that bullet point states, "I will arrange for more professional development in the area of classroom management." Do you recall whether you received any professional development in the area of classroom management from May 9th, 2012, through the end of the year?
A. No, I do not.

b. November 30, 2012 -- DOE 5, an Observation of a first grade class, and the testimony of Principal Boursiquot were submitted in support.

Principal Boursiquot testified: She removed one student who might interrupt the lesson from the class [T127.L7, 22] "to give Ms. Legra every opportunity to demonstrate...her teaching" [T129.L21]; she entered the classroom during the second period during "what should have been the reader's workshop" [T133.L10], it took "an extraordinary long time for the materials to be distributed" [T135.L5]; she did not "Think that Ms. Legra really had a plan to use that book for this lesson...she was not fully prepared for this lesson" [T136.L10, 19]; she "showed a lack of familiarity with the book that she was using to provide this instruction." [T137.L6]; books were not "leveled" [T138.L25]; "children" ...would not be able to complete the task or read the book" [T139.L2, 4]; "there was no routine" [T139.L12]; "it certainly took time, but it also compromised the safety of the children because they're all crowded around, sitting on a carpet and all on the floor like that. So that was not a good thing to have happen" [T139.L21]; "She was just kind of standing there, not really doing anything too much [T140.L20]; she did not "think it was enough planning to make it a seamless lesson and to manage the activities, the various moving and transitions

[T142.L22]; based upon "observation of the children, the time where nothing was being done, the idle time or 'down time' as they say" [T143.L2]; she did not "have a lesson plan for this lesson" [T143.L11]; "the flow of the day"...did not match the plan" [T147.L3]; there were no non-fiction books in their baggies [T148.L21]; and "A lot of the books didn't have the glossary or in the back of the books for them to refer to" [L149.L7];

The Principal testified

150

Q. In the next paragraph, you write, "Your classroom environment overall lacks order and is void of routines and the instructional supports that are required." What led you to the opinion that the overall classroom environment lacks order?
A. There were areas where there were piles of paper. There was a kidney table there or a kidney is the shape of the table, that had just stacks of paper. It was disorderly. It was-and there were no charts hanging, which I said before, or any kind of instructional tools for children, if you look around the room.
Q. Okay. And what led you to believe that the classroom was void of routines?
A. Just the behavior of the children, yes

151

was enough to tell me that.

154

Q. Now in the last sentence in this observation report, you rated the lesson unsatisfactory?
A. Yes.
Q. Can you tell us why you gave this lesson an unsatisfactory rating?
A. Because the teaching point was not made, was not met. And there were many parts of the lesson and-which I take into consideration classroom environment, learning, supports and everything, just all taken into account that it was unsatisfactory. The children were not able to do what they were asked

155

to do.
Q. Okay. Now based on your opinion, or based on your experience, do you have an opinion as to how much learning took place during the lesson that you observed on November 30th?
A. I think well, really none, very little to none, no.

At the start of the 2012-2013 school year Respondent was assigned to a pre-K class. In early October, over a weekend, referenced in a letter dated October 4, 2012 (not in evidence) she was assigned into a first grade class. [see T243.L10]

A formal Observation was held November 30, 2012 (DOE 5).

Counsel for Respondent argues "I posit that this lesson is also tainted by the fact that Ms. Boursiquot was predisposed to find that Ms. Legra wouldn't do a good job on this lesson" [T1820.L7].

The record reflects that in cross examination the Principal testified

264

Q. The other day we were talking about routines in Ms. Legra's first grade classroom. Is it

265

your position that Ms. Legra failed to establish routines in her first grade class?
A. Yes.
Q. And just to reflect back, she took over this class on October 4th, 2012?
A. Correct

265

Q. When Ms. Legra started teaching the first grade class in October of 2012, did that provide her with enough time to establish routines in her class?
A. Yeah, she was given an opportunity to establish routines in the class.
Q. And also that there wasn't a-was there a significant amount of school missed because of

vacations during that time period?

266

A. During?
Q. From the beginning of the 2012-2013 school year to when she took over the class.
A. In September, yes.
Q. There were vacations related to the, I'm assuming the Jewish holidays.
A. Yes I believe so.

273

Q. (Referencing R1) Ms. Boursiquot, could you please read the sentence starting on the fifth line in the paragraph that begins with "Extended day." The sentence begins with, "The first" and read until the end of the paragraph?
A. "The first weeks of the school year provide a valuable opportunity for setting expectations that if executed well, will pay huge dividends throughout the course of the school year."
Q. That would include the establishment of routines in the classroom?
A. Yes, and provided that a person is assigned to a classroom at the beginning of a school year.
Q. So if a person is not assigned to a classroom at the beginning of the school year, does that put them at a disadvantage?

274

A. Absolutely not, because I would afford that person an opportunity to establish routines that were not set, you know, in September. So it starts when you start.
Q. So there's no, you're saying that there is no disadvantage for someone who doesn't start at the beginning of the school year with the students?
A. With regard to?
Q. Setting up routines in their classroom?
A. Yeah, I think teachers are given an opportunity, no matter when they start, to set up routines.

282

Q. During the 2012-2013 school year, when did you first become concerned about Ms. Legra's classroom environment?
A. I would say shortly after she took over the first grade class.
Q. In terms of classroom environment is that limited to the arrangement of desks and school charts related to curriculum and items of that nature?

283

I that what you-
A. [Interposing] That's included, yes.
Q. What else would you refer to in terms of school and or excuse me, classroom environment?
A. Tidiness of the classroom, making certain that there are like designated library area. There's technology in classrooms, as I mentioned earlier, so that the computers are accessible for children for use, that the materials are neatly maintained, that there are portfolios for literacy and mathematics in a designated area and available for viewing. And that children are grouped. I-children are grouped to facilitate workshop model of instruction.
Q. And do you recall when Ms. Legra met with Ms. Zenos [phonetic] to work on Ms. Legra's classroom environment?
A. The exact date I cannot recall.
Q. Do you recall when you assigned Ms. Zenos to work on, to work together with Ms. Legra about her classroom environment?
A. I believe it was mentioned in one of the reports, that that would be something as a next step.

284

Q. And at that time, on June 21st, 2013, you stated that you would assign Ms. Zenos to work with Ms. Legra for the purpose of addressing the

285

issues that exist with her classroom environment.
A. Correct.
Q. And again, just to restate, that was at the end of the school year for the 2012-2013 school

year?
A. It was in June.
Q. And you said that you had reservations about Ms. Legra's classroom environment all the way back in October of 2012?
A. Yes.
Q. Is there a reason for the delay between October of 2012 and when you were planning to assign someone to help her with her classroom environment?
A. No, she received help before then and it was-and she was called-noted, she was told that there was issues with the classroom environment in previous meetings that I've had with her. And the thing is that it would get straightened up and then it would unravel to a point where it became messy.

287

Q. Approximately how much time in the school year remained after June 4th, 2013?
A. Approximately 20 calendar days.
Q. And how many of those days would include instruction?
A. I can't recall exactly.
Q. And how many school days are there in the entire year?
A. 18, approximately.

290

Q. With respect to the Department's Exhibit 5, which is the observation report dated December 17th, 2012, during that observation, post-

291

observation conference Ms. Legra became upset, you stated.
A. Yes I did.
Q. And Ms. Legra said something to the effect of, "since you've been here, it's always unsatisfactory." Correct?
A. Correct.
Q. And that was with regard to her ratings? Is it your understanding that that was in regard to your rating of her performance?
A. For an observation?
Q. Correct.

A. I would assume that's what she was--
Q. [Interposing] Okay.
A. --referring to.
Q. Were you surprised by Ms. Legra's comment?
A. I was surprised by Ms. Legra's arm movement and invisible anger when she said it in response to a question that I typically asked teachers when asked, "How do you think it went?"
Q. Had you ever had any prior conflict with Ms. Legra?
[Pause]

292

A. Yes.
Q. Ms. Legra has filed several grievances against you, correct?
A. From my recollection, yes.
Q. And she also filed a Civil Rights complaint against you at some point, correct?
A. An OEO complaint.
Q. And for the record, what's OEO?
A. The Office of Equal Opportunity, I believe.
Q. Is that--that's a New York City office?
A. I believe it's an office, but then it was an office within the Department of Education.
Q. Excuse me, that's--
A. [Interposing] IT's the OEO Office.
Q. --what I meant, that's--
A. [Interposing] Okay.
Q. It's a New York City Department of Education--
A. [Interposing] Office.
Q. --Office, okay. Do you recall when the most recent grievance was?
A. I'm not sure. I was thinking about

293

that. I'm trying to recall, and I'm having difficulty recalling the most recent one, okay? Maybe there was one this year.
Q. Was there a grievance hearing--
A. [Interposing] But I'm saying--
Q. --on September 18th--

A. [Interposing] Yes.
Q. --of 2013?
A. Yes, that's the one.
Q. And just to reflect, these charges were brought on October 9th, 2013? Correct?
A. Yes.
Q. Has the New York State Public Employment Relations Board ever found you guilty for retaliating against an employee for using the grievance procedure?
A. No.
Q. Are you familiar with a person named Jose Rodriguez (phonetic]?
A. Yes I am.
Q. And did Mr. Rodriguez ever file complaints against you for retaliation with the New York State Public Employment Relations Board?
A. Yes.

294

Q. And on February of 2013, were you found to have discriminated against Mr. Rodriguez for utilizing the grievance procedures?
A. Me specifically?
Q. Yes.
A. That's in appeal and it's been reopened and it's not--
Q. [Interposing] But in February 2013, were you found guilty of doing that?
A. Was I found guilty? I don't even quite know how to answer that. Based on a decision that I received it didn't appear that I was guilty necessarily specifically, of being, what is it? Retaliation?
Q. Correct. Was PS 173 found guilty of retaliating against Mr. Rodriguez for utilizing the grievance procedure?
A. Again, I don't know if that was the determination, without having that document in front of me.

295

MR. DEL PIANO: Please let the record reflect that I have shown Department's counsel what has been...marked as Respondent's Exhibit 2. (for 1D) Please also let the record

reflect that I'm showing Ms. Boursiquot what's been marked as Respondent's Exhibit 2 (for 1D).
Q. Do you recognize that document?
A. Yes.
Q. Do you now recall your school, which you are the administrator of, and your assistant principals and yourself being found guilty of retaliating against Mr. Rodriguez for utilizing the grievance procedures?
A. If that's the language in that, I'm going to say yes.
Q. Okay.

296

THE HEARING OFFICER: Okay. It will stay as

297

ID. May I have a short description of it, at least? Is it--I assume it's a perb decision [phonetic].
MR. DEL PIANO: It is a perb decision.
THE HEARING OFFICER: Than you.

MR. DEL PIANO: It's case number U-30747. The perb ALJ was Cacavas, C-A-C-A-V-A-S.
MS. SZEKELY: C-A-C-A-V-A-S.
MR. DEL PIANO: Yeah. And the decision is dated February 5th, 2013.

On redirect examination of the Principal, she was shown DOE 11 for Identification. It related to a grievance hearing or September 18, 2013 (OLR Case Number 131418, UFT Number M52169).

Principal Borsiquot testified "there was no relationship between "the grievance and the filing of charges in this proceeding [T304.L9] and the grievance decision "was denied" [T304.L2].

The record also reflects that on redirect examination the Principal testified. [T321]

But still the--her teaching ability and her ability to follow directions for improvement, that just seemed not to change. And it was having a big impact on the students in her class. I was getting a lot of response from parents in terms of wanting their

child taken out of the class because they felt that things like homework wasn't being sent home, that she was at--the parents noted that she wasn't there a lot. She wasn't present at work a lot. It just became too much.

And then I had an opportunity over the course of six years to see how children who she may have had in her class in an earlier part, and now they're in upper grades and how they're struggling. You know, it's--I couldn't do it any longer.

On recross examination, regarding the two letters, dated June 22 and June 25, 2012, on page 2 of DOE 4, the Principal testified

323

A. ...I said that so she could reflect, my purpose was not for her to implement it next school year, it would be to implement it immediately, but to also reflect on the instructions for improvement for in looking forward to the next school year.

Q. But there really wasn't much time at all left in the 2011-2012 school year for her to actually implement those directives contained in that letter. Correct?

A. The directives contained in that letter were--needed to have immediate action. They--so I would expect them to be immediately implemented.

Q. Approximately how many days were left in the 2011-2012 school year when those letters were issued?

324

Q. But approximately how many school days would be left--

A. [Interposing] Oh.

Q. --on June 22nd, 2012?

A. For that year, I can't remember exactly, but I would say at least five to six.

Q. And--

A. [Interposing] Maybe five.

Q. And possibly at the most seven? Correct?

A. Okay.

On direct examination the Respondent testified

1169

Q. Ms. Boursiquot testified that you became belligerent at the end of this post-observation conference. What is your recollection of your--of what you did during this post-observation conference?
A. I told her that she had never said anything positive about my teaching and that she never gave any pointers that I could reference and use.
Q. What frustrations if any did you have

1170

about this post-observation conference?
A. I knew I was a target after I heard Mr. Goodman's reference to me going to the way of Ms. O'Neil.
Q. Do you--what if anything did Mr. Goodman do after making the reference of going the way of Ms. O'Neil?
A. He said he would go bye-bye and he went like this with his fingers.
Q. Can you please describe what your're--what you're doing?
A. I'm waiving my fingers in a motion of saying bye-bye.

1171

THE WITNESS: Well, I knew I was a target after Mr. Goodman told me that I would go the way of Ms. O'Neil.
THE HEARING OFFICER: The "bye-bye," right.
THE WITNESS: The "Bye-bye." And when I asked what--no, when I asked him what was that, and he just waived and he said, "bye-bye."...

Q. And what is Respondent's Exhibit 16?
A. It is an email that I--that I send to Myra Cruz.
Q. And do you know--do you recognize the date that this email was sent?
A. Yes. It was sent on Monday, February 4th.
Q. Okay.

THE HEARING OFFICER: 2013?
THE WITNESS: Yes, 2013.
Q. And in this email you stated, "Hello, Ms. Cruz, hope you are well. I'm writing regarding several incidences which occurred after Mr. Goodman said I will go the way of Ms. O'Neil, and then waived his fingers saying "Bye-bye."" Is that the--that statement, is that the conversation with Mr. Goodman that you are referencing happened after the post-observation conference that's reflected in Department's Exhibit 5?
A. Yes...

Q. For what reason, if any, did that statement make you feel that you were targeted?
A. Well, first of all, I was appalled to hear from what was supposed to be a professional person talk about one of your peers in that letter, in that fashion.
Q. And how did that make you--when Mr. Goodman waived his fingers "bye-bye," how did that

make you feel?
A. Terrible.
Q. And what effect, if any, did Mr. Goodman's actions and statements have on your ability to teach?...

A. I was really nervous every time I would see them. I didn't--I mean I lost the trust. There wasn't any trust.
Q. Subsequent to Mr. Goodman making these statements and the actions of waiving bye-bye, what did Mr. Goodman then do in relation to your class?
A. He would--I don't know if I can frequently, it was more than that, he would come and stand by the door to my classroom on numerous times. He kept sending letters, disciplinary letters, meetings in the office, notices to observations.
Q. And did you ever complain about Mr. Goodman's subsequent actions to anybody?
A. Yes.
Q. And who did you complain to?
A. I complained to my chapter leader and

I also complained to the district representative.

Respondent was shown R16, an e-mail from Respondent to Ms. Cruz "Sent: Mon 2/4/2013 7:39 p.m." which stated

> Hello Ms. Cruz,
> Hope you are well. I am writing regarding several incidences which occurred after Mr. Goodman said I will go the way of Ms. O'neil and then waved his fingers saying "bye by". I have had a total of four disciplinary meetings and letters to file. I have also had Mr. Goodman stand by my classroom door on a daily basis. He entered my room last Friday and remained for two hours. He says I fail to have lesson plans when I show him my plans. Today he ordered me to his office for a post observation conference when I have not had my pre-observation conference yet nor my observation. He claims he observed me informally on Friday and this will go in my file. When I had a stomache virus last week and had to leave early he took over my class. He asked for my plans and I left him my notebook. When I returned and asked for my plans he said he did not know what I was talking about. This has really gotten to the point that I tremble when I walk into the building. Can you please Advise me on what I should do or what office may assist me.
> Thank You,
> Ann Legra

Her testimony continued with

1175

Q. And what if anything changed about Mr. Goodman's behavior after you sent this email to Myra Cruz?
A. I don't believe anything. He just kept on the same.
Q. How often would Mr. Goodman stand outside of your room?
A. Almost daily.
Q. and what affect if any did that have on your ability to teach your class?
A. It had a great affect. I mean I would see him and I would immediately check where my plans were and make sure that he wouldn't, you know, say anything to order me to for whatever reason--I would just check that everything was in order of the plans so that he can take the plans back. It was frustrating. It was frustrating.

Counsel for Respondent argued

1820

there's no documentary evidence to show that Ms. Legra actually received any of the professional development that's listed in that observation.

c. February 1, 2013 - DOE 19C, an Informal Observation of a first grade class and the testimony of Assistant Principal Goodman were submitted in support.

Assistant Principal Kevin Goodman testified on direct examination he "conducted routine classroom visits in Ms. Legra's room...at least once a week" [T459.L15, 22].

DOE 19C is his Observation of Respondent on February 1, 2013. His testimony, related thereto included

474

A. I recall walking into Ms. Legra's classroom to see quite a few students not engaged. I recall the teacher sitting at a table during that time. I recall the teacher getting up when I entered the classroom to begin a line of questioning to the students that had to do with character work, and then I remember Ms. Legra moving the class into a, onto the rug area where the instruction in the classroom happens and teaching what I believed to be a word

475

study lesson. And I recall believing that most of what I was seeing was Ms. Legra improvising during the time that I was in the classroom.
Q. And what led you to the conclusion that Ms. Legra was improvising during the lesson?
A. Because the questions and the behaviors that observed suggested that there wasn't much planned for students at that particular point in the day.
Q. Now, can you tell us what, if anything, concerned you about this lesson?
A. The first thing that concerned me was

that the agenda for the flow of the day that was posted in the classroom for the students to use did not reflect what I observed while I was in the classroom. I again, observed students not engaged in learning. I observed a number of students that were just idle. I had concerns around the questions and the way in which the teacher was interacting with the class that was, in my opinion, trying to tie up the reading portion of the period and I had concerns with respect to the word study that I observed and the fact that it was not grounded in the curriculum that we were using for the purpose of word study at that

476

time.

Q. Okay. I just want to ask you to define a couple of terms for us. You referred to character work. Can you tell us what character work is?

A. So character work is a reading unit that allows students to understand more deeply the characters in the stories that they read and their significance in those stories and allows them to make decisions about those characters, whether it's through evidence in the text or through making inferences.

Q. And another term that you used was word study. Can you tell us what word study is?

A. Word study is just a part of the day where students have access to a deeper understanding of language that's not necessarily tied to a text so it's being able to look at words and the deconstruct them for the purpose of, you know, enhancing their understanding of those words.

Q. Now, you noted the first thing about this lesson that concerned you was that the agenda or flow of the day did not reflect what was happening in the classroom. Why did that aspect of the lesson

477

concern you?

A. Because that had been a concern of mine in past visits to Ms. Legra's classroom and that is a requirement at our school, is that the flow of the day is posted for students to use as a resource and it's used as a means of helping visitors to the

classroom understand what's supposed to be happening at that time...

Q. You also noted that one of your concerns was that you observed a number of students to be idle in the classroom?
A. Yes.
Q. Why did that concern you?
A. Because that had a previous concern during past visits to Ms. Legra's classroom and students that are idle are not engaged and are not learning.
Q. You also noted that the word study that was taking place was not--in the curriculum?
A. Yes.

478

Q. Can you explain why that was a concern to you?
A. Because Ms. Legra's planning and preparation had been a concern of mine in past visits and the idea that she was not using the mandated curriculum, the actual materials provided was of concern because that suggested that students are not getting access to the grade appropriate material.
Q. And I'd like to turn your attention to the actual observation report and in that first sentence you noted that you went into Ms. Legra's classroom on February 1st at 10 a.m. during a routine instructional walkthrough. Had you intended this routine walkthrough to result in an observation, in a written observation report?
A. No.
Q. And what was the purpose of this routine instructional walkthrough?
A. Just to try to gain access to some very general information about grade one classrooms and where they are at in the curriculum and what we can do as a school community to support those teachers and students further.
Q. Now, typically, how long do you remain

479

in a classroom when you're conducting a routine walkthrough?
A. Anywhere between three minutes and say

15 minutes.
Q. And do you recall how long you were ion (sic) Ms. Legra's classroom during this lesson?
A. I recall being there for approximately one period.
Q. And how long is the period?
A. 45 minutes.
Q. Can you tell us why you stayed in Ms. Legra's classroom for the entire period as opposed to having the brief visit that you initially intended?
A. That would allow me to see several aspects of the curriculum, not just one particular part of the day, and it would allow me to see the transition that occurred from one lesson to the next, so by spending a little more time in there it gave me a better overall picture about some of the work and certainly, the growth of the teacher.
Q. Now, in the third line from the bottom of that first paragraph you write, when I first entered the classroom it appeared that students were supposed to be reading independently. Can you tell

480

us what led you to believe that students were supposed to be reading independently?
A. I recall seeing some students with books out, independent reading books.
Q. In the next paragraph you write, the majority of the students in your class were not reading nor were they holding books. There were books scattered on top of desks and even quite a few books on the floor. Considering that it was only 10 a.m. in the morning, it was quite disturbing to see that the floor in Room 314 was such a mess, books, papers, pencils, etc., strewn under desks and chairs. Can you tell us why this time of the morning, 10 a.m., was of particular significance to you in relation to the state of the room?
A. It seemed very early in the day for the class to be, for the classroom environment to be in such disarray and it suggested that there were some events prior to my arrival to the classroom that led to scattered materials and things of that nature that's described.
Q. What time does the school day begin?
A. 8 a.m.

Q. In the next paragraph in the first

sentence you write, one student I say next to -- told me that she was reading level two books but she was holding a book labeled level I. Can you tell us why you made note of that in this observation report?

A. Because Ms. Legra had been reminded in previous observation reports about the importance of making sure that students are matched appropriately to the levels that they have been identified as reading at.

Q. And what, if anything, concerned you about the fact that this particular student was holding a book at a higher level then his particular reading level?

A. It suggested that perhaps the running record was not administered, or it was administered that it was done so incorrectly. It suggested that structures might not have been in place to allow students to shop for books or their level or that the materials were not made available to the students.

Q. And what, if any, impact would having the wrong level book have on student learning?

A. Well, for the most part, a student really needs to gain proficiency at the level they have been assessed at and so the goal is to help make

a level G reader really strong so that they can approach level H books that, you know, have a different sort of structure in some instances. There are, you know, small differences between each level that makes it a level G book or makes it a level I book.

Q. Now, eight lines down from the top of this paragraph you write, -- a student in the class who was eager to share by raising her hand -- called on. She shared and you agreed with her thinking about a book that she apparently read, although you spoke about the book as though every child in the class should be familiar with it. What led you to believe that Ms. Legra's manner of speaking suggested that every child in the class should be familiar with?

A. I recall Ms. Legra allowing the

student to share out and presenting those questions specific to that one book to the entire class as if they should have all had knowledge of it, so the questions were specific to that actual text.

Q. And do you know if this was a book that was available to all the students?

A. It was not available to all the

students.

Q. and how do you know that?

A. Because none of the students, none of the other students in the class were holding that text.

Q. What kinds of questions would you have expected to see Ms. Legra ask her students at this point in -- ?

A. Questions that were more general and that could be applied to any of the books that supported this character book and so perhaps posing questions along the lines of main character, but having to do with the students' individual books, not posing the questions to other students about the one student in the class who was prepared to share.

Q. Now, in the second line from the bottom you write that Ms. Legra stated describe him, you said one student described him as, quote, a sailor, and you quickly told that child that sailor is not a word although it appeared as though the child was -- that described this character although he was never provided this opportunity. Can you explain why it appeared to you that the student you referenced here was prepared to, as you state very --

thinking?

A. I recall him continuing to speak before the teacher interrupted or interjected.

Q. And what kind of interaction between Ms. Legra and the student would you have expected to see at this point?

A. I would have expected to see the teacher being more nurturing and I would have expected to see the teacher help that student push his thinking by allowing him to finish his thought and by perhaps posing a follow-up question that could

have gotten him closer to the answer.
Q. Now, in the last sentence here you write, it was not evident that every child was familiar with this book and you never clarified for students that that was the case. In what ways would you have expected Ms. Legra to clarify for her students whether they were all familiar with the text?
A. I would have expected her to present a question along the lines of do you remember when we read this book loud together or do you remember when we saw this text at some other point, and so to be able to remind them of the time when they had an

485

experience with that text.
Q. And what, if any, impact does not having that kind of discussion with students have on learning?
A. It doesn't permit students to walk away with a deeper understanding of what it was that they are involved in and so if they're identifying aspects of their book that have to do with the character work, this lesson or the share session that I observed did not really clarify for students what it was that they should have been able to walk away with as a result of the learning that they were involved in.
Q. In the next paragraph you write, there were no instructions for your grade one students to indicate what was going to happen next in the instructional day. Why would you have expected to see instructions for students as to what would happen next?
A. Because transitions are a priority in our school and it's just good educational practice to be able to allow students, especially grade one students, to understand that they've completed one thing and they're now about to move on to something

486

else.
Q. And can you give us an example of what type of instruction you would have expected to see?
A. I would have expected to hear something along the lines of we, class 104, we just

had an opportunity to read for 20 minutes. We're going to put our materials away now and we're going to bring ourselves to the rug area for word student when I call you by table or when I call you by group.

Q. And why would that type of instruction facilitate the lesson?

A. Because it allows students to understand what they need to gear themselves up for.

Q. In the next sentence you refer to, well, you write, students were never instructed to put their reading materials away nor were they told to fill out their reading logs, a curriculum requirement. Can you tell us what a reading log is?

A. So a reading log is a tool that students use and maintain to record the number of books that they have read over the course of a period.

Q. How long have reading logs been a curriculum requirement at P.S. 173?

487

A. As long as I've been assistant principal there.

Q. And at what point during the day are students required to fill out reading logs?

A. They complete reading logs after reading independently in class and they take those same reading logs home and use them after they read independently beyond the school day.

Q. Five lines down ion (sic) this paragraph you write, without any introduction or meaningful -- you wrote EE and EA on the white board who remembers what sound. Can you explain what type of introduction or meaningful -- you would have expected to see at this point in the lesson?

A. Teachers are generally expected to present students with a teaching point which basically states the aim of the lesson and I would have expected to see something along the lines of students will be able to identify words that contain, you know, EE and EA.

Q. And why would having a teaching point such as that have been important in this type of lesson?

A. Because it allowed students to have an

488

understanding of what they are going to learn and holds them accountable for that work.
Q. Now, the next few lines you describe an interaction that Ms. Legra had with a particular student, Ja., and you indicate 10 lines down, I'm sorry, either lines down, you went on to say in a very harsh tone, you got that Ja., did you get it Ja. Can you explain why you described Ms. Legra's tone as very harsh at this point?
A. Because I don't believe that that tone was a very effective practice in dealing with that student...

Q. Do you recall who this student, Ja. was? Do you recall what her first name is?
A. Yes.
Q. And what was that name?
A. Ja.

489

Q. And when you testified that the very harsh tone was not appropriate for this student, can you explain why you felt that that was inappropriate for this particular student, Ja.?
A. Because I knew that Ms. Legra had history of struggling to deal with Ja. and the behavior that I was observing at that point in time did not seem to warrant such a harsh tone by the teacher...

Q. And can you tell us what you remember

490

about Ja. behavior in the class?
A. I recall Ja. needing reminders at times about following directions. I recall her coming late to school often and at times having a tough time integrating into the life of the classroom once the school day was already underway.
Q. And on this day, on February 1st, do you remember what Ja. was doing during the lesson that led to this discussion that she had with Ms. Legra?
A. I recall students talking on the rug as Ms. Legra was attempting to get their attention.

Q. And when you say students talking, was Ja. one of the students that were talking?

A. Yes.

Q. Now, a couple of lines down you write you then tell students that one column of words will be written -- but you go on to use a green marker. Why did you note the difference between the marker that Ms. Legra actually used versus what she said he used?

A. Because it didn't seem to make sense. It was obvious that the two groups of words were going to be written in two different colors, but to

491

state one thing in front of impressionable first grade students and to do another seemed noteworthy.

Q. You then noted, you began calling out words randomly without referring to a word lesson or even a piece of paper. you also attempted t(sic) use the word in sentences. Can you tell us what, if anything, was significant about Ms. Legra calling out words randomly?

A. Because the word work portion of the day is a part of the day where planning and preparation is necessary and to approach a lesson that looks at a particular letter structure, it would appear as though it would be useful to have those words and sentences prepared in advance to facilitate the teaching.

Q. Now, nine lines up from the bottom you write, the students that you call on to place the words in either column should have a real understanding of this work, questioning the need for this to be such a long -- class activity. Can you tell us why does the fact that the students seemed to understand the work call the length of the activity into question?

A. Because if students in the class

492

understand EE and EA words, then it would suggest that to approach it in a whole class setting for an extended period of time is unnecessary and that more sophisticated work could have been underway.

Q. Now, you just testified that that type of activity was not necessary for a whole class

activity. Is there another type of activity in which the type of word work that Ms. Legra was engaged in would have been appropriate

A. Yes.

Q. Can you tell us what kind of activity that would be?

A. So if a teacher is observing that a handful of students or one student in the class needs support with this kind of work, that could have been addressed in a small group opportunity. It could have been addressed in a one on one opportunity. It wouldn't necessarily need to drive a whole class lesson.

Q. And at what point during a lesson would Ms. Legra have had an opportunity to have a small group activity or independent work with the student?

A. So if there was something that

students were expected to go up and do as a result of the teaching, that would have been an opportunity to facilitate that work.

Q. And six lines up from the bottom of that center large paragraph you write, you then go on to tell students that they are going to take a spelling est. I was surprised to hear this because I know that we do not use or support curriculum that requires spelling tests. What was problematic about Ms. Legra's use of a spelling test at this point in the lesson?

A. Again, it was not something that could be found in our reading or writing curriculum, nor was it something that was supported by the word student materials that were provided to first grade teachers, so it suggested that Ms. Legra was creating her own set of rules, so to speak.

Q. Would conducting a spelling test such as this ever be appropriate for a lesson?

A. There are times when a spelling assessment is appropriate.

Q. And is your opinion, was the use of the spelling test appropriate in this circumstance?

A. No.

A. Can you tell us why you believe it wouldn't be appropriate in these circumstances?

A. Because the majority of the class showed a level of proficiency with understanding he EE and the EA structure and the goal of our word student is to generally teach into strategies that are necessary to spell words correctly and the idea of giving a spelling test after the lesson did not seem to make sense.

Q. In the next paragraph you describe the words that Ms. Legra used for the test. You then write, then your cell phone went off. Is there a school policy on cell phone use ion (sic) class?

A. Teachers are reminded that cell phones need to be away during instructional time and if there is an instance where a teacher needs to communicate with somebody outside of school during instructional time, then they need to ask somebody to help intervene.

Q. You then wrote, you attempted to make the test more challenging for students, but all students were obviously struggle (sic) with the work you had already presented to them. What was your opinion of Ms. Legra's attempt here to make the test more

challenging?

A. It did not seem appropriate for the majority of students in the class.

Q. And what led you to the opinion that it was not appropriate for most of the students?

A. Because there were students that were struggling to just navigate the paper that Ms. Legra had handed out for the spelling test.

Q. Okay. Can you explain what you mean when you say that they were struggling to navigate the paper?

A. Sure. So first grade students generally get paper that has a few lines on the page and students were using loose leaf paper which is more representative of what upper grad students would use for writing.

Q. And in what ways were the first grade students that you observed having difficulty navigating this loose leaf paper?

A. Just in terms of getting there, their name on the paper. Ms. Legra was moving quickly. She was reading the words and the number that corresponded with the word very quickly making it tough for the first graders to follow along.

Q. Now, turning to the next page which is Bates page 44, on the second line you write, what was most interesting was that a handful of students were able to write the words on the white board when you had the class on a rug, yet, most students were really struggling to tell the directions for completing the spelling test suggesting what you were -- as we improvised throughout the school day. Can you tell us why the, what you observed of the students at the white board versus completing their spelling test led you to believe that Ms. Legra was oblivious to her students' needs?

A. When the students were presented with the spelling structure on the board, the EE and the EA, and they were presented with words that fell into one of those two columns, they were able to write the words out, but when Ms. Legra was just reading the words aloud as she was administering the spelling test, those same students were struggling to follow along, keep up and ultimately write the appropriate word down on the paper suggesting the need to approach this in a different way.

Q. And what might have been a more appropriate way for Ms. Legra to approach this type

of --?

A. Perhaps by presenting students with a template that had the same letter structure, the EE and the EA, and then giving students words possibly in context and then to allow them to write those words into the appropriate column. That's one example.

Q. Now, in the next line you write, what I observed over roughly a class periods inside of Room 314 prompted me to request your lesson plans. Can you tell us why you wanted to see Ms. Legra's lesson plans after having observed her for about a period?

A. Because I felt very strongly that what

I observed was not planned for that day and that there was no lesson plan to facilitate what I observed...

Q. Mr. Goodman, looking at page 44, there is a heading titled instructions for improvement. When you testified earlier you testified that there

498

would be frequently an observation to the commendation section as well as an instruction -- section.

A. Yes.

Q. Does this observation report contain a commendation section?

A. It does not.

Q. Can you tell us why you didn't include a section on commendable aspects?

A. I was unable to identify any practices in Ms. Legra's classroom at that point that were more accelerating.

Q. Now, in this first bullet point under instructions for improvement, in the fourth line from the bottom of this section you write, you are required to manage your students and facilitate a learning environment that will allow students to thrive through reading and applying the relevant skills and strategies taught during reader's workshop. Can you tell us why you made this particular instruction to Ms. Legra?

A. It had been noted in previous observations of Ms. Legra that the independent reading piece was very important and that helping

499

students to maintain a good reading experience was critical.

Q. Now, in the second sentence of this same bullet point you write, there was no evidence of a reading mini lesson that you taught. What is a reading mini lesson?

A. So that's just a portion of the period where the teacher performs direct instruction to the students.

Q. And is a mini lesson part of a larger type of lesson?

A. So the mini lesson is part of the workshop as it's referred to, so it's the point in the workshop where the teacher is providing the direct instruction.

Q. Do you know if a reading mini lesson had taken place prior to your entering the classroom?

A. I don't know that.

Q. Now, in the next bullet point you note in the second sentence, you're referring to help your students manage their independent reading lines so that they match the books that are just right. Can you explain why you made this, gave Ms. Legra this instruction?

A. Because it had been noted in previous observations to Ms. Legra that students need to have access in the books that are on their level. Another way of saying that is that students to have access to books that are just right or a book that students can read with independence.

Q. In the next bullet point you note the agenda that Ms. Legra had in her classroom indicating a time for interactive writing and a time for a reading workshop and you write, I did not observe either of these instructional periods inside your classroom. Why would it have been important to an interactive writing portion and a reading workshop portion of Ms. Legra's lesson?

A. It would have been important to see because those were the instructional periods that were aligned with the time that I was in the classroom.

Q. In the last sentence of this bullet point you write, the fact that you had no coherent lesson plans later surfaced suggesting an inaccurate FOTD was to be expected. What are you referring to when you say FOTD?

A. Flow of the day.

Q. And what, if anything, concerned you about the fact that Ms. Legra did not have any lesson plans?

A. Because that had something that had been observed in Ms. Legra's practice in previous

years.
Q. And why is it important for a teacher to have a coherent set of lesson plans?
A. It's a contractual obligation and it is for the purpose of allowing teachers to plan their day out as it pertains to the curriculum that they are required to teach.
Q. Now, on the next page, page 45, on the third line from the top you write, aside from these questions lacking rigor, it was not clear to me what text you were referring to and why you would insist on calling on a child repeatedly who is not prepared to answer. Can you tell us what concerned you about the way in which Ms. Legra was questioning her students?
A. It was of concern because posing a question who was unable to answer, repeatedly posing that question is not going to help that student get the answer that the teacher is looking for and it's

just not aligned with satisfactory early childhood practice.
Q. Then what might have been another way for Ms. Legra to question her students in a more productive way?
A. So it would have been helpful to have questions that were aligned with what students were actually involved in. It would have been helpful to ensure that the reading that students were doing was, in fact, appropriate for the questions that the teacher was prepared to ask, and it would have been useful to think about allowing that student to be able to pass on answering the question and to perhaps look for a student that was more prepared to answer the teacher's question.
Q. In the next bullet point you write, there were no about what students were to do next and expectation as a professional classroom teacher is that you were willing and able to facilitate safe and thoughtful transitions for all students setting them up for what they were going to learn next. Can you explain why safe and thoughtful transitions are an expectation of your teachers?
A. Because we permit teachers an

503

opportunity in the beginning of the school year for when they are taking the class over to invest time in those structures for transitions, so it's important for teachers and students to be clear about how they are going to move on from one activity to the next and it's important to help facilitate the learning and it's also important to ensure that students are safe inside of their classroom.

Q. In the next bullet point you write, considering your flow of the day was not accurate, it was not clear as to what part of your day I observed. You then go on to say that you assumed that Ms. Legra was engaged in a word study. Can you tell us what led you to the assumption that what was taking place was a word student (sic)?

A. Because looking at words and spelling structures is generally a part of the day that we align with word study.

Q. And what was your opinion of the way that Ms. Legra approached this word study?

A. Haphazardly.

Q. And why would you describe it as haphazardly?

A. Because I did not see any evidence

504

that suggested that students needed to be presented with that letter structure, that spelling structure, to identify words that fall into either of those two categories and Ms. Legra did not approach the lesson with any kind of word list or plan that would have, you know, facilitated her instruction.

Q. In that last sentence of this bullet point you write, your word study work should be fully aligned with the words their way program which appears unused, sitting in crates atop students' desks. What is the word their way program?

A. Words their way is the word study program that P.S. 173 was using prior to this year and there are student workbooks that follow the teacher guides that were presented to all grade one teachers this year.

Q. And when you say it was used prior to this year, was the words their way program in place during the 2012-2013 school year?

A. Yes, yes, that's what I meant to say.
Q. And in what way would you have expected to see Ms. Legra using the materials from that program?
A. I would have expected to see a word

study lesson that relied upon the resources and materials that were aligned with that grade appropriate work.
Q. In the next bullet point, in the second sentence you write, a quick glance around the classroom suggested that this was a developmentally inappropriate whole class activity referring to the spelling test. Can you tell us what led you to the conclusion that it was a developmentally inappropriate class activity?
A. Because the majority of the students were finding success with placing the words into either of the two columns suggesting that the whole class did not need access to the same lesson.
Q. In the next bullet point you write, your classroom environment in Room 314 fails to meet the expectations outlined in the classroom environment checklist that has been shared with teachers on several occasions. Can you tell us where this classroom environment checklist came from?
A. The classroom environment checklist was the document created by teachers, I believe the previous year.
Q. Okay. If you could take a look at

Department Exhibit 24, is department Exhibit 24 the classroom environment checklist to which you were referring?
A. Yes, it is.
Q. Thank you. You can turn back to 19C. Can you tell us what about Ms. Legra's classroom as you observed it on February 1st led you to believe that it did not meeting the expectations outlined in that checklist?
A. Just the physical condition of it was messy. There were very few to no environmental features that were aligned with the checklist that was created by teachers previously, so there was no

evidence of current units of study that were underway by way of charts, for example. There were no charts that pointed towards structures or routines in class, so something along the lines of a chart that supported students during independent reading and what the expectations are for students during that period of time, things of that nature.

Q. In the last sentence on this page you write, it is evident that you have made a conscious effort to not address anything -- of classroom environment that's been cited in past observation

reports and disciplinary letters. What led you to the conclusion that Ms. Legra had made a conscious effort not to address the classroom environment?

A. Because considering the point in the school year that it was during that observation, I felt very strongly that the classroom represented a room that the teacher was closing up on the final day of school.

Q. And prior to February 1st of 2013 what, if any, support had been made available to Ms. Legra around the subject of classroom environment?

A. The subject of classroom environment had been a constant talking point for grade level meetings that were facilitated by myself, other administrators. Classroom environment was addressed with the literacy and math coaches during their meetings with teachers and how classroom environments can support the curriculum and instruction happening inside of classrooms, and classroom environment was also a point made by our Teacher's College staff developer at the meetings that were facilitated for teachers during her time in the building.

Q. Turning to the last page of this observation report which is page 36 (sic), you write that

you rated this lesson unsatisfactory. Can you tell us why you gave his lesson an unsatisfactory rating?

A. I rated it unsatisfactory in large part due to the shortcomings that were outlined in the instructions for improvement, shortcomings that are aligned with some of the most basic requirements that are the requirements of teachers aligned with

planning and preparation, aligned with maintaining a classroom that supports student learning, that is aligned with the management of students and with the lens of the annual rating sheet that teachers are presented with and the different categories that are rated over the course of the year.

Q. You noted in this paragraph that Ms. Legra had been made aware of these matters in past observation reports, disciplinary letters and conferences. Why did you make reference to these prior documents and conferences?

A. Because it just, we were at a point where Ms. Legra was not receptive to what had been brought other attention on numerous occasions and it felt necessary to point her back to the times where these deficiencies were memorialized by myself, by the principal and past administrators.

509

Q. In the last sentence of this paragraph you write, the classroom observance the lab tech for professional development session alongside her K to two Teacher's College staff developer on February 12th, 2013, why was Ms. Legra's classroom selected to be this lab site?

A. As a means of professional support for her.

During cross examination Mr. Goodman testified

671

Q. ...
Are you aware that under the Joint Exhibit 1, the collective bargaining agreement, that in order to consider a document for an annual rating it must be a document that's properly within a teacher's personnel file?

A. I don't believe that's the case.

672

Q. Do you recall how often during the 2011-2012 school year that you visited her classroom?

673

A. I would--I would put the number at somewhere between 25 and 30 visits.

674

Q. But on none of those visits you observed something that you thought necessitated a formal written report?
A. I don't believe so.

675

Q. How many formal observations did you conduct of Ms. Legra's classroom during the 2011-2012 school year?
A. I don't believe I conducted a formal observation that year...

A. I recall Ms. Boursiquot conducting a formal observation of Ms. Legra during the 2011-12 school year.

676

Q. Can you please identify what this document is?
A. It is a formal observation report authored by the principal, Ms. Boursiquot.
Q. And is this the observation report for the 2011-2012 school year that you were referencing a few minutes ago?
A. I believe so.
Q. And can you please read the date of the observation report on the first page of Department's Exhibit 3, which is also Bates page one?...

A. Okay. So June 21st, 2012.
Q. And June 21st, 2012, would be at the end of the 2011-2012 school year?
A. Yes.
Q. Do you recall approximately how many days there may have been in the end of the--until the end of the year from June 21st, 2012?
A. Maybe about a week.

677

Q. ...
One week is not really a whole lot of time to correct any behavior. Is that true?
A. Well, if you're thinking about each

school year from September to June then certainly not.

684

Q. So and for a teacher who is changing grades, is there--how do they learn the differences between the different grades that they've been teaching?
A. Some of that starts with the teacher just having to experience the students and experience the class. And a lot of that takes place in the first month, more or less, of the school year. There are certain responsibilities that a teacher needs to engage in with any grade where there needs to be experience with the curriculum in place that's relevant.

686

Q. So would you consider the first month of school to be an important time period for a teacher?
A. Yes.
Q. And what other things occur during the first month of school that would benefit a teacher?
A. The first month of a school year just really presents this opportunity for the sense of renewal, if you will, and it allows again a teacher an opportunity to experience certain things alongside the class that's really going to set the stage for the duration of the school year. That's generally how we think about that first month, that you're trying to lay the groundwork, so to speak, for what the remainder of the year is going to look like.

689

Q. So, even if a teacher is very experienced but they change their grade, they would get some form of professional development individually from Ms. Seratti?
A. It would be some type of support, yes.
Q. Okay. And would that be the same set up for Ms. Francisco, the literacy coach?
A. Yes.

691

Q. So, since Ms. Legra was--had only taught kindergarten for just a few months prior to the

'11-'12 school year, she was assigned to work with Ms. Seratti and Ms. Francisco?
A. Which school year is this?
Q. '11-'12.

692

A. Support would have been put in place to support Ms. Legra at whatever point she took over a class certainly....

Q. Do you know if Ms. Seratti provided any targeted professional development to Ms. Legra during the 2011-2012 school year?
A. Yes.

693

Q. What was that professional development?
A. I recall Ms. Legra having issues with just basic classroom management practices, and that being a topic of discussion with the coaches, in particular Ms. Seratti here. In addition to making sure that Ms. Legra was clear about the curriculum calendars or pacing calendars, and ensuring that she was implementing all of the instruction required for the grade that she was assigned to teach. Those are two priority areas that recall being an issue that year.
Q. And when did Ms. Seratti provide this professional development to Ms. Legra?
A. I don't recall exact.
Q. Did you ever have conversations with Ms. Seratti about the professional development, the targeted professional development that she did with Ms. Legra during the 2011-2012 school year?
A. Yes.
Q. And how often would that occur?
A. I don't recall.
Q. Did you speak with Ms. Seratti about the targeted professional development provided to Ms.

694

Legra via email during the 2011-2012 school year?
A. I don't recall.
Q. Did you ever see any of the targeted professional development that Ms. Seratti provided to

Ms. Legra during the 2011-2012 school year?
A. I don't recall.
Q. Did you ever see any logs of assistance written by Ms. Seratti which pertain to the targeted professional development provided to Ms. Legra during the 2011-2012 school year?
A. I don't recall.

734

Q. With regard to classroom environment and particular charts within the classroom, what types of things do you expect to see?
A. Charts should include evidence of the Units of study that underway for the different Content areas, particularly reading, writing, and mathematics. Charts should also include strategies for students to implement when they go off to work independently, as well as charts that outline some of the structures and routines inside of the classroom that are aligned with say behavior or that are aligned with the work that students are involved in.
Q. And where do the charts that are

735

supposed to be aligned with the curriculum, where do they come from?
A. Teachers are able to develop those charts based on the needs of their students…

Q. So they would have to create all of the charts on their own?...

Q. But there were charts?

736

A. I recall a few, yes
Q. Is there a required number of charts that you have to have in the room?
A. No.
Q. So you could have one chart or you could have 25 charts?
A. Conceivably, yes

737

Q. And are teachers required to change the content of their charts on a daily basis?

A. Not on a daily basis.
Q. On a weekly basis?
A. Charts would change over the course of a unit. So if we considered a writing unit, for example, that lasted the course a month, the number of charts relevant to that unit might increase over the course of the month.

738

Q. Isn't it true that she also only taught first grade for a few months in her career prior to that year?
A. I recall Ms. Legra spending a full year in first grade during my time at 173.
Q. Do you know when that was?
A. I believe it was the '09-'10 school year.
Q. So it was few years removed from that time period, from the 2012-2013 school year?
A. Yes.
Q. So it's possible she didn't have those charts anymore because she wasn't teaching first grade?
A. That's possible, yes.
Q. So then she would have had to create the charts for her class for the entire school year at the same time that she was supposed to be trying to cultivate expectations a month after the school year started?
A. Yes. That would have been an expectation.

739

A. The process of creating charts is an ongoing, yearlong commitment
Q. Isn't it possible that some teachers would create charts that work with the curriculum during the summer time?
A. I guess it's possible.
Q. But Ms. Legra didn't have that opportunity to make first grade charts during the summer time, did she?
A. No, she didn't.

740

Q. And is there any memorialized document

for the first grade teachers that I guess amplifies this document from the 2012-2013 school year?
A. Not that I'm aware of.
Q. What about the kindergarten teachers during the 2011-2012 school year?
A. Not that I'm aware of.
Q. So is it fair to say that this is really the exhaustive chart, as one exists for those grades in those years?
A. That was furnished by administrators, yes.
Q. I just mean in terms of a chart, not That there hasn't been - I'm not asking if there hasn't

741

been any changes. I just mean in terms of what you may have distributed.
A. What I've distributed, yes...

Q. Was there a word wall in Ms. Legra's classroom during the 2011-2012 school year?
A. I don't recall.
Q. Do you recall if there was one in her classroom in the 2012-2013 school year?
A. I don't recall...

742

Q. And Ms. Legra did the inter-visitations, correct?
A. I believe so, yes.
Q. And when else was she assigned to do

743

inter-visitations during the 2011-2012 school year?
A. I don't recall.
Q. You don't recall if she was assigned or when -
A. [Interposing] I don't recall the dates...

Q. Would you have had Ms. Legra use this tool again if she had to do further inter-visitations?
A. Not necessarily.

744

Q. Did you find this to be ineffective?

A. I found it to be ineffective?
Q. The tool itself or the inter-visitations?
A. Ms. Legra's understanding of how to use the tool.
Q. And who was the person who explained to her how to use the tool?
A. I don't recall.
Q. But you created it?
A. Yes.
Q. Did you explain to her how to use the tool?
A. Possibly.
Q. And what about during the 2012-2013 School year, did you assign Ms. Legra to do any inter-visitations?
A. I don't recall.
Q. Do you know if Ms. Boursiquot assigned Ms. Legra to do any inter-visitations?
A. Possibly.
Q. But you don't know?
A. I don't - I don't - I don't know. Yea, that's right. I'm sorry...

745

Q. What about Ms. Duratis? Do you know if she assigned Ms. Legra to do any inter-visitations?
A. I don't know.

. . .

Q. And do you know whether or not those two individuals, Ms. Boursiquot or Ms. Duratis, assigned Ms. Legra to do inter-visitations during the 2011-2012 school year?
A. I don't know.

746

Q. Who leads the class during the lab site demonstration?
A. It's generally a collaborative effort between one of the grade teachers or a supervisor, as well as the staff developer or the literacy coach.
Q. Do you know who provide - who led the class on the day that Ms. Legra's classroom was the lab site?

A. There were multiple times where Ms. Legra's class was the lab site.
Q. Other than February 12th, 2013, when was Ms. Legra's classroom the lab site?
A. The lab sites are a yearlong commitment. So I don't-- I don't recall the exact dates.
Q. I believe that your letter-- strike that. I believe that you assigned the lab site room

747

to Ms. Legra's classroom in February of 2013. Was her classroom the lab site prior to that?
A. It's possible. I don't recall exactly.
Q. Well, if it's a yearlong - -
A. [Interposing] Yes.
Q. --a yearlong program, commitment, would you have had to tell her that you were now assigning her classroom to be the lab site?
A. She would have been a part of that conversation, yes.
Q. So doesn't it stand to reason that, if you had to tell her that her classroom was going to be the lab site coming up, that it wasn't previously the lab site?
A. I recall using class 104 at different intervals over the 2012-2013 school year.

748

Q. And can you please read on the second page of Department's Exhibit 34 the very first sentence of the body of the letter that you provided to Ms. Legra, which is also Bates page 121?
A. "Your classroom has been selected as the lab site for Monique's visit on February 12th, 2013."
Q. Is that what you would write if Ms. Legra's class had been the lab site for the entire school year?
A. That appears to be something I would write if this was the first time that I was

749

memorializing that lab site for the first time that school year.

750

Q. And you stated that this would be a tremendous professional development -- sorry, you just

751

said professional opportunity for Ms. Legra. In what ways would having her classroom as a lab site be a professional opportunity for her?

A. The teacher has an opportunity to see a lesson taught with her students from start to finish that relies upon work that they have created possibly prior to the visit by the staff developer and the other grade one teachers, or perhaps as a result of the work that's created during that period when the staff developer and the grade one teachers are present. So the teacher has an opportunity then to see a lesson flow from start to finish, all of the components of the lesson, the actual teach, and the other components of the mini-lesson. They get to see a book conceivably being or potentially being used to facilitate that teaching; a staff developer modeling what that work looks like, what happen when students go off to work independently. So every aspect of the lesson is something that the teacher would have an opportunity to observe with the same class that they're assigned to during the school day.

Q. And did -- sorry, Ms. Knight actually did the lesson plan, correct?

A. I recall that being what occurred.

752

Q. Did you review a copy of the lesson plan that she wrote for this lab site?

A. I don't recall looking at the lesson plan.

Q. Were you there when Ms. Knight conducted the lesson?

A. I recall being -- I believe I recall the particular lab site session.

Q. So you were present?

A. Yes.

Q. Was anybody else present, other than you, Ms. Knight, and the students?

A. I recall other grade one teachers being present. I recall Ms. Boursiquot, the

principal, being present, as well as Ms. Francisco, the literacy coach, being present.
Q. And I'm assuming Ms. Legra was present?
A. I recall Ms. Legra being present during the February lab site.
Q. Was Ms. Knight the only person who provided actual instruction that day?
A. I recall Ms. Knight being the individual to facilitate the whole class teaching.

753

So, while the students are on the rug listening to one individual conducting a lesson, that's what I recall.
Q. So was there also small group work during that lesson?
A. I recall students working individually with teacher partnerships. So two grade one teachers working with one student, that's what I recall.
Q. I'm sorry. You said two --
A. [Interposing] I recall two teachers being assigned to one student, or two adults being assigned to one student. That's what I recall on that day.
Q. So doesn't that leave several students without any adult in the class?
A. Yes.

756

Q. What if anything would Ms. Legra have had to do the subsequent times that her room was used as a lab site?
A. There were a number of things that she could have been expected to do but - -
Q. [Interposing] But what was she assigned to do?
A. To prepare for the next lab site?
Q. Correct.
A. I don't recall.
Q. So it's possible that she wasn't actually assigned anything in particular?
A. That's correct.
Q. And approximately how many lab sites are done in a particular school year, or conducted in a particular school year?
A. Historically six

774

Q. And if a teacher complains about student behavior in the classroom, what is your - - what's the policy at P.S. 173 for administrators to get involved?

775

A. We usually dispatch the guidance counselor to the classroom to make observations about what's happening with the child, whether or not there are concerns with respect to how that child is getting along with other children in the class, whether or not the setting is the most appropriate. There's a dialogue that occurs, that includes the teacher, that includes the guidance counselor, families, the parent coordinator, that kind of thing.

Q. What about when a teacher is complaining about a student being violent towards other students? What is the policy then?

A. The teacher calls the office, for example, to suggest that a child's behavior is posing a danger to herself or the other children, then administrators will respond immediately. Sometimes, a school safety agent would be dispatched for that purpose, as well.

796

MR. GOODMAN: I recall an e-mail from Ms. Legra regarding Ja. Va., yes. I don't know if this is the e-mail that I recall.

797

Q. Okay. Do you recall, on March 21st of 2013, M. Legra notifying you of concerns that Ms.

798

Va., Ja. Va., was acting violently in her class, in Mrs. Legra's classroom?

A. I don't recall.

Q. Do you recall ever responding to a complaint of Ms. Legra when she claimed that Ms. Va. was hitting other students?

A. Yes.

Q. Or that Ms. Va. was throwing chairs and pencils?

A. I don't recall the specifics to what would have required me to respond to Ms. Legra's room regarding Ja. Va.
Q. Do you recall any other time where Ms. Legra had to physically restrain Ja?
A. I don't recall Ms. Legra physically restraining Ja.
Q. Do you recall an incident when Ja. bit Ms. Legra in the classroom?
A. I believe so...

Q. Do you recall incidents when Ja. hit

799

Ms. Legra in the classroom?
A. I don't recall.
Q. Looking at Respondent's 12, in the body of the e-mail, six lines down, there's a line that says "When my attempts to calming her down failed and she punched me, I called the main office for help. I spoke with C.P." Do you ever recall getting a phone call to the main office where Ms. Legra complained that Ja. Va. punched her?
A. I don't recall.

800

Q. Had a teacher called in and claimed that a student had punched them, would she have notified the administration about that?
A. Yes.
Q. And on March 21st, when Ms. Legra claimed that this event happened, did you also have occasion to go to her classroom that day?
A. I don't recall.

800

Q. Did you perform an observation of Ms. Legra on this day, on March 21, 2013?
A. Yes.
Q. And you stated that you performed an observation because it was a routine walk-through.
A. Yes.
Q. Isn't this also the day that Ms. Legra complained to the office about violent behavior from Ms. Va.?

A. According to the body of the e-mail, that's what it suggests.
Q. So if there were violent activity

801

going on by a student in Ms. Legra's classroom, you would have been required to go down to her class, anyways, correct?
A. Possibly.

802

A. I recall Ja. Being late frequently, right, which could be to a child struggling to get underway with the regular school day.
Q. And could that cause any disruption with the rest of the class?
A. Yes.

803

Q. And you also previously testified that Ja. needed reminders at times about following directions. Can you please state what you meant by reminders?
A. A child needing to be told more than once about what needs to happen, whether it's behavioral or academic in nature.
Q. In your role as assistant principal, would you have any responsibility for student discipline?
A. Yes.
Q. And in that role, did you ever have to personality discipline Ja.?
A. I recall dealing with Ja. And facilitating consequences for her actions, which at times, required me to remove her from the classroom.

Tania Serratty, the Math coach, on direct examination, testified

352

Q. Okay. During the 2011-2012 school year, other than the time that you observed Ms. Legra and that model lesson, did you do any other individual work with her, if you recall?
A. I don't recollect them, yes.

355

A. This was a visit and I went into Ms. Legra's classroom when she was in first grade during the 2012-2013 school year.
Q. Okay. And do you recall on what date you visited Ms. classroom--Ms. Legra's classroom during that school year?
A. It was on the date that' (sic) posted on this. I normally write the date that--on which I visit the teacher.
Q. Okay. And that date was January 17th 2013?
A. Yes
Q. And what was the reason that you went into Ms. Legra's classroom on that date to observe her?
A. I went in just to see how she was doing her lessons. And like I said, that during last year with the common core learning standards being new, just in the classrooms just to see how--and just provide support to teachers with the new standards.

Nilda Francisco, the Literacy coach, testified. Her examination, included

877

Q. During the 2011-12 school year do you recall what grade Ms. Legra taught?
A. Kindergarten...

Q. During that school year, '11-'12, during which Ms. Legra taught kindergarten, did you work with her on an individual basis at all?
A. Yes.
Q. Okay. Can you tell us how you came to work with her on an individual basis during that school year?
A. She was one of the teachers that the administration identified at the beginning of the--of the year as a teacher that needed support.
Q. And on what areas did you work with Ms. Legra?
A. Reading and writing.
Q. Okay. Can you tell us about the nature of the work you did with her on an individual basis during that year?
A. We met to discuss reading and writing

and kindergarten in general. I came in to sit in on a

878

lesson being conducted by Ms. Legra and then we switched roles in which I would be the one modeling the lesson and Ms. Legra would watch me.
Q. Okay. How frequently did you meet with Ms. Legra during the '11-'12 school year?
A. On numerous occasions, I couldn't give you a specific number.
Q. Okay. Would you say that you met with her once a month, or more frequently than that, or less frequently than that?
A. I'd say about once a month.
Q. Okay.

942

Q. During the 2011-2012 school year, you testified that you gave one-on-one professional development to Ms. Legra?
A. Yes.

943

Q. Do you recall when you provided this one-on-one professional development to Ms. Legra in 2011-2012?
A. Pretty much throughout the year, I couldn't give you specific days; on and off throughout the year.
Q. Did you keep a record of when you would provide one-on-one professional development to her during the '11-'12 school year.
A. No.

944

Q. I noticed through the documents that came into evidence there was some written materials of notes that you made during the '12-'13 school year but you didn't do any of that in the '11-'12 school year?
A. Not of my personal interactions with Ms. Legra.
Q. And we also--we didn't see any grade level professional development for kindergarten during the '11-'12 school year but you did provide that?
A. Yes.

Q. And that would have been for every kindergarten teacher?
A. Yes.
Q. Okay. Now, you testified earlier that you never observed Ms. Legra in an evaluative way. Can you please explain what you meant by that?
A. I'm not a supervisor, so I can only go in a classroom, pretty much just look at the teacher, and then offer suggestions. But I can't rate the teacher and say that was unsatisfactory. I could say, "Well, here is what I saw. Here are ways where, you

945

know, I think you could probably improve. Do you have questions for me? Do you want me to model for you?" That's--which is one of the reasons why I don't have written documentation because I can't go in a classroom and like literally take notes, observe what you're doing, and then give you a rating.
Q. So you didn't have any rating of Ms. Legra at all during your time that you worked with her?
A. No.
Q. Okay. Did Ms. Legra ever miss any of the individual professional development that she had with you?
A. Yes.
Q. And did you ever try to reschedule that professional development?
A. Yes.
Q. Did she in fact reschedule the professional development with you?
A. Yes.
Q. Did Ms. Legra ever refuse to meet with you?
A. No.
Q. Did she ever ask you for help?

946

A. Yes.
Q. When did she ask you for help?
A. Usually when I would go in and I would say--suggest things, she would say, "Well, can you provide me with materials for this? Can you provide me with more books on levels whatever? Can you provide me with an extra copy of X?"

Q. And did you actually provide her with those materials?
A. Yes.
Q. Do you know if she used those materials with her students?
A. I would say yes.
Q. Did you ever do any professional development with Ms. Legra on the topic of student discipline or student behavior?
A. No. I would give her pointers on things she could do to get--to have the children more engaged, but it still revolved around literacy.
Q. So, just to clarify, everything was in the context of literacy. There was nothing specific about student behavior?
A. No.
Q. What about with classroom management?

947

A. Same thing. I would have conversations with her on how having--during the literacy period, having routines established would in fact help with classroom management because if the students know exactly what they should be doing at X time then the chances of them not being engaged are slimmer because they actually know what they should be doing. So in that context yes.
Q. Okay. The material for first grade and pre K are very different from each other, correct?
A. Yes.
Q. Can you explain the differences between pre K and first grade material?
A. Pre K follows a completely different curriculum because pre K is funded by the state, not by the city. So the pre K curriculum is very specific to only pre K and the day is broken up completely different for them as well. K through 5 follow the same curriculum.

951

Q. Was your school affected at all by Hurricane Sandy?
A. Well, I mean yeah. Every school was. We were out of school for a week.
Q. And did that have any effect on the students?

A. Yes. I mean we--it put us behind the whole week, week and a half.
Q. Right. And Ms.--well, when did Hurricane Sandy happen?
A. October or maybe end of September, somewhere around there.
Q. I believe it was around the last week of October.
A. It was on Halloween. It was--yes.
Q. And that would have been just a couple of weeks after Ms. Legra took over the first grade class, correct?
A. Yes.

952

(Q.) She took over the class in October, correct?
A. Yes.
Q. And maybe three weeks later all of the students were out for a week?
A. Yes.
Q. You also spoke about a particular student that had disciplinary problems in Ms. Legra's class. Do you recall if that student's name was Ja. Va.?
A. Yes.
Q. You said that she like to hit other children. Do you recall how many times instances like that happened with Ja. Va.?
A. There were several. I couldn't give you a number.

953

Q. And you said that over the course of the 2012-2013 school year that you were in Ms. Legra's classroom four to five times because of behavioral issues?
A. Yes.

974

Q. Were they all because of Ja.?
A. Yes.

Counsel for Respondent argued

1820

Ms. Legra didn't even know that this was

supposed to be an observation until after Mr. Goodman notified her that she was going to be scheduled for a post-observation conference. She thought it was just Mr. Goodman coming in to her classroom on one of his routine visits, which also coincidentally, were all of the time.

In fact, he had done one similar to this on January 15th. It was only two weeks before, where he had come and done the same thing. And furthermore, Mr. Goodman thought the same thing. In Respondent's Exhibit 33 and 34, he didn't call this a routine, or did he didn't call this an informal observation. He

1821

called this a "routine classroom visit." You heard from Ms. Legra that that was the only time he came that day, and Mr. Goodman was trying to have it both ways; come to her room and find a way to discipline Ms. Legra, and also at the same time say that is was supposed to be an observation.

Now when Mr. Goodman went to Ms. Legra's room on this day, he already knew that she didn't have lesson plans. And the reason why he knew she didn't have lesson plans is because he took them the day before, when he had to take over a classroom because she had become ill and had to leave school. That's reflected in Ms. Legra's email to Mr. Goodman in Respondent's Exhibit 7, where she asks them for her lesson book back. She had already planned for this class and she didn't have a new lesson plan.

But Mr. Goodman already knew that and he just disregarded it and claimed that that was a problem. We also know that Mr. Goodman was supposed to be giving Ms. Legra a formal observation during the same exact time period. He promised her in an email that is in Respondent's Exhibit 6. He never scheduled the pre-observation conference. He never did a formal observation. And when Ms. Legra asked him again for

1822

formal observation, he never responded back to her.

...Observations are supposed to be instructive and are supposed to support the teacher, not be discipline.

d. March 21, 2013 - DOE 20 an Observation of a first grade class and testimony of Assistant Principal Goodman in support.

Assistant Principal Goodman's testimony, included

518

Q. Do you have any independent recollection of the lesson you observed on March 21st?
A. I believe I do.

519

A. I recall Ms. Legra struggling with a student in the class, if I'm not mistaken. I recall observing those events and then having the opportunity to see Ms. Legra on the--or rather bringing her class to the rug for a lesson that used a big book, I believe. And I recall Ms. Legra attempting to show students how to deal with words that are I believe unfamiliar to them. And I recall students suggesting that they had experience with the book already prior to Ms. Legra reading it and attempting to model for students what that would look like in terms of how to deal with words that are unfamiliar to them. That's what I recall.
Q. Okay. Now what if anything concerned you about what you observed during this observation?
A. I recall walking into the classroom to again see students not engaged in anything meaningful. I recall seeing students behaving inappropriately. I recall Ms. Legra struggling with one student in particular and again I recall observing Ms. Legra attempting to teach something without any kind of reference or plans to facilitate the lesson. I felt as though she was improvising again in my presence.

520

Q. Now, turning your attention to the first paragraph of the observation report. In the first sentence you noted that you visited Ms. Legra's grade one classroom during a routine instructional walkthrough. Was--do you recall how long you stayed in Ms. Legra's classroom during this walkthrough?
A. I believe I was there for approximately 45 minutes.

Q. And, when you first entered the classroom, how long had you intended to stay?
A. Just a few minutes.
Q. If you had intended to stay for just a few minutes, why did you lengthen your stay in the classroom to 45 minutes?
A. Because I was observing behaviors and practices that had been mentioned to Ms. Legra previously and it was my professional obligation to documents those findings.
Q. Now you testified with regard to observing Ms. Legra struggling with a particular student in the class?

521

Q. Is that struggle what is referenced in the second sentence in the observational report where you write, "When I entered room 314, I observed you trying to grab something out of the hands of student J"?...

A. I recall Ja. holding onto something. It might have been something from her lunch box or her Lunch-able if I'm not mistaken. And Ja. apparently wanted to hold on to it and Ms. Legra was attempting to grab it out of Ja. hand's. It didn't appear to be anything that was dangerous in nature, that would have caused harm to Ms. Legra or Ja. So I was little unsure about why the struggle was taking place.

522

Q. Now, when you testified that you would have preferred not to see a situation where either the student or the teacher could be at risk, can you tell us why you were concerned about this particular set of events with regard to putting either of them at risk?
A. If the teacher is grabbing onto

523

something and the child is grabbing onto that same object and they are both pulling on it, either the child could fall back and get hurt and accuse the teacher of causing that injury or the teacher could wind up in the same situation where she stumbles as the child lets go of the object. And that's just not a safe situation.

A. Now, directing your attention to the second paragraph of the observation report. you write in the first sentence that, "The agenda or the flow of the day in Ms. Legra's classroom indicated that the students should have been involved in the readers' workshop. Though I immediately observed a handful of your students copying words into marble notebooks from the small white board positioned in the meeting area were the rug is located." Was the activity you observed the children engaged in copying words into notebooks consistent with the readers' workshop?
A. No, it was not.
Q. Okay. What type of activity would you have expected to see the students engaged in for it to have been consistent with the readers' workshop?
A. I would have expected to see students engaged alongside the teacher using one text. I would

524

have expected to see students reading independently in different places around the classroom while the teacher is working alongside one student or a small group of students. I would have expected to see a teaching point or an aim that was consistent with a reading instruction lesson.

525

A. It appeared as though Ms. Legra had no control over the class and the majority of students were not listening to her or paying attention to her requests to move the class into the next part of their day...

A. All right. The expectation is that structure and routines are in place for getting the attention of the class when it's necessary, and for the purpose of moving students from one activity to the next in a safe way and in a way that provides some

526

level of clarification for students about what's going to happen next.
Q. Now, yesterday you testified that Ms. Legra was assigned to this first grade class in late September early October of the 2012-2013 school year?
A. Yes, I did.

Q. Going back to that time of year, can you tell us in this situation, where Ms. Legra or any teacher is assigned to a new class a few weeks into the school year or a month into the school year, about how long would you expect it to take for the teacher to establish routines?
A. We generally provide about a month to teachers in the beginning of the school year to establish those routines. So it would make sense at any point in the school year when a new teacher is put into place that there is that same amount of time provided for the opportunity to establish those routines.

527

Q. In your opinion, was Ms. Legra at all in any disadvantage in having been assigned to this class later in the school year then early September?
A. No.
Q. Can you explain why you have come to that opinion?
A. I believe that it was early enough in the school year to make that transition. If I recall, the 2012-2013 school year had quite a bit of downtime in the fall. I really mean days off actually, right, where students are away from school for holidays and things of that nature. I believe very strongly that the class that Ms. Legra inherited was a class where there we were things in place already that were established by the teacher that left the class. So it wasn't as if Ms. Legra was starting from day one essentially.

528

Q. Okay. And by March 21st 2013 do you know how many students were in the class?
A. I believe there was 16 students on the official roster.

530

Q. Okay. Here you write, "After about six minutes of attempting to get your class settled you then direct them back to the rug area again." Why did you note the length of time that it took to--for Ms. Legra to get her class settled?
A. That seemed like a very long time for

a transition, given the fact that the class was very small.
Q. Okay. And about how long would you expect this type of transition from desks to the rug area. How long would you expect that to take?
A. I would say two minutes would be an appropriate amount of time.

531

A. I was under the impression that Ms. Legra was attempting to expose children to unfamiliar vocabulary, and that children appeared familiar with the text and familiar with the vocabulary and the book. So it seemed like a poor choice of a text to model for students how the teacher might go about figuring out a new word or an unfamiliar word that comes--that comes--that you come across in the text.

532

A. I think that making the decision in advance about what text would be appropriate for students, a text that they are unfamiliar with, that has some vocabulary words that they are in fact unfamiliar with would be the most appropriate way. Right? In addition to identifying a couple of steps that students can take to address those unfamiliar words in their own reading, right, and to be really clear about what those steps are so that students can go off and implement it in their own reading.

533

A. It's a simple fact that I did not observe students getting settled and taking out materials necessary to facilitate the work and beginning to read. I did not observe that.

535

Q. Did you include a section on commendable aspects of the lesson in this report?
A. I did not.
Q. And you tell us why you did not include that section?
A. Because I did not observe anything in the classroom that was worth of celebrating.
Q. ...

Can you explain why you

came to the conclusion that Ms. Legra was unwilling to implement classroom management practices?

A. Because it was evident based upon my time in the classroom on this particular day that those practices were just still not in place. So from the moment I entered the classroom seeing Ms. Legra struggle unnecessarily with a student, to the fact that students were just not listening to her in order to move on from one activity to the next was

536

pretty evident.

538

Q. Now, eight lines down from the top of this bullet point you write, "The lack of structure and routines for your grade one students are contributing to these significant and frequent classroom management issues. This was demonstrated during the two transitions I observed where the majority of your students in your classroom did not listen to you. Grade one students require strong structures and routines to support their learning and safety." Can you explain why you made this recommendation to Ms. Legra with regard to structure and routines?

A. Because that's just a common practice in our school and we encourage teachers to ensure that they have established these practices inside their classroom, so that students can be successful and so the teacher can be successful. And so that seemed like a good starting point, to make sure that Ms. Legra was really clear that she had a system in place for gaining the attention of her students, so that they could stop talking or stop doing what it is that they are doing and hear her instructions about what

539

needs to happen or what needs to happen next.

541

A. It was evident that planning and preparation were still something that she was struggling with as a seasoned classroom teacher. And that by observing or by taking a look at her lesson plans at the start of her week, the administration

could make a decisions around whether or not the teaching points and any additional information tied to that teaching point was in fact aligned with the curriculum just as a--as a very basic way to ensure that the first grade class was getting what they need.

Q. And did Ms. Legra, following this observation report, submit lesson plans to you?

A. I recall her submitting lesson plans once following this observation report.

542

A. The fact that the book appeared to be chosen randomly and that there was no evidence that the teacher had identified words in the text or parts of the text that were going to support the instructional approach. So to see--I believe I write, you know, post-its, for example, to identify pages. That would be something that I would expect to see with respect to lesson of this nature.

544

A. I--again, there were certain expectations in place with respect to classroom environment tied to evidence of current units of study. So to be able to observe charts that are aligned with the work that was underway at this point in the year would have been important, to see charts that just support expectations in place by the teacher. So what it is that, for example, students need to be doing during independent reading. Those kinds of things in addition to some of the other things such as just the cleanliness of the classroom, the word wall supports for English Language Learners, things of that nature that are relevant.

550

A. Yes. So I recall Ms. Legra suggesting that the students in her class had needs that required more restrictive settings. So Ms.--I recall Ms. Legra alluding the fact that there were some students that needed to be in special education in the class, as

551

well as students that needed services such as speech and other forms of therapy, in order for them to be successful students.

Q. Okay. And how does that concern relate to your recommendation here and concern about her book baggies?
A. Because Ms. Legra was making excuses for all of the things that were not in place inside of her classroom and she was making excuses for the students not learning in her classroom.

552

A. I don't recall Ms. Legra ever submitting required documentation relevant to any of the students that were of concern to her.

Q. ...

Can you tell us why you gave this lesson an unsatisfactory rating?
A. Because it lacked evidence of the teacher implementing the instructions for improvement that had been made in previous observation reports, that were required expectations for teaching across the school. It was also rated unsatisfactory with respect to the annual rating sheet and looking at those individual categories where teachers need to show a satisfactory level of performance. And this lesson fell short in many of those categories.

Respondent's testimony, included

1252

Q. Ms. Legra, do you recognize what's in evidence as Department's Exhibit 20?
A. Yes.
Q. And what do you recognize Department's

1253

Exhibit 20 to be?
A. It's an informal observation...

Q. What recollection if any do you have of Mr. Goodman coming to your classroom other than when you called for help with Ja.?
A. I don't have any of him coming in other than when I called for Ja.

A. Yeah, he came in that day but I think he did come in just that once when I called for help.

Q. And on page two of Department's Exhibit 20 under "Instructions for improvement," Mr. Goodman wrote "When I entered your classroom you were involved in a struggle with student J. as you were attempting to physically take something away from her that she did not want to relinquish. J. was not causing harm towards her classmates or you, so it was not clear to me why you were adamant about taking an item away from her that she clearly needed to hold."...

Is student J., Ja.?

A. Yes.

Q. And what is your recollection of what Ja. was holding that you were trying to take away from her?

A. The juice.

Q. And what was Ja. doing with the juice at that time?

A. She was wetting other children in the classroom.

Q. And what opinion if any do you have

about Ja. wetting other children with the juice had towards harm towards her classmates?

A. Harm? Well, she was--she was wetting a good group of students that were on the carpet with the juice.

Q. And why did you find that inappropriate?

A. Well, because I had to send students down to maybe call home for a change of clothes or go to the restroom to wash off. Prior to that in the morning she was throwing desks over...

Q. And what is your recollection of what

was discussed during that post observation conference?

A. My failure to have plans, my failure to have charts, my failure to properly manage a classroom, all of that.

Q. And were there up-to-date charts in your classroom at that time?
A. Yes.
Q. And what if anything did you do to plan your lesson for March 21st, 2013?
A. Well, I always planned for my reading workshop, my writers' workshop, so everything was planned for March 21st, 2013.
Q. And what effect if any did Ja.'s behavior have on your ability to implement your lesson plan for that day?
a. Well, the students were way off task when they were getting wet. They were also way off task from the beginning when Ja. was posing a threat to them by throwing things and by turning the desks over.
Q. And can you please state for the record the date that this--...Exhibit 20 was provided to you?
A. April 10th, 2013.

1260

Q. And what do you recognize Respondent's Exhibit 12 to be?
A. It is an email addressed to Mr. Goodman.

1261

Q. And who is it from?
A. From myself.
Q. And can you please state the date of the email contained in Respondent's Exhibit 12?
A. April 11th, 2013.
Q. And on Department's Exhibit 20 you had referenced a response--an email addressed to Mr. Goodman on April 9th. Is this the email that you were referencing?
A. Yes.
Q. Is there a reason why you wrote April 9th instead of April 11th?
A. Well, there was another incident of April 9th where he had to come into my room--where he came into my room.
Q. Is this the only response that you sent regarding this observation?
A. I believe so. I don't recall.

Q. Okay. And, Ms. Legra, can you--it says "On two separate occasions I have called the office to ask for help with Ja. Va. and you have appeared with a yellow note pad and pen. These two incidents took place on March 21st and on April 9th." Is that what you were just referring to when you said

1262

there was two incidents?

A. Yes.

Q. And do you recall the incident with Ja. Va. on April 9th?

A. yes.

Q. And what occurred on April 9th?

A. On April 9th she was kicking other students and she was climbing on the table.

Q. Did any of the other students in your class--which students if any in your class also climbed on the tables?

A. No one.

Q. And when you state, "You appeared with a yellow notepad and pen," who is that in reference to?

A. Mr. Goodman...

A. "On March 21st, Ja. Va. was hitting other students and throwing chairs, pencils, pulling desks over, and wetting the other students with the

1263

juice she was drinking from in her hand. She was also throwing a cookie she had brought for lunch. I informed the office that I--that Ja. Va. was out of control, exhibiting violent behavior towards others, and specifically stated what she had done. When my attempts to calm her down failed and she punched me, I called the main office for help. I spoke with C.P."

"The following day on March 22nd I was called to a meeting based on my classroom observation on March 21st. In this meeting, I asked if I -- if it would be to disciplinary action so that I could acquire my union representative and you said no. During this meeting, you stated that your observation on your visit would be to a U rating and this would be placed in my file."

"On April 9th, the same occurred only this

time you walked in with a yellow pad and pen but you stated that the secretary had something for me to sign. Despite the call I had placed to the school secretary that morning of a family member's passing and my call to the office based on Ja. Va's violent behavior, there was no response. You came into the room, stayed with my class, and sent me to sign for the observation dated March 21st. I'm asking for

1264

another observation based on the aforementioned circumstances."...

Q. When, if ever, did Mr. Goodman respond to the e-mail that is contained in Respondent's

1265

Exhibit 12?
A. He responded with the informal observation...

What is your recollection about any discussion that you had with Mr. Goodman regarding a formal observation subsequent to the e-mail that is contained in Respondent's Exhibit 12?
A. I was still awaiting the observation that he mentioned that he was going to give me.
Q. Is that the observation in January that you're -- that you're speaking about?
A. Yes.
Q. And approximately how much time had passed from when he promised you a formal observation

1266

and this e-mail?

1812

Counsel for Respondent argued

Mr. Goodman used to promise Ms. Legra that he was going to perform a formal observation of her,

1813

in particular in the middle of the 2012-2013 school year. He never followed up on his promise. This

would have allowed Ms. Legra the ability to come up with a formal lesson plan in conjunction with the school administrators at PS 173 in order to show them that she was implementing the items that she was learning and the grade level professional development in her classroom.

She was never given the opportunity. Instead, Mr. Goodman would just come to her class on what was labeled an informal observation but at the same time he would call those informal observations routine classroom visits and would send her disciplinary notices for the same day. Ms. Legra would call the office to complain about student behavior and then Mr. Goodman would come to her class and write her up for something. He was constantly summoning Ms. Legra to the office for disciplinary conferences.

1823

This was another informal observation by Mr. Goodman, at least he claims it was an observation. This was again, was not a real observation. Mr. Goodman only came to Ms. Legra's classroom because she had called for help from the main office for help with Ja. Va., because Ja. Va. Was jumping up and down on desks. She was rolling desks over. She was squirting other students with her juice box.

And then there was commotion going on from the fact that Ja. Va. was misbehaving, was causing the other students in the class to misbehave. So instead of coming to assist with Ja. Va. And getting the students under control, Mr. Goodman comes with his notepad and writes an observation report. This is completely unfair. This is not, Mr. Goodman knew that there was problems going on in Mr. Legra's classroom at this very time that he came in there

1824

...You heard testimony from Ms. Legra that she had, on the day that this observation report was written, which was in April of 2013, she called that day complaining about Ja. Va. again.

And Mr. Goodman came to her class again that day, observed her, and then the next day she received the observation report that's reflected for March 21st, 2013. And then there is the June 4th, 2013,

observation…

…It occurred almost seven months after the first formal observation that Ms. Legra received. That's how much they were interested in finding out whether or not Ms. Legra had corrected any of her purported deficiencies.

They waited until the end of the school year. It was done solely so that Ms. Bousiquot (sic) and Mr. Goodman could finish papering their file with another formal observation. Furthermore, it was a good lesson. Ms. Legra did exactly what they asked her to do. She thoroughly planned a lesson on with the math curriculum. She properly used manipulatives in order to teach her lesson. She provided Ms.

1825

Boursiquot and Mr. Goodman with a written lesson plan, as they requested. She even used a proper worksheet, which is Respondent's Exhibit 36, which was provided to her the math coach Ms. Serrati [phonetic]…

And then in that report, there is all this information from Ms. Boursiquot saying that -- about classroom environment, things like that, and that she was going to assign Ms. Zenos [phonetic] to provide professional development to Ms. Legra in a classroom environment. This report was written on June 21st. It was the absolute end of the school year. There is no way that Ms. Legra was going to get any type of meaningful professional development from June 21st

1826

until the end of the school year.

And then Ms. Boursiquot sat here and told you that she actually did assign Ms. Zenos to provide that professional development to Ms. Legra. She was emphatic about it. She said that it was hands on and that she knew that Ms. Zenos had done that. Now Mr. Goodman came in a couple of days later and said that that wasn't true, it was at the end of the school year, and that Ms. Zenos was never assigned to actually provide this professional development.

1827

...there is no evidence of notice of the purported deficiencies in Ms. Legra's teaching prior to the date of the observation.

1832

...We also heard about the fact that the first couple of weeks of the school year are crucial for a teacher, even the greatest teacher, to set up routines and set expectations in her classroom.

Ms. Legra was deprived of that time period with her class. She missed the entire first month of school.

1833

The first few weeks of school are still the first few weeks of school, and they're very important. Then Ms. Legra takes over the class and New York City is hit with Hurricane Sandy, one of the biggest natural disasters we've had, and her students are again out for another week at the same time when she is trying to establish her routines. She didn't have sufficient time with her students at the beginning of the year to be able to set her routines...

...We are not taking about high school students who can easily adapt to a new teacher. We are talking about five

1834

year olds who had gotten used to their original teacher, had her removed, have a new teacher put in, and then continue to miss time from school because of things like Hurricane Sandy. Obviously the beginning of Ms. Legra's school year was not typical and is not the easiest way to set up routines.

Continuing with the students that caused behavioral problems in her class, we get to Ja. Va. Now every Department witness who came in during the case in chief discussed Ja. Va. And the fact that she caused a lot of disciplinary problems in Ms. Legra's classroom during the 2012-2013 school year. We heard about the fact that on March 18th, 2013, Ms. Legra had to put Ja. Va. Into a hold because she was throwing a temper tantrum and she was kicking and punching herself and other students on that day.

Similar events occurred with Ja. Va. on March 20th, 2013, that are reflected in Respondent's Exhibit 20 and Respondent's Exhibit 21. On both of those occasions Ja. Va. kicked Ms. Legra in her leg to the--and injured her to the point to where she had to fill out an injury report. We also heard that on March 21st, 2013, Ja. Va. was hitting other students, she was throwing chairs, she was rolling desks over

1835

and was wetting other students with her juice box That's reflected in Respondent's Exhibit 12.

What's the response to the school by that? They sent Mr. Goodman to come to her classroom and observe her. On April 9th, 2013, there was similar violent behavior again by Ja. Va. Ms. Legra called the office and the response was again to send Mr. Goodman to observe her. Now this didn't result in another observation report for April 9th, 2013, but what did happen was Mr. Goodman wrote the March 21st, 2013, observation report.

On May 20th, 2013, we heard about how Ja. Va. pulled her friend's hair and was swinging her backpack at students. That's contained in Respondent's Exhibit 22 and also Ms. Legra testified about that. She called the office again about Ja. Va's behavior and took them over an hour to send someone down to the classroom to deal with Ja. Va. And it wasn't even Mr. Goodman or Ms. Boursiquot or Mr. Addis. (sic) They sent the security officer down and none of the administrators actually showed up about that.

1838

...Ms. Legra wasn't assigned to turn in her lesson plans until April 10th, 2013. The first day that Ms. Legra was required to turn in her lesson plans as they were specified in this charge by the Department's own Bill of Particulars was June 4th, 2013.

You have seen Ms. Legra's lesson plan from June 4th, 2013. We know that the Department received it because we have the date, the Bates stamp page that they sent. So clearly Ms. Legra did comply to the extent that she is being charged. Furthermore, Ms. Legra did lesson plan for her class, it's just not in

the manner that Ms. Boursiquot and Mr. Goodman now say that they wanted. They didn't provide Ms. Legra with any instruction on what they would have -- what they wanted done differently.

They just said that they were incomplete or weren't there, even when Ms. Legra would show them her lesson plans, or in the case of February 2013, when Mr. Goodman had the lesson plan book. And then he claimed that they weren't there... Ms. Legra is not

1839

required to lesson plan in a particular way or manner, and is not required to submit her lesson plans unless it's part of a program to improve her deficiencies. Now for whatever purported deficiencies Ms. Legra may have, this never came as part of an assignment to her until April 10th of 2013, the tail end of the school year.

1841

...There is no evidence in the record, other than conclusory statements by Mr. Goodman and Ms. Boursiquot about Ms. Legra's classroom environment. All they claimed was that the classroom environment didn't align to the curriculum at the time.

They didn't know what was on the walls. They didn't know the subject. They couldn't say why any of the problems were or what wasn't aligned, or what exactly the problems were.

Mr. Rodriguez the Chapter Leader and Teacher, on direct examination, testified

991

Q. Mr. Rodriguez, in your position as UFT chapter leader do you have independent knowledge of the relationship between Ms. Boursiquot and the teachers in the school?

A. Yes, I do...

With regard to R13, a NYC Department of Education School Survey 2012-2013 Report relating to P.S. 173, he testified

992

Q. So 61% of the teachers at PS 173 disagreed with the statement, "I trust the principal at his or her word?"
A. Yes, that's correct.

The Transcript also reflects

994

MR. DEL PIANO: Roughly 25 to 30 teachers.
THE HEARING OFFICER: Were the participants in the survey?
MR. DEL PIANO: Correct.
THE HEARING OFFICER: And then it's 61% of

995

the number who participated?

On cross examination he testified

Q. Okay. And you testified that when Mr. Del Piano asked you about the results that 61% of the teachers that took the survey disagreed with the statement "I trust the principal at his or her word?"
A. That's correct, yes.
Q. And that would be 61% of the 24 teachers that took the survey?
A. Of the ones who participated, yes.

999

MS. SZEKELY: ...

So at the school it appears that 24 teachers took the survey.
THE HEARING OFFICEER: That matches the 48%?
MS. SZEKELY: Yes.

Mr. Rodriguez testified

1005

Q. In your opinion was Ms. Legra one of those teachers targeted by Ms. Boursiquot?
A. Yes.
Q. And upon what facts do you base that opinion?
A. The number of times that the administrators have visited her classroom and the

number of times that they've written letters to her, and the number of times that she's gone into disciplinary meetings.

1007

Q. What if any importance do you put on the first few weeks of school in establishing routines in the classroom?
A. Well, it's very important. You have to get to know your population. You have to get to know your parents. You have to instill routines in the children and what to follow for the year. And if it's like this year where you have a new curriculum, you have to instill that with the children also. It's very important.
Q. What if any disadvantage would a teacher have who missed the first few weeks of school?

A. If it's a matter of weeks later it could disrupt not only the teacher but the class itself because you're getting everything new. If I'm getting a new assignment in October and November, it's like day one. So I'm already six weeks behind.

1014

Q. What if anything do you recall about complaints regarding student behavior during the 2012-2013 school year?
A. Normally when we have students who are disruptive we have to report it to the administrators and the administrators follow up on that.
Q. What if anything would the administrators do if they felt that a teacher called too often about a student?

1015

A. Depending if the teacher was targeted by administration, the norm is that they would do everything to try to alleviate the problem or transfer the student out of that class into another class to see if the change of scenery might help the student.
Q. What would happen if the teacher, as you characterize, was targeted?
A. Well, let's say we have four teachers on the grade. Okay? A teacher would have the kid for a month. Maybe a month, another teacher a month. If the

teacher is targeted, they'll make sure that they'll keep that child in there for a longer period.

1016

Q. What if any opinion do you have about Ms. Legra's ability to manage her classroom?
A. Ms. Legra is, as I said before, she's a professional. She's an educator and she can handle behavior problems. But, if you're consistently being put (sic) behavior problems or given more than other teachers that will affect anybody's management, classroom management, no matter how good the teacher is.

Mr. Rodriguez, on cross examination, testified

1022

Q. Okay. If a teacher receives an unsatisfactory rating, would it be a fair practice to go in to observe the teacher again to see if they had made any improvements from the last rating?
A. Yes.

e. June 4, 2013, DOE 6, and observation of a first grade class and Testimony of Principal Boursiquot and Assistant Principal Goodman in support.

This was a joint observation by the Principal and Assistant Principal. The examination of Principal Boursiquot reflected

157

Q. And who conducted this observation?
A. This was conducted by myself, alongside the assistant Principal for daily instruction, Mr. Goodman [phonetic].
Q. And why did you and Mr. Goodman conduct an observation together?
A. Sometimes we, well oftentimes, not sometimes, oftentimes we do joint observations just to assure that we're seeing the same things and have discussion and have a different lens, all right, so.
Q. And when you say you often do a joint observations, how frequently would you say that you observe a lesson along with Mr. Goodman?
A. I would say we try to do one for every

teacher who might be either a probationary or an unsatisfactory teacher.
Q. And when you and Mr. Goodman conduct an observation, can you tell us what goes in to the writing of the observation report?
A. Well, after we - - to the writing of it? After we observe, we go back. We review, we have each person taking notes, and we have a discussion between

158

us about what we saw what we noted.
Q. Okay. And for this observation report, do you recall who write - - wrote the report? Did one of you write it or did you both write it?
A. We, I want to say we wrote it together, because we did consult with each other on the writing. Mr. Goodman actually typed it on the computer.
Q. Okay. And if Mr. Goodman typed it on the computer, did you read the observation report prior to it being given to Ms. Legra?
A. I've seen it several times before.

159

Q. So it states, "while you were required to submit your lesson plans every Monday following your last unsatisfactory observation, to facilitate professional assistance relative to your teaching practice, you have failed to take advantage of this opportunity for professional development." Can you tell us when Ms. Legra was - - when this requirement to submit lesson plans began?
A. It began as a result of her - - an observation that was conducted, I believe, by Mr. Goodman.
Q. Okay. And to whom was Ms. Legra required to submit her lesson plans?

160

A. She was required to submit them to me...

Q. No, she did not submit some?
A. No, she did not submit. She - - I believe she submitted one once, and that was it.

163

Q. Now in the first full paragraph on page 50, Bates page 52, and the paragraph begins, "We entered your classroom." In the second sentence you write, and the sentences that follow, you write, "You were in the process of telling students to transition to their rug spots. The students were also told to bring pencils to the rug, so there were students attempting to locate and sharpen pencils. The pencils were not easily accessible for all students, nor were they used at the rug."

Can you tell us what significant about Ms. Legra asking the students to bring pencils with them to the rug?

A. Typically you don't do that. When the children are writing, they usually write at their desks, unless they are writing on whiteboards, which you know, we provide markers for. But certainly, you know, what also brought to mind was that that was no prepared ahead of time, that if that's what your intention was, to have children bring pencils to the carpet, then that should have been done, you know, ahead of time. Or you provide the pencils as a way to do it.

164

Q. Okay. And what if anything was significant about the student sharpening pencils?

A. It just took an extraordinary amount of time. It's, you know, just a lot of down time with that, and the children out of their seats doing that. It delays everything.

Q. Now going on towards the bottom of this one paragraph, it states, from the sixth line up from the bottom, "You then went to the closet to retrieve something which apparently was necessary to teach the lesson already underway." Why was it significant to note that Ms. Legra went to the closet to retrieve something for this lesson?

A. Because as I indicated, that she didn't have all of the materials ready to teach the lesson. So it is, it speaks to the being prepared.

165

Q. ...Can you tell us what concerned you about the fact that there was vocabulary

and instruction specific to the worksheet that had not previously been addressed?

A. If you are asking children to complete a worksheet and you're giving them a worksheet to go back, to go up to their desks and complete, it seems if any vocabulary that you're -- that the child will -- would encounter would have been addressed prior, considering again that these are first grade students, that you would hope that it would certainly be addressed sooner. And again, a lack of preparedness and planning, planning in this case.

166

...Can you tell us what concerned you about the fact that the lesson plan, the lesson, and the independent practice didn't match?

A. The lesson plan that I was given, Mr. Goodman was given, right? That was to match this lesson and the activity that the children were engaged in and what Ms. Legra actually did at the meeting area, which is where we have the direct instruction. It was all different. And so then that, again the question is how was this planned? You know, so...

A. They're not going to learn it. If you're at the carpet with children and you're teaching them or modeling or showing them one - - something to do and then set them off to go do something completely different, there's no connection. There's no value in that whatsoever. And most of the children were not even able to do the work or complete the worksheet

167

that was given to them...

Q. And what concerned you about the fact that something that was in the teaching point didn't actually take place in the lesson?

A. Because that's what's before the students and they're looking up there. And also that is what the observer is expecting to see, right? And it's not -- but certainly the children, if you're telling them that's what you're going to be doing, then you should be referring to that teaching point and you're doing something else. It's very confusing

for children.

168

A. Right. What happened during this lesson is evidence that she was not thoroughly planned. Previous instructions for improvement were for her to thoroughly plan lessons and then ultimately to submit to me, so that we could have a discussion and I could provide some professional development support to her. And the necessity of that - - which she did not follow through, which she did not do, which shows that she did not want to change this aspect of her teaching, or professional practice, should I say.

Q. Now in the next sentence, it states, "Although you have been required to submit your lesson plans for review every Monday in the weeks leading up to this lesson, you are, "and it's emphasized again, "being directing to a weekly conference alongside the coaches and Mr. Goodman on a day and time to be

169

determined to discuss your lesson plans and your lesson and communication techniques." Why was this directed to - - why was this directive made to meet with Mr. Goodman and review - - and the coaches and review lesson plans?

A. For the purpose of providing professional development to Ms. Legra again. And having Mr. Goodman there as the assistant principal who, you know, certainly would oversee specifically ELA instruction, but certainly oversees all instructions alongside me, that the coaches would also have support with Ms. Legra there, Mr. Goodman, and so that she could become better at planning. And that was -- the purpose was for support, okay?...

...Can you tell us what you would have expected Ms. Legra to be doing during the time that the students were working on their

170

worksheets?

A. During independent practice, which is what this worksheet was supposed to be, a teacher should be monitoring what is going on. And the way they monitor is that to look at students, to have

conversations with students or to confer with them. If she had just walked around and looked in or checked in with students, she would have seen clearly that they were not able to complete this task. She may have also noted that it didn't match what she was teaching at, you know, at the area or trying to convey to students at that area.

And maybe, you know, would have refined her next steps to say you know what? Let's not do this worksheet. Let's do something else. So all of that was not - - was a missed opportunity.

171

Q. Now in a sentence, the last sentence before the underlined words in this paragraph, you write, "No effort or attempt was made to confer while students completed the worksheet." Can you explain what you mean by "conferring?"

A. Conferring is having a conversation with the child, one child, about the work underway. Or about, for example, in this instance if he was working on this worksheet you would have a conversation about his thinking, asking him questions, trying to get some clarification. You are also recording what the child is saying, you are recording notes. That's a means of assessing during instruction.

Q. Okay. And why would you have expected to see Ms. Legra conferring with students during this particular worksheet practice?

A. That's a practice that is required during interview practice.

172

Q. Now in the sentences that follow which are underlined, you refer to training alongside staff developers, coaches and colleagues with respect to this instruction requirement. Can you tell us why there is a reference to professional development and training that had been given to Ms. Legra in this observation?

A. It's important to note that Ms. Legra was - - has received extensive professional development in how to confer, and yet chose not to. To understand the reason, reasoning behind it, not conferring as assessing instruction, and it just - - and also to just

let her know that we will continue to support you in this effort…

A. Well, you expect to see student work hanging up that reflects the current unit. I would expect to see charts that would aid students in completing work that's contained in this mathematics

173

unit of study. And there were no charts or any display of student work, but specifically the charts, which are their instructional aides to children. It was void of that in the classroom…

A. Because these classroom environment and the lack of charts to support the unit of study and the way it was noted, nothing was done about it. And the taking time later, still nothing was done about it.

174

...Now it states that, "You will again need to visit other classrooms." Can you tell us when Ms. Legra was first, if you know, when Ms. Legra was first directed to visit other classrooms?

A. I can't specifically tell you a date when, but that is certainly the practice, where a teacher would have an inter-visitation…

...But she has been directed before. I cannot recall the exact date.

Q. Okay. And why was Ms. Legra directed again to visit classrooms to determine physical characteristics?

A. Just to give her some idea, you know, ideas about what should - - what a classroom like that reflects the curriculum that's underway. That's one thing. The tidiness of the room is another. The organization of the tables and chairs and groups is another concern. As I said earlier, her desks were all one side. I don't know if that's really the best

175

way to facilitate group work, which is the classroom arrangement. Just to give her other ideas from her colleagues of how a first grade classroom would look

and should look.
Q. Now in the -- on the next page, which is Bates page 55, in the first full sentence on the top of that page, it states, "Ms. Zeno [phonetic], our advisor will - - test coordinator, special projects liaison will be assigned to work with you weekly during a day and time to be determined for the purpose of addressing the issues that exist with respect to your classroom environment."...

176

A. Yes.
Q. Can you tell us why this lesson was given unsatisfactory rating?
A. Right. For everything stated in the observation report, the children were unable to complete a task. The children were confused. Children did not learn. And all of the reasons that were stated, the environment, lack of planning and so forth.
Q. Now this was an observation that was conducted by both yourself and Mr. Goodman. Whose decision was it to rate the lesson unsatisfactory?
A. It was a combined decision.

B. The DOE's evidence relating to running records in Specification "5)" [page 2, above] are DOE's 16, 18 and 36 and testimony of Assistant Principal Goodman and Literacy Coach Nilda Francisco in support.

The Specification references "letter dated June 23, 2012." The letter is DOE 18. It is referenced in Item No. 1 as substantiating in the Documentation Section 4, on page 2 of the Annual Professional Performance Review (DOE 4) signed June 22, 2012, as B4 on Page 1 ("Planning and Preparation of Work in Pupil Guidance and Instruction).

DOE 18, the letter sent to Respondent by Mr. Goodman stated

> On February 1, 2012, Ms. Boursiquot and I met with you alongside your UFT Representative to discuss my findings during a routine classroom visit on Tuesday, January 31, 2012. During my classroom visit, I observed a number of concerns aligned with Independent and Partner Reading *and* the content of students' Book Baggies. This prompted me to request the actual Running Records that you as the

> professional classroom teacher had administered prior to my visit. You were unable to produce *any* Running Records during my classroom visit. It was expected that Kindergarten teachers were in the process of formally administering Running Records.
>
> Ms. Legra, you should be reminded of the critical role Running Records play in our whole class, small group, and individual instructional practice, particularly for Kindergarten students as this assessment was to be the first formal Running Record assessment of the school year.
>
> We trust that moving forward, you will adhere to the required timeline outlined in all faculty correspondence issued by administrators and Coaches that aims to identify dates for important assessment work to be completed by. Additionally, we want to you ensure that a formal system is in place to organize all formal and informal assessment work; actual Running Records that are administered to students should be placed in a binder or folder.

Counsel for Respondent argued, on Page 1829 of the Transcript

> Department's Exhibit 18, references a time in February
> of 2012. The letter itself was not generated until
> June of 2012. Therefore, under the collective
> bargaining agreement, this letter should not have been
> placed in Ms. Legra's file.

DOE 16 is a seventy page Package of the "Week Ahead" memo's to "P.S. 173 Community". The memo dated November 20, 2011 (Bates No. 270) included

> Most importantly, we'll continue to use the data available to us to inform our next steps throughout the school; especially when it comes to Running Records and *assigned* Reading Levels.

The memo dated January 21, 2012 (Bates No. 281) included on page 1.

> During our time in K - 2 classrooms this past week, we had the opportunity to:
>
> . . .
>
> Beginning to look carefully at the actual Running Records and in some cases, reassessing the Kindergarteners identified as Level A or Level B readers.

DOE 36, which is not dated, (Bates No. 339) includes:

Big Ideas to Hold on to (K-2) Across Reading *and* Writing

. . .

Reading

Hold off an administering form running record and sight word assessments until mid to late September.

Ms. Francisco's testimony included:

897

Q. Can you tell us what that (DOE 36) is?
A. This is sort of like an overview or a guideline that we normally pass out to teachers at the beginning of the year. There is one for teachers in K to 2 and there is one for teachers in grades 3 to 5. And it's just like, again as I stated before, an overview of ideas that you should be holding on to or paying attention to as far as reading and writing instruction is concerned.
Q. Okay. And who created this document?
A. I did.

900

Q. So tell us about the purpose of distributing this document to the K to 2 teachers at PS 173.
A. It's you could call it a reminder because none of the stuff that's written here is new to veteran teachers as we call them. For a brand new teacher I would have a meeting and sort of address each component and elaborate on each component. That's why it's bulleted and it's very sort of straight to the point, because it's a reminder of what our literacy curriculum looks like pretty much. Like the big things that need to be addressed in literacy and writing.
Q. Okay.
A. And literacy in general.

901

Q. - - the first bullet point states "Hold off on administering formal running record and site word assessments until mid to late September." Can you tell us about - - well, first, what are running

records?

A. Running record is a formal assessment that's administered to children and it's pretty much the child has a copy of a book in the lower grades and the teacher has a copy of - - a typed up copy of the book. And the child reads and the children - - and the teacher takes note on what the child is able to do with no assistance.

Q. Okay. And why in this bullet point does it state to hold off on administering formal running records until mid to late September?

A. Because when we get the children back in September they've been off for two months, two and a half months; most of them having been reading. If they're in kindergarten, most of them don't know how to read. They're - - that's one reason. Another reason is because they are coming into a classroom, to a brand new teacher, a person that they don't really know. So we give them those two weeks to get

acclimated to the school setting, to get acclimated to their teacher, to become comfortable with the idea of holding a book, because it is very intimidating for a young child to just sit with an adult and the adult is just taking notes as the child is reading. So we like to give the children just those first two weeks to just again become acclimated and sort of get back into the grove (sic) of things. And then we begin formally assessing them but that does not happen in kindergarten however. In kindergarten we don't start that until January because it takes them a lot longer than a first or second grader.

Q. Okay. So tell us about how running records are administered in kindergarten.

A. The same way when we begin in January.

Q. Okay.

A. The child would hold a book, very simple. We start from letter A. There are just a few words on the page, like one simple sentence. It moves all the way up to level Z. And the child has an actual copy of a book. The teacher has a typed up copy of the book and the teacher just takes notes and marks off the words that the child knows, the ones that he doesn't know, what he does when he gets to a

903

word he doesn't know. But that doesn't start until January in kindergarten.
Q. Okay. And at what point in January does it begin?
A. Usually mid-January.
Q. Okay. And by the end of January what is the expectation for kindergarten running records?
A. The expectation is that the teacher is either completely done assessing the whole class or very, very close to being done. And then there is a step right after that because once we assess the child and we know the child's level we then prepare what we call a book baggie. And it's just pretty much a Ziploc bag with multiple books at whatever level it was determined that the child is at. And the child travels with the baggie back and forth to home and school, and reads those books during a certain period of the day.

Mr. Goodman's testimony included

440

A. So a running record is an assessment tool that is aligned with a particular level and that assessment is administered to a student to determine their reading level and ultimately, the level books that they should be reading.
Q. How long has P.S. 173 been using running records, if you know?
A. As long as I have been there.
Q. And can you tell us about the

441

expectations or a teacher's use of running records?
A. Right. The expectations for use are ultimately that teachers are not just assessing students, but they are analyzing those running records for the purpose of making instructional decisions that are relevant to the entire class, small groups of students, as well as individual students.
Q. And how are running records maintained?
A. Teachers generally maintain their running records, the actual running record document

whereas the list of students is submitted to school administrators as a means of accountability. So they hard copy stays with the teacher and a list of every student and their level goes to the administration.

Q. And what ultimately happens with the list that goes to the school administration?

A. It's analyzed and decisions are made around, you know, how many students are, you know reading on level, below level, above grade level and it's used as a means of determining the kinds of things that should be see (sic) inside of that classroom during classroom visits.

442

Q. And you testified that there are also copies of running records that are kept with the teacher?

A. Right, so the teacher maintains the actual running record itself - -....

A. So just to clarify, there are different intervals during the year where the running records are administered and it's been a general practice to have the most recent running record, the one administered in say May or June, move up with that student to the net (sic) grade for the following year teacher.

Q. And what happens with the previous running records that have been collected?

A. So provided that the child is not a

443

candidate for summer school, the teacher would discard that.

Q. And at the end of the school year what happens with the list of running records that you testified is submitted to the school administration?

A. Those are maintained over several years?

Q. And when you say that they're maintained over several years, is there any point at which they are discarded?

A. I can't say that I've ever thrown out a running record list submitted by a teacher.

On cross examination, Mr. Goodman testified

Q. If you look at the fifth bullet point, it says "Beginning to look carefully at the actual running records and, in some cases, reassessing the kindergarteners identified as Level A or Level B readers." Can you please explain that -- what that bullet point was in reference to again?

A. I recall the administration, along with the literacy coach, determining that it was necessary for us to take another look at the assessment data that teachers were beginning to submit and that the emphasis was on looking at the students that teachers were identifying as Level A or Level B readers to ensure that that data was, in fact, accurate.

Q. And you also testified that on January 29th, 2012, that you expected teachers to be assessing students with running records. Is that correct?

A. Yes.

Q. Were teachers supposed to have had their running records completed by January 29th, 2012?

A. I recall that there needed to be evidence that the process was underway, not completed.

A. Okay. And on February 1st, 2012, you had opportunity to be in Ms. Legra's classroom, correct?

A. I believe that's correct.

Q. And you asked her to produce her running records.

A. Correct.

Q. And she didn't have them that day.

A. That's correct.

Q. Do you know if it's because they were underway or they just weren't present in the room that day?

A. I recall that the running records were not underway at that point.

Q. But your testimony earlier was that she couldn't provide you with the running records.

A. Right, that the running records were unavailable for review.

Q. But Ms. Legra did actually turn in running records at some point that year.
A. Probably.
Q. Okay. And so, the timeframe between when you were saying that teachers were expected to be working on running records and when you weren't able to see them in Ms. Legra's classroom was approximately two to three days.
A. I believe that's what the dates

812

suggest
Q. So, it's possible that they could have been completed on February 2nd.
A. Unlikely, but possible.

C. The DOE's evidence relating to supervising students in 2012 - 2013 school year in Specification "6)"[page 6, above] are DOE's 5, 19C, 20 and 21B and the testimony of Principal Boursiquot and Assistant Principal Goodman in support.

DOE 21B is a January 22, 2013 two page letter, Bates No. 65 and 66, to Respondent from Mr. Goodman relating to an observation on January 15, 2013.

It included:

> You were summoned to a disciplinary conference on Wednesday, January 16, 2013 at 8:10am to discuss what I observed inside of your classroom on Tuesday, January 15, 2013. The conference addressed the issues that I observed at approximately 8:50am while I was conducting a routine instructional walkthrough of Grade 1 classrooms. Present at the disciplinary conference was the Principal, Ms. Boursiquot and your union representative.
>
> On January 15, 2013 while on the third floor, I was immediately drawn to your classroom by the excessive noise and sounds that suggested that you were struggling to manage your 17 Grade 1 students, likely as a result of your lack of adequate planning. I looked through the window on the door of your classroom and observed chaos; students up out of their seats, at least one was running, another was demonstrating karate moves on the closet door and the majority of the students were not involved in *anything* instructional in nature or otherwise — an issue that has repeatedly plagued your tenure as a classroom teacher at P.S. 173. I attempted to locate you, the professional classroom teacher, in the room and was unable to do so. One of your students noticed me standing at the door observing the mayhem and opened the door for me so I was able to enter. At that point, I observed you "buried"

in a comer of the classroom at the computer table; out of sight from your students in a position that would make it extraordinarily difficult to observe *all* of your students properly. You were negligent in maintaining a safe classroom environment because your position in the classroom at that time prevented you from monitoring the safety and well-being of your Grade 1 students, a minimal responsibility for any teacher — even the substitute teachers that cover classes in our school on a regular basis.

Once you observed that I was inside of your classroom, you quickly left the computer table and attempted to address the many behavioral issues that were evident.

At your disciplinary conference, you stated that you were "sharpening pencils" during the time I observed your classroom. You are not permitted to abandon your authority as the adult in the classroom to engage in a task that takes you away from your students, provided you were in fact "sharpening pencils." You also alluded to the idea that the several students in your class are responsible for the lack of order that is observed inside of your classroom consistently. You should be reminded that several students were removed from your class since September 2012 because you had great difficulty in addressing their behavioral and academic needs. You are required to maintain a safe classroom environment for all students and to immediately address behavior that is deemed to be disruptive; i.e. students running or demonstrating karate moves on a closet door. Idle first graders are likely to engage in unacceptable behavior.

You have been warned repeatedly and it has been documented on several occasions over the years that your inability to manage your students for the purpose of providing a safe learning environment has been a recurring theme and needs to be your professional priority moving forward. However, you continue to fail to acknowledge this.

It was brought to my attention later in the day on January 15, 2013 that ***three*** students were injured later that same day while in your care. This is unacceptable. It can be concluded that these students were injured as a result of your inability to, monitor the safety and well-being of your students and by failing to engage them in meaningful curriculum and instruction or activities. During your disciplinary conference, you stated that a female student in your class, J., initiated the behavior that led to the injuries.

Please be reminded of your responsibility to maintain a safe learning environment for your Grade 1 students. Failure to comply with these directives will result in further disciplinary action, including, but not limited to, charges that may lead to termination of your employment and an Unsatisfactory rating for the 2012-13 school year.

The Respondent testified she responded to Mr. Goodman's letter on January 22, 2013, (R11) [T.1203 L. 23-25] and "placed it in his mailbox" [T.1205 L.4].

Her letter states

> On the day you entered my class room (January 15, 2013) you first stated I was on the computer. Then you said I was sharpening pencils. The morning in which I was summoned to a disciplinary hearing by you I was re-sharpening three pencils which were too sharp. To prevent any accidents I decided to re-sharpen these pencils right away. The students were walking around the room working on word activities. One of which is reading the room. In this activity during our word work period students look for words in the room which have to do with the specific teaching point for that day.
>
> I teach a first grade class which started with many issues of behavioral disruptions. This is not only stated by me but by their former teacher, and other teachers as well. I took over this classroom in October. I currently have two children with IEP's. I do implement and practice rules on a daily basis. As a professional I do care and do provide a safe environment for my students. The safety of my students is of great importance to me. I do like to practice moving games with my students. This has been since I took over this class. Moving activities tend to help students with attention deficit hyperactivity disorder. These activities were suggested by the student's therapist. The time that you do stand by my door please take this into consideration.
>
> I am not aware of any students being removed from my room due to my lack of meeting their behavioral or academic needs. The students which have been removed from my room are Christopher Adames; which moved to the Bronx, and Eric Montanez who was transferred to a special Education classroom due to an IEP hearing in which it was determined that due to a learning impediment Eric would advance in that special classroom. I am unaware of any other student being removed due to anything else other than what was previously stated. You mentioned in your disciplinary letter dated January 22, 2013 that students were removed from my room since September of 2012. Please let me remind you that I took over class 104 in October. I really do not know of anyone being removed prior to that.

Respondent's testimony on direct examination included

1206

Q. During Mr. Goodman's testimony he stated that you were behind a desk, not watching the children on January 15th, 2013. Can you please explain to us what you were doing that day?

A. That day there were students preparing to go to ESL and they needed pencils. The pencils were too sharp, so I re-sharped some of the pencils

1207

so that they can take one with them.

Q. Where is the pencil sharpener located

in your classroom?

A. On the computer desk.

Q. Where would have to stand in order to sharpen pencils?

A. Behind the desk.

Q. Do you recall how long you were sharpening pencils for?

A. Maybe a minute.

Q. What do you recall doing after you sharpened those pencils for the students going to the ESL class?

A. I had to gather them and give them their pencils and send them to their class.

Q. After you took care of the ESL students, do you recall what if anything you did after that with your class?

A. I think I gathered them on the carpet.

Q. Mr. Goodman also testified about the students misbehaving during that - - the time he was in your class on that date. What is your recollection of what your students were doing on that date?

A. On that date, I believe that was --

1208

January 15th was a Thursday. On Thursday we have music. We were coming from the music and the ESL teacher wanted to see the ESL students. Because we had missed the reader's workshop which was supposed to be during music; I made it up that period. Now, before we went to music there were activities that we were doing which was -- I don't recall whether it was interactive writing or word study in which students had to read the room. So I don't recall whether I finished that portion when we came back from music that we were doing prior to leaving or whether I just gathered the students back in the meeting area for the reading lesson.

Q. In your response letter you stated, "I do like to practice moving games with my students." Can you please explain to us what "moving games" are?

A. Well, especially with children that have a hard time concentrating or have a hyperactivity disorder, it's important for them to move around. So that's one of the strategies that I used with them.

Q. But what exactly are moving games?

A. For example, when I see a student is

exhibiting behavior, then that student will have a chance to go out to the restroom and walk around and

1209

walk it off by walking fast to and from the restroom. So many students in my class knew that they could just ask, that they needed that time and it would be given to them. Another activity of moving games would be as a whole class, for example jumping jacks or sometimes they would be correlated into the lesson. So different, different activities would be done.

Q. What if any rules are there at PS 173 about using moving games?

A. There are none.

D. The DOE's evidence relating to lesson plans in the 2012-2013 school year in Specification "7)" [page 6 above] and DOE's 6, 19C and 20 and the testimony of Principal Boursiquot and Assistant Principal Goodman in support.

Respondent's testimony included

1211

Q. And you can please state for the record what you recognize Department's Exhibit 19C to be?

A. It is an informal observation.

1212

Q. And do you recall whether there was a post observation conference for this lesson?

A. Yes.

Q. And what is your recollection?

A. There was post observation conference on February 4th.

Q. Mr. Goodman has testified that you did not come to the post observation conference. Do you recall whether you went to the post observation conference?

A. Yes, I do.

Q. Okay, and what is your recollection?

A. There was a phone call to my room from Mr. Goodman stating that there was a post observation conference. I was really confused because I don't know what he was referring to because I was supposed to have a pre-observation conference which never

occurred. So I asked him about it and he hung up the phone. At that time, I went to my union representative and explained to him what was happening.

Q. And you recall what if anything your union representative said in response?

A. Yes.

1213

Q. And what was that?

A. He said I had to attend the conference.

A. And then did you attend the conference?

A. There wasn't enough time from when I was called to when I had to pick up the class.

Q. When if ever did Mr. Goodman try to reschedule the post observation conference?

A. He did try. He tried during the other informal observation.

Q. Okay.

1224

Q. ...

...On page three of Department's Exhibit 19C the bottom bullet point says, "The share you attempted to facilitate at the end of independent reading." What is your opinion of what a share is that context?

A. A share is part of the -- of the readers and writers workshop where after the mini-lesson and after the independent work and after the last part of the lesson is to gather the students back again and do a big share of whatever skill was practiced or whatever they were doing. And that's a typical share.

Q. And how do you facilitate a share?

A. Well, you look for an example of someone that had done either needed work or excelled in what they were supposed to do. You catch an example that you want to share with everyone else to reinforce what was learned that day.

Q. And Mr. Goodman characterized your questioning of the student as that you "grilled the student with a line of questioning." Can you please state your recollection if any about what happened

with your interaction with a student?

A. Well, this particular student really did not--was, very--was very quiet, did not share, did not speak at all. And one of the worries of the mom was that in the report card was that he develops this thoughts and, pardon, and with the class he gives his thoughts out. And he would never get a satisfactory mark on his report card. So I tried--this particular child I tried to get him to speak, get him to speak, to give his opinion in class discussion. That was something that was talked about with the parent.

Q. Do you agree with Mr. Goodman's assessment that you grilled the student?

A. No.

Q. And what purpose if any is there in asking a student questions about recent activity that they just did?

A. To reinforce the activity with this particular child to get him to interact more, to give his opinion in class discussion during the lesson.

Q. In asking a student questions, what if anything does that do to aid in your assessment of a student?

A. Of this particular student?

Q. Well, in general and then…

A. In general, you would get a response and you would see what their area of thinking is and if there was a deficiency or there was something you needed to work at.

Q. And with this particular student what if anything about asking him questions helped you aid an assessment of the student?

A. Well, if it gave me the opportunity to see whether or not he was developing the--let going of the shyness and developing a talk in class discussion, to be able to speak…

Q. …

…Mr. Goodman also references in …Department's Exhibit 19C on

page five that your cellphone rang while he was in the classroom. Do you recall whether this happened?
A. Yes.
Q. And what is your recollection?
A. Well, I usually put the alarm on to let us know that we have to move on to another lesson. And students were accustomed to hearing the alarms on my phone knowing that this activity would be coming to an end. It was not ringing, it was the alarm.
Q. When if ever do you use your cellphone to call people during the school day?
A. I usually call parents on my phone.
Q. When would be an appropriate time for you do that?
A. During lunch time or during my professional period.
Q. When if ever would you use your cell phone to call people during instructional time?
A. In case of an emergency.
Q. Is there any other reason why you would, other than an emergency, that you would call someone during a class?
A. No.
Q. Other than in an emergency, is there a

reason why you would answer your cellphone during instructional time?
A. No.
Q. In the third paragraph on Department's Exhibit 19C, page five, third paragraph, there is a sentence starting,..."We will continue to provide ongoing intensive professional development to you." What is your recollection of the intensive professional development that was provided to you prior to this day?
A. I believe Ms. Francisco [phonetic] came in to do a demonstration lesson sometime in February. I remember it was prior to this -- to this date.
Q. Do you recall whether you had any professional development other than grade level professional development at this time?
A. Yes.
Q. And what is your recollection

regarding that?

A. There was none.

Q. Also on page three of Department's Exhibit 19C in the --at the top of the page there's a sentence that starts with, "What I observed..." Mr.

1229

Goodman wrote, "What I observed over roughly a class period inside of room 314 prompted me to request your lesson plans. You were unable to produce a cohesive set of plans that outlined your day." Do you recall a time previous to this date where you provided Mr. Goodman with your lesson plans?...

Q. What if any is your recollection about providing Mr. Goodman with your lesson plans prior to this date?

A. I remember I had to leave early in January and I left him the lesson plans because he was the one that took over my classroom when I left early.

Q. And when was that in January?

A. January 31st.

Q. And at that time what exactly did you provide to Mr. Goodman?

A. I left him a marble notebook with my

1230

plan.

Q. ...

...What if anything do you recall about Mr. Goodman returning that notebook to you?

A. He did not return it.

Q. And can you please state again for the record the date that Mr. Goodman performed this informal observation?

A. February 1st, 2013.

[Pause]

Q. ...

When if ever did you request the lesson plans back from Mr. Goodman?

A. I requested them the day I returned, maybe February 1st.

Q. Do you recall memorializing that request into writing?

A. Yes, it was through email.

1231

Q. And can you please state for the record what you recognize Respondent's Exhibit 7 to be?
A. It is an email from myself to Mr. Goodman.
Q. And do you recognize the subject to that email?
A. Yes.
Q. And is this the memorialization of your request to -- is Respondent's Exhibit 7 the memorialization of your request for your notebook back from Mr. Goodman?
A. Yes, it is.

1233

Q. Okay. Is Respondent's Exhibit 7 the only request that you made to Mr. Goodman for the notebook back, to get the notebook back?
A. No, I'm sorry. I do recall he -- the day he came in for the informal observation, I did ask for my notebook.
Q. And how did you ask?
A. I asked Mr. Goodman if he could please return them to me.
Q. Was it -- was it in an oral request?
A. It was an oral request?
Q. And what if anything did Mr. Goodman respond to you?
A. He said that he did not have them.
Q. And, with respect to the email that is contained in Respondent's Exhibit 7, what if anything do you recall about Mr. Goodman replying to that email?

1234

A. No, he did not…

…What if anything did Mr. Goodman say to you regarding an informal observation after the informal observation that occurred in February 1st, 2013?
A. He did not.

1235

A. It's an email from myself to Mr. Goodman dated Monday, February 4th, 2013.