9        Q. And can you please read the body of
10   email of Respondent's Exhibit 6?
11        A. "Just a reminder of having my pre-
12   observation conference, I have not received any
13   notices of any dates as of yet.  Please let me know."
14        Q. And can you please state for the
15   record who Respondent's Exhibit 6 was directed to?
16        A. It was directed to Mr. Goodman.
17        Q. And what if anything do you recall
18   about Mr. Goodman responding to Responding's Exhibit
19   6?
20        A. He did not respond.

1236

7        Q. And what do you recognize Department's
8    Exhibit 19B to be?
9        A. It's an email.
10        Q. And who is it from and who is it to?
11        A. It's from Mr. Goodman to myself.
12        Q. And do you recall receiving
13   Department's Exhibit 19B?
14        A. Yes.
15        Q. And what is the date of Department's
16   Exhibit 19B?
17        A. February 4th, 2013.

1238

8        Q. What if anything do you recall of Mr.
9    Goodman scheduling a pre--a pre--observation conference
10   and a formal observation during the week of February
11   4th, 2013?
12        A. He did not perform neither (sic) of them.
13        Q. Do you recall whether he scheduled
14   either?
15        A. No, he did not.
16        Q. Subsequent to the email that Mr.
17   Goodman sent to you that is in evidence as 19B, what
18   was your understanding about whether you would receive
19   a pre-observation conference and formal observation?
20        A. I was still waiting a date as to when
21   these, the pre and the formal would take place.

1239

15        Q. And how do you know Ja. Va.?
16        A. Ja. Va. Was a student in my first
17   grade class.

18     Q.  And what if any disciplinary problems
19    did you have with Ja. in your first grade class?
20     A.  Well, Ja. tended to come in late
21    almost every day and she tended to exhibit somewhat
22    irrational behavior.  She would exhibit violence many
23    times.  So there were many times that she did pose a
24    risk to herself ad to the other students in the
25    classroom.

                                                       1240

2     Q.  Do you recall--what if anything do you
3    recall about having to physically restrain Ja.?
4     A.  When in my attempt to calming her down
5    when she was either a threat to herself or to others,
6    I would and my attempts failed and she would still
7    exhibit the violence.  I would have to put her in a
8    hold.
9     Q.  And can you please explain what you
10   mean by a "hold?"
11     A.  A hold is where you take a student
12   that's not responding to a verbal command and is still
13   exhibiting violent behavior.  You have to subdue that
14   person--child.
15     Q.  What if any concerns did you have
16   about Ja. hurting other students in the class?
17     A.  Grave concerns.
18     Q.  And what was the reason for those
19   concerns?
20     A.  Well, she would act impulsively.  Many
21   times she would hurt other students.  She would throw
22   things and she would kick and classroom objects she
23   would throw many times, desks.  So during those times
24   she had to be put in a hold.
25     Q.  When if ever did you have an occasion

                                                       1241

2    to speak with the -- with Principal Boursiquot
3    [phonetic] about Ja. Va's behavior?
4     A.  I spoke to Ms. Boursiquot when I first
5    noticed that she was exhibiting these behaviors.
6     Q.  And do you recall when that was?
7     A.  Not exactly, no.
8     Q.  Was Ja. in your first grade class when
9    you took the class over?
10     A.  Yes.
11     Q.  ...

12    Approximately how much time elapsed from the time that
13    you took over the class to when you started noticing
14    behavioral problems with Ja?
15        A. She always had offsets but they got
16    worse. They escalated maybe a month or two after. I
17    don't exactly recall when...

21        Q. Ms. Legra, do you recognize what's in
22    evidence as Respondent's Exhibit 20?
23        A. Yes.
24        Q. And can you please tell us what
25    Respondent's Exhibit 20 is?

                                                    1242

2        A. This is a comprehensive injury report
3    for Ja. Va.
4        Q. And do you know who prepared
5    Respondent's Exhibit 20?
6        A. Yes.
7        Q. And who is that?
8        A. I did.
9        Q. And do you recall when that was done?
10       A. On March 20th, 2013.
11       Q. And for what reason did you prepare
12    Respondent's Exhibit 20?
13       A. Well, I had accidentally scratched Ja.
14    while placing her in a hold.
15       Q. ...
17    what was the date that you had to place
18    Ja. into a hold. Do you recall?
19       A. March 18th, 2013.
20       Q. Okay. And what were the circumstances
21    surrounding you having to put Ja. into a hold?
22       A. Well, she was exhibiting violence in
23    the classroom that day. She was jumping from desk to
24    desk and in one of her attempts to get to the other
25    table she slid in right through the four desks. So

                                                    1243

2    she was also punching, kicking, and throwing things.
3        Q. And, prior to placing Ja. into a hold,
4    what if anything did you do to try and control her
5    behavior?
6        A. I tried to speak to her. I tried to
7    get her to draw in her notebook. She had her special
8    notebook just for her. I tried to get her to go on

9    the computer, the things that I would usually do with
10   Ja.
11        Q. And were any of those things effective
12   on March 18th, 2013?
13        A. No.
14        Q. What if anything do you recall about
15   notifying principal Boursiquot or one of the assistant
16   principals about this incident?
17        A. I called the office that day.
18        Q. And what if anything do you recall
19   about the response from the office?
20        A. There was a response from Mr. Goodman,
21   very late.
22        Q. And can you please explain what you
23   mean by "a response from Mr. Goodman?"
24        A. Well, he came into the classroom and
25   he saw what was going on.  He just had a yellow

                                                           1244
2    notepad and a pen.  And he just came in and started
3    writing on his yellow notepad.

                                                           1245
12        Q. And can you please tell us what you
13   recognize Respondent's Exhibit 21 to be?
14        A. It's an injury report.
15        Q. And who is it for?
16        A. For myself.
17        Q. And can you for the record state what
18   it says in box 16 of Respondent's Exhibit 21?
19        A. "Date of the injury, March 18th,
20   2013."
21        Q. And can you please state the time --
22   excuse me, the information that is contained in box 17
23   of Respondent's Exhibit 21?
24        A. Yes.  "The time of injury is -- was
25   11:30a.m."

                                                           1246
21        Q. Do you recall whether the incident
22   that occurred on March 18th, 2013, is the incident --
23   also relates to the incident that was contained in
24   Respondent's Exhibit 20?
25        A. Yes.

1247

14       Q.  So the circumstances surrounding the
15   incident that is referenced on March 18th in
16   Respondent's Exhibit 21.
17       A.  Well, on March 18th I placed Ja. in a
18   hold and while placing her in a hold she accidentally -
19   -when she was having a tantrum, she didn't want to
20   be placed in a hold and she kicked me.
21       Q.  And where did she kick you?
22       A.  On my leg.
23       Q.  And with respect to the incident of
24   March 30th or, excuse me, March 20th, 2013, do you
25   recall the circumstances that day that required you to

1248

2    fill out Respondent's Exhibit 21?
3        A.  The same occurred.  I had place her
4    on a hold and she kicked my leg on the same spot
5    again.
6        Q.  And do you recall what activity or
7    what is your recollection about the activity that Ja.
8    was engaged in on March 20th?
9        A.  Well, Ja. got into school late that
10   day and she did not want to take off her coat and she
11   didn't want to put her book bag away.  She had her
12   lunchbox in her hand and she got a juice from her
13   lunchbox and she started squirting the other students
14   with the juice.  It was like a carton juice with a
15   straw, the carton juices that you have a -- you place a
16   straw in.  And when you squeeze you -- juice comes out
17   of the straw.  So she started wetting many students in
18   the class with the juice.
19       Q.  And had Ja. done -- did that happen on
20   more than one occasion where Ja. engaged in that
21   activity?
22       A.  Yes, I believe so.
23       Q.  And do you recall when the other times
24   were?
25       A.  There was one time where Mr. Goodman

1249

2    was in the classroom observing Ja. with the other
3    students with the juice and he didn't attempt to do
4    anything about the situation.
5        Q.  ...
6    What recollection if any do you have about notifying

7     the office about Ja's behavior on March 20th, 2013?
8         A. I called the office and I spoke to one
9     of the secretaries, to Carmen [phonetic]. And I told
10    her that Ja. was violent, that she was hitting other
11    students. And I believe on that day that was the day
12    that Ja. actually did punch me. So I called the
13    office because I was unable to get Ja. to do the other
14    activities that she usually does when she's not in
15    this mood.
16        Q. And what if any response did you
17    receive from the office as a result of Ja's behavior
18    on March 20th?
19        A. It was very late but Mr. Goodman did
20    come in.

                                                    1251

2         Q. And what if anything did you do on
3     March 21st to notify the office about Ja's behavior?
4         A. I called the office.
5         Q. And what if any response did you
6     receive from the office regarding Ja's behavior?
7         A. Mr. Goodman came in.
8         Q. Can you please explain what you mean
9     by the statement, "Mr. Goodman came in?"
10        A. Well, he came and he saw what Ja,. was
11    doing and he continued as if nothing was happening.
12    And he sat down at the desk, one of the desks, and he
13    wrote on his yellow pad.

E.    The DOE's evidence relating to classroom environment in 2012 - 2013 school year in
Specification "8)" [page 7, above] are DOE's 5, 6, 16, 17, 20, 24, 30, 31, 34 and 35 and the
testimony of Principal Boursiquot, Assistant Principal Goodman, Literacy Coach Francisco and Math
Coach Serratty.

      DOE 17, Bates No. 353, a two page letter dated January 25, 2012 to Respondent from Mr.
Goodman which includes

        We are at a really critical juncture in the school year where we need to elevate our
        expectations for students and teachers alike. Informal visits to your Kindergarten
        classroom during instructional time with students present *and* to observe your
        classroom environment without the presence of students suggest that there are still a

number of curricula and instructional deficiencies present that require immediate attention.

For example, when Mrs. Francisco, Monique Knight, our K–2 Staff Developer, and I visited your classroom last week, the majority of your class was not engaged in any learning while you were "navigating" the class from the "kidney" table. While it appeared that students were supposed to be reading independently, a look into Book Baggies demonstrated that students did not have the materials necessary to facilitate this work. If this required, critical component of literacy instruction is not in place in your Kindergarten classroom, it suggests that other structures are not in place during the course of the school day. Ms. Boursiquot and I have serious concerns around whether or not you are adhering to the curricula and instructional mandates required of every teacher at P.S. 173 and throughout the city.

In an effort to support your ongoing professional growth and learning, our Coaches will begin a cycle of support that will begin next week and end at a time to be determined. The structure of this support *may* include opportunities for the Coaches to: observe your teaching, confer with students working independently, support your classroom environment with suggestions, plan collaboratively, etc. Note that the Coaches will *not* be responsible for working with students on a regular basis. The focus will be on the work you are involved in to meet the educational needs of your students.

It is evident that there is a tremendous amount of downtime for students during the school day in your classroom.  Both the Coaches and school administrators will ensure that your planning is one aspect of the support you are being afforded during this cycle of work.

It's imperative that the support structure includes time for the Coaches to observe your teaching practices. It is also necessary for you and the Coaches to have the opportunity to come together to discuss Next Steps, which may include the need for demonstration lessons, Inter-visitations, etc. Time can and will be made for this work on an as needed basis.

*The expectation is that there is legitimate evidence of the support provided when the Coaches are not present and after the cycle of professional support ends.*
*The Coaches are in a position to provide meaningful feedback that you're expected to implement.*

Please expect the Coaches to visit your classroom within the next several days, during Math and Reading or Writing to begin this very important work with you. In our effort to support the valuable work of our Coaches, you should anticipate that an administrator may visit your classroom alongside the Coaches during this cycle of work.

DOE 24, Bates No. 336, a Class Environment Checklist, dated November 8, 2011, with the

word "**DRAFT**" on it, includes

| Classroom Libraries | Word Walls |
|---|---|
| ▢ Brightly colored labels designating baskets | ▢ Pictures and or sentences exist to support words |
| ▢ Book Shopping Schedule is posted | ▢ Word Walls to support **multiple subject areas** |
| ▢ Pictures (preferably two) match the contents of the basket. | ▢ Differentiating Word Wall work; i.e. folders, high frequency |
| ▢ The library is enticing and **books are leveled properly** | words, etc. |
| | ▢ **Making Word Walls accessible and useful to students** |
| **Charts** | **Environmental Print** |
| ▢ Pictures, visuals exit when possible | ▢ Conversational Charts that can be applied across the entire |
| ▢ "Short and sweet" clear language, box and bullet structure | **day** |
| ▢ Legible font, readable from any or most locations | ▢ Pictures to support ELL's and former-ELL's |
| ▢ Charts organized by content area | ▢ Tracking Read Aloud history within the classroom |
| ▢ **Students are using the charts regularly** | ▢ **"Growing" labels that support language acquisition, i.e.** |
| ▢ **Evidence of current units of study in all content areas,** | **"Please close the door" vs. "Door"** |
| appropriate quantity of charts | |

DOE 30, Election Day Professional Development Faculty and Staff Schedule; November 6,

2012 has as its second page entitled "Reading and Writing 1ˢᵗ Grade," with Respondent the seventh

name and signature.

The first page includes

**Grade 1 Faculty**
- **Assessment Pro Data Input in Computer Lab at 10:10am**
- **Meeting with Monique Knight in Room 313 at 8:40am; please bring the** *upcoming* **Reading and Writing Units of Study** *and* **a Writing Folder for a low, medium, and high student (3 folders in all)** *and* **current Reading Levels for your entire class**
- *Implement the 2011 Room Environment Checklist during the time you are not required to be in a meeting*

DOE 31, Bates No. 101, 102 and 103, is a three page letter, dated November 13, 2012, from

Mr. Goodman to Respondent, which includes

Dear Faculty and Staff,

The past few weeks have been extraordinarily challenging for our region and for many of us personally. With Parent Teacher Conferences on the horizon for Wednesday the 14th, we recognize that many faculty and staff members have been gearing up for this significant event.

Mother very important event will be underway in our building this week when our *entire* Network visits P.S. 173 for the purpose of Quality Review preparation. The goal of our Network visit this week will be to simulate some of the components of the *actual* Quality Review which is now less than one month away. While some of

the time on Friday will be spent addressing the Quality Review Rubric alongside our Administrative Team, including Coaches, the better part of the day will be spent inside of classrooms. You may recall that we shared some pertinent information aligned with the Quality Review during our November Faculty and Staff Conference. The critical points below will more completely detail what we will be observing inside and outside of classrooms throughout the day on Friday. We want the day to be as transparent as possible with an emphasis on truly recognizing our strengths as a school community while realistically identifying areas that we can improve for the actual December Quality Review. We'll continue to commit to truly recognizing and supporting initiatives that are going to improve student achievement in the long run.

Recent initiatives, namely the Citywide Instructional Expectations document (see link below) and a more complete implementation of the Common Core Learning Standards will require us to address a number of practices in the weeks and months ahead to fully realize the expectations aligned with raising student achievement, teacher quality, and supervisory responsibilities. Teachers are strongly encouraged to read this document. This is a document that our Common Core Learning Standard. Committee/Inquiry Team has examined in recent weeks. Our Grade Level Meetings and Planning Sessions have aimed to address the goals of this document when possible but of course, it is necessary for **all** teachers to be mindful of these expectations since we are at such a critical juncture as a school community.

http://schools.nyc.gov/NR/rdonlyres/944401BC-84C3-41AC-A8C6-9F326F310DD2/0/201213CitywideInstructionalExpectationsFINAL.pdf

In the interim, it will be necessary for all teachers to acknowledge and Implement the following points moving forward, particularly in preparation for Friday classroom visits.

☐ **Curriculum and Instruction**: It will be necessary to observe instructional practices that are aligned with Workshop teaching across the entire school. Additionally, Reading, Writing, Word Study and Math Workshops should all be relevant to **current** Curriculum Calendars that have been shared by Administrators and Coaches. Science and Social Studies content is equally relevant *especially* if it is content that is being addressed during the Literacy Block as in Grade 3 for example. Consider the Flow of the Week templates submitted earlier in the school year. The Flow of the Day **must** present an accurate account of the work that will unfold in your classroom that day. Ensure that your instructional practices are relevant to the needs of all of the learners in your classroom; think about the mini-lesson and small group instruction as well as the listening and speaking opportunities available to your students over the course of the Workshop. Additionally, Teaching Points should be visible (preferred) and relevant or lesson plans Must be made available to School Administrators/Network Staff. Ideally, we should be able to identify coherence and consistency across a grade. There will be an even greater emphasis placed on the classrooms that have engaged in Unit Planning to address the immediate instructional

practices necessary to teach to the Common Core aligned Performance Tasks in ELA *and* Mathematics. Very simply put, there must be evidence in place where we have exhausted time and resources tied to planning and professional support. Multiple students will most definitely be prompted to identify what they are working on and why. Teachers will likely be asked a variation of that same question.

☐ **Classroom Environment**: We'll again enthusiastically point teachers to the Room Environment Checklist that was created by faculty and staff last year and that was redistributed with the Election Day P.D. schedule this past Tuesday. The most noticeable element of your classroom environment will continue to be the very visible charts hanging in your classroom. Charts *must* be relevant to the work that is presently underway in your classroom across content areas. Charts must be grouped by content area. Charts no longer relevant to the work students are engaged In must be taken down. Most importantly, are charts accessible to all students in that they promote independence and support learning? Many of us invest a great deal of time with the charts we create but we need to go one step further by considering which charts our students are able to use on a regular basis. Look at *all* of the elements of the Room Environment Checklist to thoroughly analyze your classroom environment prior to Friday. Students will likely be prompted to identify a chart that they have recently used to support their learning — in Cluster Rooms/Spaces too. Realistically, teachers will likely be asked why certain charts exist, why certain words are included on the Word Wall, etc.

☐ **Data & Assessment:** There are a number of assessments that we've administered to date as well as some data that we have available to us about our students. While we believe that we have some significant work to accomplish on this front, particularly with the analysis of student work, it is necessary for teachers to have access to the data that they are using to make instructional decisions for individual students, small groups of students and the class as a whole. While we have embraced the use of Conference Notes for Reading, Writing, and Mathematics, systems in place for maintaining Conference Notes across classrooms have been inconsistent, but are still a requirement nonetheless. Having access to data such as Conference Notes and being familiar with DoE Systems like ARIS will allow you to more fully speak to the instructional moves you are making inside of your classroom. To go one step further, when your students' are able to speak to their needs individually, (My teacher has me working on...) that can showcase a good part of the assessment work that you are regularly engaged in.

As an aside, while we have a Portfolio Check-In tentatively scheduled for later in the month, it is necessary for ELA and Math Portfolios to be in place and accessible with some of the contents in place since we aim to use the Portfolios as a means of data collection and for student learning analysis when possible; especially when student work samples are graded using rubrics.

☐ Please do not forget about Bulletin Boards inside and outside of your classroom. Bulletin Boards **must** showcase recent **assessed** work that Is relevant and aligned

with Common Core Learning Standards in ELA and Mathematics.

DOE 34, Bates No. 120 and 121, is a February 11, 2013 two page memo to Respondent from

Mr. Goodman numbered as page 1 of 3 and page 3 of 3, which includes

> **Please open and read the attached document.** I placed a copy of this *same* letter in your Main Office mailbox at 9:00 am this morning. I will also let Ms. Vargas know to remind you that you need to complete this document and return it to me **before** the end of the day so that we are able to afford this excellent Professional Development opportunity to *all* Grade 1 teachers on Tuesday, February 12, 2013.

> I believe very strongly that facilitating a Lab Site in your Grade 1 classroom will be a tremendous professional opportunity for you personally since we continue to have very serious concerns about your instructional and classroom management practices.

> Your classroom has been selected as the **Lab Site** for Monique's visit on February 12, 2013. In order to for Monique to facilitate the mini-lesson alongside you tomorrow, please provide your **Reading and Writing Teaching Points** for **Tuesday, February 12, 2013**. Providing these Teaching Points will allow for the mini-lesson to be aligned with the important reading and writing work that is presently underway in your classroom.

> *Additionally, please make sure all of the required tools that students use daily during reading and writing is available during our visit tomorrow; i.e. Book Baggies, Reading Logs, Writing Folders, that contain student writing relevant to the current unit of study, etc. This will help us facilitate small group work should time allow.*

> Please make sure your schedule is somewhat flexible tomorrow. We will be in our Kindergarten Lab Site during Periods 6 and 7; our Grade 1 Lab Site during Periods 3 and 4 and our Grade 2 Lab Site during Periods 1 and 2.

> Please return this document to Mr. Goodman before you leave today. Please do not hesitate to reach out to Mr. Goodman should you have a question or concern.

DOE 35, Bates No. 115 and 116, references Grade 1 Conference, May 23, 2013 Room 514.

The second page has Respondent's name and signature on line 8. The first page, without

handwritten comments, as typed, reflects

> A. *Final* **Reading and Writing Units** of the year (late May/early June) to act as the Portfolio Writing sample; Mrs. Francisco is going to speak to this

B.      **End of the year expectations**

*       Running Records; late May/early June (the final, *actual* Running Records for the year will move up with the child)

*Do not discard any other Running Records or Conference Notes until further notice.*

*       Portfolios
*       Revised Articulation document sample
*       Cumulative Record Folder completion (a memo is forthcoming)

C.      **Loose ends**

*       Formal Observations
*       Classroom Library maintenance
*       Running Record Materials
*       Questions or concerns

D.      Looking ahead:  **June 2013**

*       Citywide  Instructional Expectations for the year ahead
*       Danielson's Framework
*       Depth of Knowledge
*       Professional Development opportunities; Summer 2013
*       ELA & Math Curriculum preparation

*There are many professional resources available on the Department of Education website that we would strongly encourage teachers to explore in the Interim.*

F.      The DOE's evidence relating to excessively late and/or absent for 2012-2013 school year in Specification "9)" were listed as DOE 9 and 46 and the testimony of Principal Boursiquot and Secretary Vargas in support.  DOE 7 and 48 were not listed.  However, they were submitted and testimony was offered.

DOE's 9, Bates No. 83 and 84, is for a P.S. 173 Faculty meeting on September 5, 2012. The second page has Respondent's name and signature on the fourth line. The first page is an agenda, which includes:

| | |
|---|---|
| I. | Welcome Back |
| | Welcome New Staff Members |
| | •    Ms. Kim; Grade 4 |
| | •    Ms. Angel; Grade 3 |
| | •    Ms. Moscoso; Grade 1 |
| III. | Tentative Organization Sheet; student enrollment will dictate class needs |
| IV. | Library Update |
| V. | ATS Class List distribution, classes will appear large at first |
| VI. | Supervisory Assignments |
| | •    Kevin Goodman - ELA, Cluster Teachers, New/Probationary Teachers |
| | •    Madrid Deratus - Math, ESL, Discipline & Safety |
| | •    All administrators will supervise classroom teachers across the grades |
| VII. | Cluster Program delayed due to Space Sharing |
| VIII. | First Day Procedures including roles of out of classroom personnel |
| IX. | Questions |

*Please look for Book Baggies and Work Samples in your classroom; Grades 1-5 only. This will help facilitate Independent Reading during the first few days of school for many of your students - not all. We will once again try to facilitate the collection and return of these books later in the month. If you have a question, please speak with Mr. Goodman or Mrs. Francisco.

Check with your grade level colleagues if you are missing these items or if you have materials for children who are not on your ATS since some class changes have been made.

FYI:

K, 2, and 5 will eat during the first lunch period this year.

1, 3, and 4 will eat during the second lunch period this year.

DOE 46 is a memo sent May 7, 2013 to Respondent from the Office of Assessment, Division of Academics, Performance and Support regarding her "ABSENT" status on 5/6/2013 as a "Scorer -- ELA - Session B". It included

The following is a summary of your attendance status for scoring that took place on 5/06/2013:

| | |
|---|---|
| Position: | Scorer - ELA - Session B |
| Status: | ABSENT |
| Scoring Site: | P.S. 076 A. PHILIP RANDOLPH (03M076) |
| | 220 WEST 121 STREET, MANHATTAN, NY 10027 |

Please note:

1. If your principal instructed you not to report to the scoring site, or designated a different staff member to take your place, please disregard this notice.

2. If you believe that there is a mistake in the attendance data summarized above, please contact the scoring site supervisor.

If you have any questions, please email elamath@schools.nyc.gov.

DOE 7, the letter dated June 17, 2013 from Principal Boursiquot to Respondent, relating to

lateness and absence, included

Dear Ms. Legra:

I had scheduled a conference with you for March 15, 2013 at 8:10am to discuss your attendance and punctuality. Since you were late on March 15th and did not arrive to work until 8:42am, I had no choice but to postpone the conference until March 18th.

On Monday, March 18, 2013 at 8:10am, I met with you and your union representative, David Brophy, to discuss your attendance and punctuality for the 2012-2013 school year. You were issued a letter dated December 13, 2012 which warned you that you had been absent 5 days from September 4, 2012 and late 6 times. Ms. Legra, as of March 18, 2013 you have been absent 20.5 days and late 22 times as follows:

(5 entities deleted)

| | |
|---|---|
| Tuesday, January 8, 2013 | Personal ½ day) |
| Friday, January 25, 2013 | Med. Certified |
| Monday, January 28, 2013 | Med. Certified |
| Tuesday, January 29, 2013 | Med. Certified |
| Thursday, February 21, 2013 | Med. Certified |
| Friday, February 22, 2013 | Med. Certified |
| Monday, February 25, 2013 | Med. Certified |
| Tuesday, February 26, 2013 | Med. Certified |
| Wednesday, February 27, 2013 | Self-Treated |
| Thursday, February 28, 2013 | Self-Treated |
| Friday, March 1, 2013 | Self-Treated |
| Monday, March 4, 2013 | Self-Treated |
| Tuesday, March 5, 2013 | Self-Treated |
| Wednesday, March 6, 2013 | Self-Treated |
| Thursday, March 7, 2013 | Self-Treated |

Friday, March 8, 2013                 Self-Treated

Since our March 18, 29013 (sic) conference you have been absent an additional 7 days as follows:

Wednesday, April 24, 2013         Personal
Monday, May 6, 2013               Self-Treated
Tuesday, May 14, 2013             Self-Treated
Tuesday, May 28, 2013             Unauthorized
Monday, June 3, 2013              Personal
Thursday, June 6, 2013            Self-Treated (Professional
                                      Development Day)
Wednesday, June 12, 2013          Self-Treated

**Total Days Absent:  27**         **Total Times Late:  37**

Ms. Legra, your absences for the 2012-2013 school year are excessive and have greatly impacted the continuity of Instruction for the students of your First Grade class.  In addition to being absent, you have been late more than 37 times during the course of the school year.  Your continued absence and lateness after being reprimanded during a disciplinary conference, and a Time and Attendance Conference which resulted in a fine, (i)ndicates that your behavior is reckless.  You have made no attempt to correct your pattern of excessive absence and lateness as evidenced by your 7 additional absences after March 18, 2013.

Be advised that your Excessive Absence and Lateness will result In further disciplinary action that will lead to an Unsatisfactory Annual Rating, and charges that may lead to termination of your employment as a teacher with NYC Department of Education.

Attached to the letter, were eight pages, including the following information, entered by

YVARGAS

USER: YVARGAS   NYC PUBLIC SCHOOLS EMPLOYEE INFORMATION SYSTEM   EIIM751
06/05   10:49                    TIME AND ATTENDANCE INQUIRY

EIS ID: _____   SSN: _____   NAME: ANN         LEGRA
FROM DATE: 09 01 2012   TO DATE: 06 05 2013        EVENT:

|   | EARNED DATE | EVENT CODES | EVENT DESCRIPTION | EVENT DY | TIME HRS | MIN | RECORD STATUS | | ENTERED DATE |
|---|---|---|---|---|---|---|---|---|---|
| A | 06/03/13 | 43A00 | PERSONAL DAY | 1 | 0 | 0 | C A | OS | 06/03/13 |
| A | 05/28/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C A | AJ | 05/31/13 |
|   | 05/22/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 12 | C A | AJ | 05/22/13 |
|   | 05/21/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 38 | C A | AJ | 05/22/13 |
|   | 05/16/13 | 41A00 | SELF TREATED | 0 | 2 | 15 | C A | AJ | 05/22/13 |
|   | 05/15/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 10 | C P | SG | 05/15/13 |
|   | 05/15/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 10 | C P | AJ | 05/15/13 |
|   | 05/14/13 | 50U00 | ABSENCE UNAUTH | 0 | 3 | 25 | C P | SG | 05/14/13 |
| A | 05/14/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | AJ | 05/14/13 |
|   | 05/10/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 8 | C P | SG | 05/10/13 |
|   | 05/10/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 8 | C P | AJ | 05/10/13 |
|   | 05/09/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 47 | C P | SG | 05/10/13 |

Page 2

|   | EARNED DATE | EVENT CODES | EVENT DESCRIPTION | EVENT DY | TIME HRS | MIN | RECORD STATUS | | ENTERED DATE |
|---|---|---|---|---|---|---|---|---|---|
|   | 05/09/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 47 | C P | AJ | 05/10/13 |
| A | 05/06/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | AJ | 05/10/13 |
|   | 04/30/13 | 40F00 | CONVENT CONFRNC | 1 | 0 | 0 | C P | OS | 04/29/13 |
|   | 04/29/13 | 40F00 | CONVENT CONFRNC | 1 | 0 | 0 | C P | OS | 04/29/13 |
|   | 04/25/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 6 | C P | SG | 04/26/13 |
|   | 04/25/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 6 | C P | OS | 04/26/13 |
|   | 04/24/13 | 90300 | ABSENCE WO PAY | 0 | 3 | 25 | C P | SG | 04/24/13 |
| A | 04/24/13 | 43A00 | PERSONAL DAY | 1 | 0 | 0 | C P | OS | 04/24/13 |
|   | 04/23/13 | 40F00 | CONVENT CONFRNC | 1 | 0 | 0 | C P | OS | 04/22/13 |
|   | 04/22/13 | 40F00 | CONVENT CONFRNC | 1 | 0 | 0 | C P | OS | 04/22/13 |
|   | 04/16/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 17 | C P | SG | 04/16/13 |
|   | 04/16/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 17 | C P | OS | 04/16/13 |

Page 3

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ........... | .......... | ....................... | ......... | .......... | .......... |
| | 04/10/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 15 | C P | SG | 04/10/13 |
| | 04/10/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 15 | C P | OS | 04/10/13 |
| | 04/03/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 22 | C P | SG | 04/03/13 |
| | 04/03/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 22 | C P | OS | 04/03/13 |
| | 03/22/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 23 | C P | SG | 03/22/13 |
| | 03/22/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 23 | C P | OS | 03/22/13 |
| | 03/20/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 12 | C P | SG | 03/20/13 |
| | 03/20/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 12 | C P | OS | 03/20/13 |
| | 03/19/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 38 | C P | SG | 03/19/13 |
| | 03/19/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 38 | C P | OS | 0319/13 |
| | 03/15/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 41 | C P | SG | 03/15/13 |
| | 03/15/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 41 | C P | AJ | 03/15/13 |

Page 4

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ........... | .......... | ....................... | ................ | .......... | .......... |
| | 03/13/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 13 | C P | SG | 03/13/13 |
| | 03/13/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 13 | C P | OS | 03/13/13 |
| | 03/12/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 14 | C P | SG | 03/13/13 |
| | 03/12/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 14 | C P | OS | 03/13/13 |
| | 03/11/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 10 | C P | SG | 03/13/13 |
| | 03/11/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 10 | C P | OS | 03/13/13 |
| | 03/08/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/08/13 |
| A | 03/08/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | OS | 03/08/13 |
| | 03/07/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/07/13 |
| A | 03/07/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | OS | 03/07/13 |
| | 03/06/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/06/13 |
| A | 03/06/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | OS | 03/06/13 |

Page 5

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ........... | .......... | ....................... | ................ | .......... | .......... |
| | 03/05/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/05/13 |
| A | 03/05/13 | 41A00 | UNEXCSD LTNESS | 1 | 0 | 0 | C P | OS | 03/05/13 |
| | 03/04/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/04/13 |
| A | 03/04/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | OS | 03/04/13 |
| | 03/01/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/01/13 |
| A | 03/01/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | OS | 03/01/13 |
| | 02/28/13 | 50U00 | ABSENCE UNAUTH | -1 | 0 | 0 | H D | SG | 03/01/13 |
| | 02/28/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | H D | OS | 03/01/13 |
| | 02/28/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 03/01/13 |
| A | 02/28/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | AJ | 03/01/13 |
| | 02/27/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 02/27/13 |
| A | 02/27/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | C P | OS | 02/27/13 |

Page 6

|   | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|   | 02/26/13 | 90300 | ABSENCE WO PAY | 1 | 0 | 0 | C P | SG | 03/06/13 |
|   | 02/26/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 02/26/13 |
| A | 02/26/13 | 41B00 | MED. CERT. SICK | 1 | 0 | 0 | C P | AJ | 03/06/13 |
|   | 02/26/13 | 41A00 | SELF TREATED | -1 | 0 | 0 | H D | AJ | 03/06/13 |
|   | 02/26/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | H D | OS | 03/01/13 |
|   | 02/25/13 | 90300 | ABSENCE WO PAY | 1 | 0 | 0 | C P | SG | 03/06/13 |
|   | 02/25/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 02/26/13 |
| A | 02/25/13 | 41B00 | MED. CERT. SICK | 1 | 0 | 0 | C P | AJ | 03/06/13 |
|   | 02/25/13 | 41A00 | SELF TREATED | -1 | 0 | 0 | H D | AJ | 03/06/13 |
|   | 02/25/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | H D | OS | 03/01/13 |
|   | 02/22/13 | 50U00 | ABSENCE UNAUTH | 1 | 0 | 0 | C P | SG | 02/26/13 |
| A | 02/22/13 | 41B00 | MED. CERT. SICK | 1 | 0 | 0 | C P | AJ | 03/06/13 |

Page 7

|   | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|   | 02/22/13 | 41A00 | SELF TREATED | -1 | 0 | 0 | H D | AJ | 03/06/13 |
|   | 02/22/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | H D | OS | 03/01/13 |
| A | 02/21/13 | 41B00 | MED. CERT. SICK | 1 | 0 | 0 | C P | AJ | 03/06/13 |
|   | 02/21/13 | 41A00 | SELF TREATED | -1 | 0 | 0 | H D | AJ | 03/06/13 |
|   | 02/21/13 | 41A00 | SELF TREATED | 1 | 0 | 0 | H D | OS | 03/01/13 |
|   | 02/12/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 4 | C P | SG | 02/12/13 |
|   | 02/12/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 4 | C P | OS | 02/12/13 |
|   | 02/11/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 13 | C P | SG | 02/11/13 |
|   | 02/11/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 13 | C P | OS | 02/11/13 |
|   | 02/05/13 | 50U00 | ABSENCE UNAUTH | 0 | 0 | 11 | C P | SG | 02/05/13 |
|   | 02/05/13 | 49N00 | UNEXCSD LTNESS | 0 | 0 | 11 | C P | OS | 02/05/13 |
|   | 01/29/13 | 90300 | ABSENCE WO PAY | 1 | 0 | 0 | C P | SG | 01/30/13 |

Page 8

|   | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| A | 01/29/13 | 41B00 | MED. CERT. SICK | 1 | 0 | 0 | C P | OS | 01/30/13 |
|   | 01/28/13 | 90300 | ABSENCE WO PAY | 1 | 0 | 0 | C P | SG | 01/30/13 |
| A | 01/28/13 | 41B00 | MED. CERT. SICK | 1 | 0 | 0 | C P | OS | 01/30/13 |
|   | 01/25/13 | 90300 | ABSENCE WO PAY | 0 | 0 | 20 | C P | SG | 01/30/13 |
|   | 01/25/13 | 41B00 | MED. CERT. SICK | 0 | 4 | 20 | C P | OS | 01/30/13 |
|   | 01/08/13 | 49A00 | LATENESS | 0 | 0 | 9 | C P | OS | 01/08/13 |
|   | 01/08/13 | 43A00 | PERSONAL DAY | 0 | 2 | 50 | C P | OS | 01/08/13 |

DOE 48, an e-mail to Principal Boursiquot, dated May 8, 2013 at 4:19 p.m. reflected Respondent "was absent on May 6".

Ms. Vargas testified on direct examination

1717

21     Q. Now Ms. Vargas, I would like to ask
22    you about your responsibilities with regard to
23    timekeeping. Tell us what happens when a teacher is
24    absent from school?
25     A. The rule is that, and I made a memo to

1718

2    everybody. They should call up the night before with
3    myself, instead of having them call central, which is
4    the rule....

11     And if they are going to be late, they can
12    call the school then after 7:00 and let me know
13    they're going to be late and I get somebody to pick up
14    the class. And they have to -- if they're going to
15    make it after 8:00. Because with 8:00 and 8:10, 8:15,
16    I am by the front to make sure if anybody is late,
17    they can clock in. And I put it in the system that
18    they arrived late.
19     A. When you say that if somebody arrives
20    late that they have to clock in.
21     A. Yes.

1719

9     Q. Now if the teacher is late to work,
10    what time is considered late to work?
11     A. 8:01.
12     Q. And if a teacher is late to work, what
13    happens with their timecards?
14     A. Once they clock in, I write it in my
15    book. I have my journal for everyday occurrences.
16    And I put it in the system.

1720

4     Q. Now, when a teacher is--well, during
5    the 2012-2013 school year, do you recall whether Ms.
6    Legra was ever late to work?
7     A. She was often late when, during the
8    school year. Sometime trouble with the road, her --.
9     Q. And what, if anything, does Ms. Legra
10    do to notify the school that she's going to be late?
11     A. She calls the school. She called the
12    school.

13        Q. And when she calls to notify the
14     school that she's going to be late, what if any
15     reasons does she give for her lateness?
16        A. Whatever it is, her asthma or car
17     troubles, like traffic on the bridge. Whatever it is.

1726

22        Q. Were there ever times during the 2012-
23     2013 school year that Ms. Legra provided you with any
24     form of documentation for her absences?
25        A. Well, whatever she give me, oh I

1727

2      always make a copy for the teachers. So whatever she
3      gives me, I make copies. So every school year she
4      brings at least one or two. Whatever she brings I,
5      you know, I make copies, give her a copy in case, you
6      know, something happens. With mine, I always say
7      that's from the record. That's why I give, always
8      give the teacher a copy, because we are only human.
9      If I was to misplace mine just in case I'm going to
10     file it and don't, I always give the teacher a copy,
11     always.
12        Q. Now were there ever times that Ms.
13     Legra gave you a medical note or any other sort of
14     documentation of her absence when you did not put that
15     document in her file?
16        A. No.
17        Q. Were there ever times that Ms. Legra
18     came to you and told you that a documentation of her
19     absence was missing from her file?

1728

3.        A. No. Sorry.

1730

19        Q. Now I would like to direct your
20     attention to Department Exhibit 7, and specifically
21     looking at Bates page 73. Do you recognize that
22     document?
23        A. Yes.
24        Q. Can you tell us what it is?

1731

7         Q. Just this piece of paper, this print
8      out, what is this printout--

9      A. [Interposing] This is okay, that's
10   when the principal asked me, "I want you to print this
11   person's attendance from the beginning of the year
12   through today," for example. That was June 5th. So I
13   go and ask the system to give me the attendance from
14   September 1st, 2012 through June 5th, 2013. So it's
15   going to give me everything, you know, that she's been
16   late, she's been absent, everything.

1732

24      Q. --"Conference." Can you tell us what
25   that event description means?

1733

2      A. She could have gone to a training.
3   She could have gone schooling. Or she could have
4   been--that's the code that is used when the teacher is
5   out of the building. She's not charged. It's not an
6   absence. But we just want to show that she was out on
7   DOE, that we sent her for something, just in case they
8   want to say that something happened in the building
9   and she was involved. We just want to show that we
10   sent her for something, okay?...

20      Q. Now under the entry that you see for
21   May 6th, 2013...

24      A. Okay.
25      Q. What was Ms. Legra's attendance on

1734

2   that day?
3      A. So May 6th, it says "Self-treated."
4      Q. What does "Self-treated" mean?
5      A. That means that she called in sick and
6   she didn't go to the doctor. She treated her, you
7   know, without a doctor's note.
8      Q. And who determines whether, in the
9   event description, they listed as "self-treated" or a
10   sickness with a doctor's note?
11      A. The doctor's note that she brings to
12   me. If she brings me a doctor's note, then it's
13   medical. And if she has no days in her CAR, no sick
14   days, he lends her a day.

1735

3       Q.  Well, my question is when you receive
4   a doctor's note, do you input the medical absence
5   before you place the note in the personnel file or
6   after?
7       A.  Sure.  One of the first thing I have
8   to do is in my book, okay?  Because I just put the
9   person absent in my book.  But I cannot do anything in
10  the system until I'm--the person comes back and I know
11  what's going to happen.  So when I put it in my book
12  and oh, that's 41-B.  I know that's medical.  Change
13  it in the system and then put the note away.  And then
14  at the end of the week, I have prepared a report with
15  everybody's attendance.  And there again, because I
16  have like a different way to follow up and make sure
17  that is the right reason.

1736

2   ...for example, Monday a para was out.  I know she
3   went to the doctor.  The doctor has not given her the
4   note.  He's going to send it by fax.  I wait until
5   Friday, okay?  Because I know it's coming.  Because if
6   I just put self-treated, and the payroll is going to
7   take away that screen.  And when I go and try to
8   change it, forever it's going to show that it was
9   self-treated and I changed it to medical.  And it's
10  going to be a few lines of confusion.  So I'm not
11  going to, until she comes.
12      It's never too late for a reason.  Right
13  now, okay?  You can go six months back...

20                          ...You bring me a
21  doctor's note, it's not a copy, I will go in there an
22  change it.

1737

12      THE HEARING OFFICER:  But if that note shows
13  up a month later, you have the ability to go into the
14  system--
15      THE WITNESS:  [Interposing] And change it.
16      THE HEARING OFFICER:  And change it.
17      THE WITNESS:  Yeah.  I guess at the first,
18  okay I'm going to do self-treated, okay?  And then
19  when you bring it, I'll change it.  Well, I tell the
20  person listen, you already took out your self-treated
21  days.  If you don't bring me a note, you're going to

22    be docked.

1738
14        Q.  Ms. Vargas, if a teacher leaves work
15    early for any reason, would that be reflected at all
16    in the time and attendance printouts, in the time and
17    attendance system that we see in Department's Exhibit
18    7?
19        A.  Yes, it will.  The person, if she's in
20    the building, will clock out.  If the person was out
21    in her lunch and calls me that she's not returning, I
22    will put it in the book that that person left.  I
23    would not dock from the lunch time.  I would ask when
24    the lunch was finished, then from then on, after 2:50,
25    that's the time of dismissal, would dock for the time.

On cross examination Ms. Vargas testified

1748
6        Q.  So for 5/14/13, there's two entries
7    and one is for self-treated an entire day.
8        A.  Okay.
9        Q.  And one is for absence unauthorized
10    for three hours and 25 minutes.
11        A.  Okay, because in her bank, she--they
12    were able to give her part of the payment.  For
13    example, she had some hours in the bank that they
14    could pay her, okay?  But they didn't have enough to
15    pay her six hours and 50 minutes.  So this you read it
16    as they're going to pay her three hours and 25
17    minutes, but they're going to consider three hours and
18    25 minutes without pay, unauthorized, because they
19    don't--there's not enough hours in the sick bank.

1749
5        THE HEARING OFFICER:  [Interposing] Nobody
6    had to say this is authorized or not, it's the
7    computer.
8        THE WITNESS:  The computer.

1750
2    on Bates 74, where it says, "Personal day" and then
3    above that it says, "Absence without pay."  Does that
4    just signify that--
5        A.  [Interposing] Okay.
6        Q.  --for that day she received a half of

7       a day's pay because that's the time that she had?
8          A. Mm-hmm.
9          Q. Okay. But the--
10         A. [Interposing] The other part says
11     unauthorized. Then you will say why it says this
12     without pay and the other one unauthorized. I will
13     tell you why. Because of the--after the problem that
14     it happens a lot, I don't know how they program the
15     system, that in April it says without pay and then
16     once May comes, you call it unauthorized. Why? I
17     don't know. That's the program.
18         Q. So if it says, where it says,
19     "Personal day," is that your entry stating--
20         A. [Interposing] That's the code.
21         Q. --your reason for why?
22         A. Because she told me she was going to
23     court, something personal.
24         Q. Okay.
25         A. She asked for that day. I don't

                                                    1751
2      determine the reason. The teachers tell me.
3          Q. Okay.
4          THE HEARING OFFICER: So if you have time in
5      the bank, a personal day can be converted to a paid
6      day.
7          THE WITNESS: Yes, three days a year only...

                                                    1759
6          Q. Do you recognize Respondent's Exhibit
7      30-F?
8          A. Okay, this is a nurse visit. Okay?
9      That is not a doctors.

                                                    1760
14         Q. Do you know if the visit was with a
15     nurse practitioner?
16         A. It just said "nurse," so I just asked
17     for a doctor's note. I never got it.
18         Q. But is that the reason why this was
19     never changed on the attendance report to say--
20         A. [Interposing] It was--
21         Q. --"medical certified sick" because you
22     thought that this didn't qualify because it was a
23     nurse's note?

1761

3        A. Yes, you have to be a doctor's note...

7        THE HEARING OFFICER:  No, just let me clear
8    it in my mind.  There is a distinction then between a
9    nurse visit and a doctor visit.  If you get a note
10   from a doctor, you will enter it as a medical.
11       THE WITNESS:  Yes, correct.
12       THE HEARING OFFICER:  If you get a note from
13   a nurse, you don't enter it because it's not from a
14   doctor.
15       THE WITNESS:  Correct.
16       THE HEARING OFFICER:  What effect then does
17   a nurse--
18       THE WITNESS:  [Interposing] A nurse is not
19   certified to diagnose and give a note certifying to an
20   illness.

1762

4        THE WITNESS:  --as established in the rules,
5    it has to be a doctor.
6        THE HEARING OFFICER:  Okay.  That's why you
7    call it a "doctor's note."
8        THE WITNESS:  Yes, correct.

1763

15       Q.  Turning your attention to Department's
16   Exhibit 7 on Bates page 73, it says that May 14th,
17   2013, was a self-treated date.  Is that correct?
18       A.  It's correct.
19       Q.  And according to Respondent's Exhibit
20   30-I, Ms. Legra had a doctor's appointment on that day...

25       THE HEARING OFFICER:  [Interposing] No, it

1764

2    says "return to work on the 16th," so that covers 14
3    and 15 right?

1765

17       THE HEARING OFFICER:  So to go back to the
18   second page of Department's Exhibit 7, where I'm
19   looking at the date of May 6th as being an additional
20   seven days, okay that's accurate.  The self-treated is
21   accurate based upon we just looked at, you put in she
22   was self-treated.  Then she got paid part of the day.

23     THE WITNESS:  Yes.

24     THE HEARING OFFICER:  But either way, she

25     was still not there.

                                                             1766

2     THE WITNESS:  No.

3     THE HEARING OFFICER:  Whether she got paid

4     is not the issue.  It's whether she was there...

10     THE WITNESS [Interposing] The 14, you mean

11     the 14?

12     THE HEARING OFFICER:  Yes. May--

13     THE WITNESS:  [Interposing] May no, she was--

14     she wasn't there.

15     THE HEARING OFFICER:  Correct.

16     THE WITNESS:  She was out, but she was paid

17     part of the day because she didn't have time in her

18     bank.

19     THE HEARING OFFICER:  I understand that.

20     THE WITNESS:  Uh-huh.

21     THE HEARING OFFICER:  But the statement that

22     she was absent is accurate.

23     THE WITNESS:  yeah, that's accurate.  Yes,

24     it's accurate.

25     THE HEARING OFFICER:  She wasn't there.

                                                             1767

2     THE WITNESS:  She wasn't there.

3     THE HEARING OFFICER:  Whether she got paid

4     is another story.

5     THE WITNESS:  She wasn't there.  It's just

6     the reason that is going to change.

                                                             1768

3     Q.  So the three hours and 25 minutes only

4     signifies that she was paid for part of the day,

5     correct?

6     A.  Yeah.  Yeah, that won't change.  It

7     will be the same amount, but it's going to change the

8     reason.

9     Q.  So the excuse is for the entire day,

10     not for the half day.  Correct?

11     A.  Yeah.

12     Q.  Okay.

13     THE HEARING OFFICER:  I understand that.

14     But my point was she was absent.

15      THE WITNESS:  Yes.
16      THE HEARING OFFICER:  That day.
17      MR. DEL PIANO:  Yes.
18      THE HEARING OFFICER:  So it will--the
19  wording of the letter is correct.  You've been absent.
20      MR. DEL PIANO:  Yes.
21      THE HEARING OFFICER:  You may have had a
22  medical excuse, you may not have had an excuse, that
23  is her pay.  It doesn't deal with whether you're there
24  or not.

1769

3       MR. DEL PIANO:  Yes, that's correct.

1774

16      Q.  Now one of those days for Ms. Legra on
17  Department's Exhibit 7, Bates page 74 on May 6th,
18  2013, is marked as "self-treated."  Is that the day
19  that you were referencing--
20      A.  [Interposing] Yes, she was absent.
21      Q.  --for her absent?  And how did you
22  come to find out that she was absent?
23      A.  They call us from the--
24      Q.  [Interposing] Who?
25      A.  --center, they call us.  They let us

1775

2   know when one of the teachers has to go for scoring,
3   is absent.
4       Q.  And who called you?
5       A.  They--I don't keep record of who
6   called.  They just let us know.
7       Q.  Do you know when that phone call took
8   place?
9       A.  The same day.
10      [Pause]
11      THE HEARING OFFICER:  Let me ask a question.
12  Focusing on this May 6th, the day she did not appear
13  for scoring.
14      THE WITNESS:  yes.
15      THE HEARING OFFICER:  When they called you
16  and said, "She's not here," you then made the entry,
17  "She's absent, self-treating," okay?  If she had shown
18  up at school that day, how would that be reflected?
19  Would you in some way take back--
20      THE WITNESS:  [Interposing] Yes.

21      THE HEARING OFFICER:  -or change the self-
22      treated date?

1777

12      Q. Respondent's Exhibit 30-H is an email
13      from the Department of Ed to Ms. Legra saying that she
14      was present on May 6th, 2013.  Did you receive a
15      similar type email?
16      A. No.
17      Q. Did you receive a similar type email
18      that said that she was absent on May 6th, 2013?
19      A. I was informed verbally.

1779

7       Q. Did you speak with the person directly
8       who said that Ms. Legra was not present?
9       [Pause]
10      A. I was told.  Somebody else took the
11      message.
12      Q. Who told you?  Did Ms. Boursiquot tell
13      you?
14      A. Yes.
15      Q. Yes?
16      A. Yes.
17      Q. So this message, excuse me, the
18      information that you--of Ms. Legra being absent from
19      the scoring set (sic) on May 6th, 2013, was never directly
20      told to you by anybody from the scoring site?
21      A. No, usually the scoring site
22      administrators are the one that communicate directly
23      to principals...

1780

12      Q. So how do you know for sure when a
13      person is present or not present at a scoring site?
14      A. If I get a message that they didn't
15      show up, I get the message.  They never contact me.
16      directly.
17      Q. So otherwise it's just presumed that
18      they did go to the scoring site?
19      A. Yes.
20      Q. Okay, thank you.
21      A. Yes.

1782

19      Q. If there was going to be a planned

20    absence, Ms. Legra always notified the school about
21    it?
22        A.  Yes.
23        Q.  And you said that when she was going
24    to be late, she always notified the school?
25        A.  She'll call, looking for parking,

1783

2    traffic, whatever it was.
3        Q.  And that benefitted you when she would
4    call and notify you that she was going to be absent or
5    late, correct?
6        A.  In a way.
7        Q.  And how so?
8        A.  Well, at least I had a heads up that,
9    you know, I had to get somebody.  Not all of the time
10    I was able to, but at least we knew.  It was too
11    often, but at least we knew.

Mr. Bush, on direct examination testified

1594

18        Q.  What if any procedures are in place to
19    record the attendance of teachers who score the ELA
20    and math tests?
21        A.  For scoring that takes place during
22    the school day, each school is given a requirement in
23    terms of the number of teachers that they are required
24    to send for scoring at one of our designated scoring
25    locations.  Those selections are made by each school

1595

2    principal, and they enter those names into an online
3    application.  So we have a list of teachers that are
4    expected to report to each of the scoring locations
5    for each--all the days of scoring.  So each scoring
6    location the morning of each day of scoring will print
7    out this list which serves as an attendance roster,
8    and the location will display that roster and ask
9    teachers to check in as they enter the building.
10    After that process is complete, one of the supervisors
11    at each scoring location takes the list and they go
12    into an online application that our office has built,
13    and they enter the attendance status of each of the
14    individuals who was expected to report.
15        Q.  And how if at all are the teachers who

16    are at the scoring sites--who are assigned to the
17    scoring sites notified about their attendance status?
18           A. Right. So after the supervisor goes
19    into the online application and enters the status of
20    each individual, they press a button on the
21    application which submits the attendance status for
22    each individual for that particular day. When that
23    button is pressed on the application, that triggers
24    two different e-mails which are sent. The first e-
25    mail is for each of the scorers who was expected to

1596

2    show up for scoring that day, receives an e-mail which
3    has the date of scoring, the scoring location, and a
4    status which was recorded at that particular site.
5    And the second notification is sent to the school
6    principal, and that is a summary of all teachers from
7    that particular school for that day. It lists the
8    attendance status for everyone who was asked to report
9    from that particular school.
10         Q. Okay. Are there an circumstances
11    under which a teacher who is assigned to a scoring
12    site would receive two e-mails about their attendance
13    on one particular day?
14         A. Right. So there are circumstances
15    that each time the attendance is recorded on the
16    online application, that triggers a new e-mail. So if
17    the attendance was originally recorded for one status
18    and then that status is subsequently changed, if there
19    is an error in the entry process, then once the status
20    is changed and the attendance is submitted again, then
21    a subsequent e-mail or subsequent pair of e-mails is
22    sent out.

1601

2         Q. Mr. Bush, can you tell us what
3    Department Exhibit 46 is?...
6         A. Sure. this is the--an e-mail which
7    was sent to Ms. Legra regarding her attendance status
8    which was recorded at P.S. 76 for May 6th, 2013.
9         Q. Okay. And on what date was this e-
10    mail sent?
11         A. It was sent on May 7th at 3:11 p.m.

Respondent, on direct examination testified

1643

15           Q.  And what do you recognize Respondent's
16    Exhibit 39 to be?
17           A.  It's an e-mail from myself to Ms.
18    Borsico. (sic)
19           Q.  And what is Respondent's Exhibit 39 in
20    reference to?
21           A.  It's in reference to a June 17th
22    letter of attendance.
23           Q.  And just to clarify, who wrote
24    Respondent's Exhibit 39?
25           A.  I did.

1644

2           Q.  And what was the date of Respondent's
3    Exhibit 39?
4           A.  Tuesday, June 18th, 2013...

19           Q.  Ms. Legra, what was the purpose of
20    sending Respondent's Exhibit 39 to Ms. Borsico? (sic)
21           A.  There were several mistakes on my
22    attendance sheet and scoring dates.
23           Q.  And what about that concerned you?
24           A.  Because attendance is important, and I
25    had been told that my attendance had to improve, and

1645

2    for the benefit of the students.  I saw that there
3    were many mistakes on my attendance of days that I was
4    present, I was marked absent.
5           Q.  And what if any response did you
6    receive from Ms. Borsico (sic) to this letter?
7           A.  I didn't receive any response.
8           Q.  To this e-mail, excuse me.
9           A.  No response.
10           Q.  At the end of Respondent's Exhibit 39
11    it says, "I have written documentation which I would
12    also like to furnish to you regarding these attendance
13    errors." Did you ever provide documentation regarding
14    attendance errors?
15           A.  No.
16           Q.  And for what reason did you not
17    provide them?
18           A.  Well, the meeting was never held, and

19      I never got a response.

On recross examination Respondent testified

1655

17          Q. Okay.  And is it your testimony that
18      that box did not contain your entire personnel file?
19          A. Correct.
20          Q. What items were missing, Ms. Legra?
21          A. The... There's an attendance sheet
22      that I handed to the payroll secretary, the doctor's
23      note.  When I had asked for the file in terms of the
24      items in the 3020-a, there were several documents
25      missing.

1656

2           Q. And you don't recall what documents
3       those were?
4           A. No.  Not offhand.
5           Q. Now the attendance sheet and the
6       doctors' notes, those were documents that you said
7       that you yourself submitted to the payroll secretary?
8           A. Yes.
9           Q. Okay.  Did you maintain a copy of
10      those documents for yourself?
11          A. Yes.
12          Q. Okay.  And do you still have them?
13          A. I lost that particular one that I'm
14      referring to.
15          Q. Okay.
16          THE HEARING OFFICER:  Well, the attendance
17      and doctors' notes are separate items.  When you say
18      you lost the one, which one did you lose?  The
19      attendance or the doctors or both?
20          WITNESS:  The doctors.
21          THE HEARING OFFICER:  The doctors.
22          WITNESS:  Yes.
23          Q. So you still have the attendance
24      sheet?
25          A. I don't know.

1661

2           Q. Ms. Legra, I'd like you to take a look
3       at Respondent's Exhibit 39 which is the--...
5       --e-mail that you sent to Ms. Borsico (sic)
6       regarding the attendance.  You stated in this

7    document, in this e-mail that you have written
8    documentation which I would like to furnish to you
9    regarding these attendance errors.  Did you ever
10   provide this written documentation to Ms. Borsico? (sic)
11       A. No.

1663

2    ...Ms.
3    Legra, looking at the first two pages of Department
4    Exhibit 7, are there dates here which you are listed
5    as being absent for which you were actually present?
6       A. Yes.
7       Q. Okay.  And what dates were those?
8       A. I have them written down.  There are a
9    couple of dates, one of which is May 6th.
10      THE HEARING OFFICER:  And that's on the
11   second page?  Okay.
12      WITNESS:  On the second page, yes.
13      A. June 6th which was a professional
14   development day and also a self-treated day.  There
15   were many.  Specifically I can't name them all.
16      Q. So other than May 5th and June 6th,
17   you don't know what other dates you were present but
18   marked absent?
19      A. Off the top of my head right now, no.
20      Q. Okay.  May 6th is the date on which
21   you were assigned to be at the ELA scoring site, is
22   that right?
23      A. Yes.
24      Q. Okay.  And it's your testimony that
25   you were present at P.S. 76 for the scoring on May

1664

2    6th?
3       A. Yes.

1665

25      Q. And so if the scoring site marked you

1666

2    absent on May 6th, that was an error?
3       A. Yes.

1668

24      Q. Okay.  Ms. Legra, looking at
25   Department Exhibit 7, take a look at the second page

1669

2 of the document.  Does your signature appear at the
3 bottom of that page?
4   A. Yes.
5   Q. Okay.  And you didn't write on that
6 anywhere near your signature that the dates listed in
7 this letter were incorrect did you?
8   A. No.
9   Q. Okay.  And you didn't write anywhere
10 in this letter that you wanted to submit any
11 additional documentation to refute the statements made
12 in this letter, did you?
13   A. No.
14   Q. Okay.  And you also didn't write in
15 this--below your signature or anywhere near it that
16 you intended to write a letter in response to this did
17 you?
18   A. Not in this particular document, no.
19   Q. …

22 You signed your name here and write the date,
23 but you didn't attach anything to the document did
24 you?
25   A. No.

Counsel for Respondent argued

1841

20 Specification nine states that Respondent was
21 excessively late and/or absent during the 2012-2013
22 academic year.  And the main document that the
23 Department wants you to rely on for this specification
24 is Department's Exhibit 7.

1842

3 There are errors in both sheets, where some
4 of the absences were supposed to be medically
5 certified behavior but were not in the letter or were not on
6 the attendance sheet…

9 Departments Exhibit 7 will clearly show, clearly
10 shows that these dates that Ms. Legra was not present
11 at the school were for some reason beyond her control,
12 such as illness or such as a court date or such as
13 grading the English Language Arts exam, which we

14    believe that Ms. Legra was present on May 6th, 2013,
15    and that there has been no convincing proof that she
16    was not present on May 6th, 2013.  We have competing
17    emails from the Department of Education, solely the
18    information that we have to go upon.

                                            1843

2    ...Ms.
3    Vargas testified today that Ms. Legra was absent on
4    May 6th, 2013, and that she didn't go to grade the ELA
5    exam.
6        And we found out that Ms. Vargas never
7    talked to anybody who was actually present at the
8    school, and that she only heard about this information
9    secondhand from Ms. Boursiquot.  We don't know who Ms.
10    Boursiquot heard this information from, and we posit
11    that Ms. Boursiquot was targeting Ms. Legra at this
12    time period.  There is not enough information on May
13    6th to conclusively say that Ms. Legra was not present
14    at the ELA during that time period.

                                            1844

3        From February 21st, 2013 through May 8th,
4    2013, there is multiple days' absence, multiple days
5    that Ms. Legra was absent, but again they all revolve
6    around one event, the skin rash that Ms. Legra had.
7    She has notes for all of those days...

24        Now I'm referring specifically at this point
25    to Respondent's Exhibit 30-F.  There is nothing, no

                                            1845

2    reason to believe that there -- this document is somehow
3    not true or improper.  It was turned in to the payroll
4    secretary...

14    ...On May 14th, 2013, Ms. Legra had a
15    medical note that was not properly documented on this
16    letter.  It says "Self-treated" when it should say,
17    "Medically certified sick."  On June 3rd, 2013, when
18    Ms. Legra had to take a personal day, it was because
19    she had a court appearance.  And then again on June
20    12th, 2013, where it says that Ms. Legra had an
21    absence for self-treatment, that's again another-
22    should have been another medically certified absence.

1846

2    Ms. Boursiquot assigned Ms. Legra to grade state-wide
3    exams even though she claimed that her attendance was
4    affecting her class. The grading would continue to
5    take Ms. Legra out of her class...

22        Now Ms. Boursiquot stated that grading the
23   ELA was supposed to be a form of professional
24   development for Ms. Legra. But again, that doesn't
25   make any sense. What possible professional

1847

2    development could Ms. Legra have received related to
3    her first grade class by going to grade, fifth grade
4    English exams. There is no purported deficiencies of
5    Ms. Legra that include her inability to grade, so
6    again this is another disingenuous statement by Ms.
7    Boursiquot that is trying to show that she did some
8    form of professional development with Ms. Legra that
9    really didn't have anything to do with what she said
10   her purported deficiencies were.
11       Because of the years in Ms. Legra's
12   attendance and the mitigating factors of her excused
13   absences, you should not find that she was excessively
14   absent during the 2012-2013 school year.

G.    The DOE's evidence relating to professional development, meetings, advice and

recommendations during the 2011-2012 and 2012-2013 academic years in Specification "10)"

regarding

a.    The elements of effective lesson planning/executions are DOE's 3, 5, 6, 10, 13, 14,

15, 16, 17, 19C, 20, 21B, 22, 23, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41 and 42 and the

testimony of Principal Boursiquot, Assistant Principal Goodman, Coach Serratty and Coach

Francisco, in support.

DOE 10, Bates No. 111 and 112, is a two page letter dated February 7, 2013, to Classroom

Teachers from Principal Boursiquot. The second page contains Respondent's name and signature on

line 6. The first page includes

We are working toward ensuring that *every* child in our school is matched to appropriate, **Just Right** books daily.

Teachers are required to administer Running Records that reflect a late January/early February assessment interval. Please carefully determine the students in your class that have not been assessed recently. Ensure that all of your assessment documents are in order and accessible for supervisors and coaches daily. Be prepared to submit an updated Running Record Placement Chart by the close of business **Friday, February 15, 2013**. Ms. Pena will be facilitating the collection of this very important document on the 15th. She will provide teachers a copy of the document submitted.

It goes without saying that this point in this school year you should have multiple Running Records for *all* of the students who have been assigned to your class in ATS since September 2012. Teachers are required to retrieve records from colleagues and ultimately assess new and inter-classed students as soon as possible.

To maintain accountability and to provide a more consistent assessment approach at our school, expect to provide **all** of the Running Records administered to date for *at least* any one child in your class, including the Level tested following the Level the child is presently reading. Additionally, Reading Conference Notes for that child will be requested along with the Running Records. Expect this process to begin as early as February 11, 2013 through the end of the month.

Finally, in addition to the administration of Running Records and maintaining relevant Conference Notes, teachers are required to help students maintain healthy reading lives. That is, students must maintain Book Baggies that contain an adequate number of books that are on their level. Additionally, the distribution, maintenance, and safekeeping of Reading Logs is something that teachers need to address with their students, in Grade K - 5 when necessary.

Please do not hesitate to reach out to Mr. Goodman or Mrs. Francisco should you have a question or concern.

DOE 13, Bates No. 377 in a communication, dated "February 2012" addressed to Respondent

"Kindergarten" referencing "Lesson Features" and "Suggestion", as follows:

| Lesson Features | Suggestions |
|---|---|
| <ul><li>Some of your students were engaged in your interactive lesson.</li><li>The children were "putting into practice" the lessons' vocabulary.</li><li>You introduced the vocabulary (printed on sentence strip) to the students once they had "put them into practice." (very interesting for this grade)</li></ul> | <ul><li>Prepare any materials and or manipulatives before your lessons this will help with the flow of the lesson and allow the children to have more time to practice the skill you've taught.</li><li>Plan your lessons so that your entire class is engage.</li><li>Improve your classroom environment so that your students have better accessibility to materials.</li><li>Vocabulary should have pictures and examples, especially for lower grades.</li><li>Encourage your students to follow along as you do the lessons and to complete the assignments.</li><li>Plan so that your students have concrete finished products that you can assess their understanding.</li></ul> |

DOE 14, Bates No. 97, dated October 19, 2012 referencing a "Grade 1 Math Meeting - 7[th] Period" with an Agenda and Respondent's name and signature on the seventh line.  The Agenda states

### WINTER PERFORMANCE TASK - NINA'S NUMBERS

I.   **BECOME FAMILIAR WITH CCLS**
II.  **LOOK AT COMPONENTS**
III. **MODIFICATIONS TO CALENDAR**

DOE 15, Bates No. 376, communication dated January 17, 2013 addressed to Respondent "First Grade" references "Lesson Features" and "Suggestions" as follows:

| Lesson Features | Suggestions |
|---|---|
| • Started the lesson with a lesson that had been taught in the past (lesson 3.9)<br>• Proceeded to do review for units 1 and 3. Read the word 'Sum' asked its meaning and what operation do we do?<br>• Did several examples from the unit review. (Children had done the review at home for homework.)<br>• *Some* of the kids were engaged. | • As we (the first grade teachers) had discussed in the past we start the review in school and the children complete it at home. (Children answer questions similar or related to skills you reviewed in class that day.)<br>• Prepare your lessons ahead of time and manipulates/materials you may need.<br>• Vocabulary should have pictures and examples, especially for lower grades.<br>• Encourage your students to follow along as you do the lessons and to complete the assignments. Engage all your students in your lessons.<br>• Plan so that your students have concrete finished products that you can assess their understanding. |

DOE 22, Bates No. 355 and 356, is a two page email of September 22, 2011 to Respondent

and six others referencing "Kindergarten Classroom Visits - Feedback #1." It includes

Hello,

I am sorry for the delay in getting this email out to you. I wanted to provide you some feedback and provide you a few days *before* I spend some time in Kindergarten classrooms again.

Please read the attached one page document. Thank you in advance. We're looking forward to seeing you this evening.

Late last we had the opportunity to visit a number of Kindergarten classrooms using a very specific lens. We are addressing a few areas of concern and are attempting to keep our work in Kindergarten classrooms these first few weeks of the school year as focused as possible in our pursuit to improve life in Kindergarten for all students. As we continue to create and maintain structures in our classrooms and throughout the school that will allow children and teachers to thrive, please consider the following:

**Room Environment** – It is imperative that we continue working to ensure that our classroom environments are conducive to early childhood teaching *and* learning. One way to drastically improve early childhood classrooms is making certain that **everything** in the classroom has a place. Materials that are available for children need to labeled and accessible. Materials that are for the sole use of the teacher should be stored in areas that are accessible, i.e.

conference notes, lesson plans, etc. We should avoid keeping books in piles in various locations around the classroom. Books that are leveled should be in leveled baskets unless there are book baskets set aside for children at tables. We should make every effort to find a safe place for books that we are in the process of leveling or books that we will be using in the future. We should avoid having piles of books or materials in different locations around the classroom. *Classrooms function best when everything has a place.*

**Evidence of Units of Study** - There should be evidence of current units of study in Kindergarten. When record our thinking or the thinking of our students, we want to be sure to have a record of our teaching through the creation of child friendly (kindergarten friendly) charts when possible. If we do a lot of our work on whiteboards, we don't have artifacts to be able to point children to after we teach our original mini-lesson. If we are recycling charts from a previous year, the charts won't hold the kind of value in the eyes of our students compared to charts we make alongside and with children. Always push yourself to think about what is useful, relevant, and accessible to kindergarteners. We have done so much important work with our coaches and staff developer recently that's still applicable *even* if we are from another grade level.

**Differentiating Our Instruction** - We need to be mindful of ensuring that we are paying attention to the students in our class and making decisions around what they're ready for. Think about what we are asking them to do and if they have the capacity (yet) to tackle the work we have them involved in. If we are suggesting that students put a POST-IT Note on a page that was a favorite part of a book, we have to be realistic about the students who are really capable of doing that work (probably not too many yet!) We need to pay attention to what students are ready for at this point in the year by having realistic expectations.

DOE 23, Bates No. 9, 10, 13 and 12, to Respondent, dated September 28, 2011 references

"Early Childhood Inter-Visitation". The four pages include

| Specific structures, routines, and instructional practices that I observed... | How I envision implementing this in my Kindergarten classroom... |
|---|---|
| e.g. Mrs. Harris - Has 2 monitors assigned to distributing materials so that she can help students get settled and right to work. | e.g. Some of my students might be ready for classroom jobs. |
| Mrs. Faioli - Morning Routine | Handshake and good morning. Interactive Writing message. |
| Ms. Huang - Interactive Writing | Partner Reading/Chart. Name Chart |
| Ms. Kapetanos - Read Aloud | Reading Chart - How to Choose a Book. Things in the room are labeled (Listening Center) |
| Mr. Colon | Class Behavior Chart has 4 colors for 4 chances of Behavior improvement. |

| Specific structures, routines, and instructional practices that I observed... | How I envision implementing this in my Kindergarten classroom... |
|---|---|
| e.g. Mrs. Harris - Has 2 monitors assigned to distributing materials so that she can help students get settled and right to work. | e.g. Some of my students might be ready for classroom jobs. |

Use this template to keep track of how your time was used today.

| Time Period | Class/Classroom Teacher | Brief description of what was observed |
|---|---|---|
| e.g. 8:00 - 8:20 | e.g. 601/Ms. Harris | e.g. Interactive Writing |
| 8:00 - 8:35 | 1 / Fraioli | morning Routine |
| 8:38 | K / Ms. Huang | morning Routine |
| | K / Ms. Kapetanos | |
| | K / Ms. Castillo | |
| | /Mr. | Reader's Workshop |
| | 1 / Ms. Glickstein | |

Use this template to keep track of how your time was used today.

| Time Period | Class/Classroom Teacher | Brief description of what was observed |
|---|---|---|
| e.g. 8:00 - 8:20 | e.g. 601/Ms. Harris | e.g. Interactive Writing |
| | | |

DOE 28, Bates No. 28, dated May 7, 2012, from Mr. Goodman to K-2 Teachers included

As you know, we are presently involved in a Professional Development Cycle with our K-2 Staff Developer from Teacher's College, Monique Knight. A fairly explicit set of expectations was outlined in the Weekly Letter sent electronically to teachers on Sunday morning. Kindly refer to that document. Remember, it'll be especially useful for teachers to have *easy* access to these **"Bottom Line"** expectations:

| | |
|---|---|
| ✓ | **Teaching Points** (always a good idea to have TP's accessible for students) posted |
| ✓ | Relevant **charts** related to __current__ Units of Study visible for *students* |
| ✓ | Current **Reading Levels** presented on a Running Record Placement Chart - which most teachers already have available from last week. |
| ✓ | Evidence of **Reading Conferences** *and* **Small Group Work** |

Our visit to your classroom **today** will provide us with an opportunity to observe and or coach into your Workshop alongside you as we give thought to the work our school has been involved in throughout the year - and during our extensive time with the Project.

Teachers will teach their **Reader's Workshop** during the time indicated in the table below.

| Time | Teacher | Monday Prep Period |
|---|---|---|
| 8:15 | Ms. Adames | 3 |
| 8:45 | Ms. Grube | 5 |
| 9:15 | Mr. Colon | 7 |
| 9:45 | Ms. Jackson | 7 |
| 10:15 | Ms. Hassan | 7 and 8 |
| 11:50 | Ms. Glickstein | 7 |
| 12:20 | Ms. Pepitone | 2 and 8 |
| 12 50 | Ms. Kapctanos | 8 |
| 1:20 | Ms. Legra | 2 |
| 1:50 | Mr. Menses | 6 |

DOE 29, Bates No. 89, dated October 2012, from Mr. Goodman to Teachers included

Please note the *slightly* revised prep schedule. There are some instances where no changes were made although I would advise you to compare the schedule you were using in October to what has been placed in your mailbox today. Changes were necessary to accomplish the following:

- Provide permanent **Professional Activity Periods** for *all* teachers.
- When we made some lunch period changes a few weeks into the school year,

a few issues were never fully resolved that required us to take another look at the Prep Schedule and some concerns classroom teachers had.

- Our goal was to provide every grade with two Common Prep Periods. There were a handful of classes that did not have a Common Prep twice a week and that needed to be adjusted to allow for easier scheduling of Grade Level Meetings, planning sessions with Coaches, etc. With so many challenging initiatives underway, it is extraordinarily useful to be able to bring teachers together to interpret and plan for instructional mandates.

- Ms. Halpern advocated for a Special Education Team Common Prep. One was provided every Wednesday Period 8. This will give our S.E. Team some flexibility to come together to address matters specific to Special Education.

- A handful of classes did not really have a well-rounded program and we tried to make adjustments to give some classes a more equitable and fulfilling schedule. We can absolutely look at your Program during the middle of the year so more classes have access to Art and Music as well as Science and Technology. It's encouraging to know that so many of you were anxious to have us take another look at the Preps your class was assigned. *Again, we can take another look at the schedule midyear.*

- Please contact me **via email** regarding any scheduling glitches that come up during the week ahead or any questions that you may have. Don't hesitate to communication with each other about scheduling. Of course, you can always check in with Cluster Specialists or classroom teachers if you want to clarify a matter pertaining to scheduling.

If there are adjustments that need to be made that impact ESL or SETTS, please let me know via email. I will work alongside Ms. Zenoz and Ms. Halpern to provide the best possible solution for our students. Thank you for your patience.

DOE 32, Bates No. 378, a letter, dated December 14, 2012, from Mr. Goodman to

Respondent, included

In an effort to support you professionally following your most recent Unsatisfactory Observation, Monique Knight, our Teacher's College K - 2 Staff Developer is going to visit your classroom during a portion of either your Reading or Writing Workshops **today**. This will allow her the opportunity to observe your lesson, coach in alongside you and your students, *and* provide you immediate feedback at the end of the school day.

She will stop by first thing this morning to observe your Flow of the Day for the purpose of determining when she can best support you and your students this morning.

DOE 33, Bates, No. 110, referenced a January 17, 2013 Grade 1 Meeting, Period 7, Room

514. It contained Respondents name and signature on line 5. The Agenda was

I.    How's it going?

II.    ELA Professional Development; our next day with Monique will involve a Lab Site, meeting time, student work and Reading Level/conference note analysis

III.    ELA Planning in the meantime...

IV.    ELA Performance Task Update; rationale for delaying this work, tweaking the calendar to make time for this work before the end of the month (Ms. Nuchman; 1/22?)

V.    Planning options outside of the regular school day (ELA/Math)

VI.    Strive for updated assessments by late January/early February; formal and Informal Running Record work, **next steps for individual students**

VII.    Student discipline; identifying expectations, roles, classrooms structures and routines (in and out of the classroom) that impact behavior

VIII.    Future Trips/Celebrations

IX.    Loose ends, questions, concerns

DOE 38, Bates No. 382, is a handwritten "1st Grade Planning Unit - Authors as Mentors" dated October 12, 2012. It includes

- What does the final product look like?
    -- a narrative piece in which they try some craft moves, mimicking the Author they are studying
- What other lessons should we incorporate?
- More details
- Dialogue

Goals
- Increase Writing staminas - volume
- Reinforce strategies to develop writing
- Model more strategies and get kids to try them in their writing

DOE 39, Bates No. 390, January 31, 2013 1st Grade Literacy Meeting, contained Respondent's name and signature on the seventh space below a handwritten line with "0.18" in margin. The Agenda was

1. Looking closely at our reading levels
2. Where are my kids?
    a.    High
    b.    Middle
    c.    Low
3. During which component of balanced literacy will address the

needs of my students?
4. Looking closely at TC's reading unit five
5. Looking closely at the TC Performance Task

DOE 40, Bates No. 380 and 379, is a two page handwritten note dated January 17, 2013

    1st                         1/17/13

    -- Demo lessons - labs sites - Monique
    7th Period - 1st Grade
        -- Clarify Persuasive
       • Assessment - R.R.

<u>1st Erin</u>                <u>K - Grace</u>
Writers Write a conclusion by
1. Restating  - say your opinion again
2. Talking to reader
    • Don't you agree with me - question
    • You should love it too. statement
Skyla                  Writers elaborate by adding labels,
Jaiden                speech bubbles & add a sentence.
Sadai
Sebastian

                  <u>Kindergarten</u>
Writers teach more by
    • Adding # facts;  How much?
    • Describing Words
        • Shape
        • Size
        • Color
        • Senses

  - Plan a sentence by
    • Touching the line
    • Saying the words
    • Putting a line
DOE 41, Bates No. 381, is an undated handwritten note

    (1st Grade)

    *T.P. always has a strategy attached to it.
    Persuasive → You want the reader to agree with you.

DOE 42, Bates No. 387, letter dated February 2013, unsigned, to Respondent - "Demo

lesson". It stated

I visited Ms. Legra's class to conduct a reader's workshop demo lesson. The purpose of the lesson was to give readers strategies they could use to read for an extended period of time, since Ms. Legra was struggling with this. I conducted the entire reader's workshop and conferred with students during independent work. Below is a quick overview of the lesson.

**Teaching Point:**  Readers use various strategies to figure out tricky words.

- They ask themselves:
  - o  "Does it make sense?"
  - o  "Does it sound right?"
  - o  "Does it look right?"
- They look at the whole word and look for sounds they know
- They ask themselves "what word would make sense here?"

**Active Engagement:**  Readers use interactive chart to figure out unfamiliar words.

**Independent work:**  Readers read their independent books and use some of the strategies taught today, as well as other previously learned strategies (I will confer with readers)

Respondent, on redirect, testified

1580

12      Q. And what do you recognize Respondent's
13   Exhibit 32 to be?
14      A. This is a lesson plan for readers
15   workshop lesson, Unit 8.
16      Q. Is Respondent's Exhibit 32 the written
17   lesson plan that you are referring to for the May 9th,
18   2012 lesson?
19      A. Yes.
20      Q. And who prepared Respondent's Exhibit
21   32?
22      A. I did.

1581

5      Q. do you recall when Respondent's
6   Exhibit 32 was provided to the administration?
7      A. The day of the observation.
8      Q. And do you recall how you provided
9   Respondent's Exhibit 32 to the school administration?
10      A. I hand delivered it.

11     Q. To whom?
12     A. To Ms. Borsico. (sic)

                                                    1618
9      Q. What do you recognize Respondent's
10     Exhibit 33 to be?
11        A. This is one of the schedule meetings
12     with a different date and time for a disciplinary
13     conference...

17        Q. And Ms. Legra, can you please read the
18     paragraph starting with, "I have schedule?"
19        A. "I have scheduled a meeting with you
20     on Tuesday, February 5th, 2013 at 8:15 a.m. in the
21     principal's office to discuss your failure to provide
22     lesson plans during a routine classroom visit on
23     February 1st, 2013."

                                                    1619
2         A. "Since this meeting will lead to
3      disciplinary action, you may bring a representative.
4      Please let me know in advance of this meeting who you
5      would like to represent you so that I can provide
6      coverage."
7         Q. Ms. Legra, when did Mr. Goodman accuse
8      you of failing to provide lesson plans on February
9      1st, 2013?
10        A. In this notice.

                                                    1628
10        Q. Do you recognize Respondent's Exhibit
11     35?
12        A. Yes.
13        Q. And what is Respondent's Exhibit 35?
14        A. It's an e-mail from Ms. Borsico (sic) to
15     myself, cc Goodman, collection of lesson plans.
16        Q. And Respondent's Exhibit 35 says "Per
17     the observation report dated April 10th, 2013, you are
18     required to submit our (sic) lesson plans for the week to
19     either Mr. Goodman or myself every Monday before 8:30
20     a.m." Prior to April 10th, 2013, what assignment if
21     any did you have to provide your lesson plans on a
22     weekly basis?
23        A. I didn't have any.
24        Q. After April 10th, 2013, did you submit
25     weekly lesson plans?

1629

2      A. Yes.
3      Q. And who did you submit weekly lesson
4   plans to?
5      A. I gave them to the secretary...

9      Q. Would they be handwritten?  Would they
10  be typed up?
11     A. Well, they'd be handwritten if I was
12  not going to be absent.  There were a couple of
13  occasions where I did e-mail the secretary the lesson
14  plans.
15     Q. How would the lesson plans be if you
16  were going to be absent?
17     A. They would be typed.
18     Q. And for what purpose would you be
19  submitting lesson plans when you're going to be
20  absent?
21     A. For the substitute teacher to continue
22  the flow of teaching.

1630

9      Q. And what do you recognize Respondent's
10  Exhibit 37 to be?
11     A. Lesson plans from myself.
12     Q. And do you know when these lesson
13  plans were from?
14     A. For the week of Monday, May 20th
15     Q. And do you know which year?
16     A. The 2012-'13.
17     Q. And Ms. Legra, where were these lesson
18  plans originally located?
19     A. In my composition notebook.
20     Q. And did you provide Respondent's
21  Exhibit 37 to the school administrators?
22     A. Yes.

1632

23     A. I do recall that I did submit the
24  lesson plans from the whole week of May 20th, and as I
25  see these copies, it only goes to Wednesday.  And I --

1633

2   Tuesday.  So there's two--only two days...

12          Q. And who did you provide Respondent's
13     Exhibit 37 to?
14          A. To the school secretary.
15          Q. Is that Iris (sic) Vargas or Carmen Pena?
16          A. Iris (sic) Vargas.

                                                    1634
15          MR. DELPIANO: So 37A would be Bates page
16     126 through 129...

                                                    1635
10          THE HEARING OFFICER: So 37B is going to be
11     130?
12          MR. DELPIANO: I's going to be 130 and 131.

                                                    1639
13          Q. And how would you give these to Ms.
14     Vargas?
15          A. I would give her the composition
16     notebook that they were on.
17          Q. Would she keep the notebook?
18          A. She'd make the copies and she would
19     give them back.

                                                    1642
5           Q. Ms. Legra, did you ever have any
6      conversations with Ms. Borsico (sic) concerning your
7      attendance--
8           A. Yes.
9           Q. --during the 2012-2013 school year?
10          A. Yes.
11          Q. Do you recall how that conversation
12     occurred?
13          A. That occurred with a disciplinary
14     letter.

Counsel for Respondent argued

                                                    1847
24          Now with regard to the 2011-12 school
25     year, there is no evidence at all any assistance

                                                    1848
2      meetings with supervisors or remedial professional
3      development or recommendations regarding any of these
4      three subjects.  There was no testimony by any of the

5      witnesses that the Department put forward about any of
6      those subjects during that school year...

13     Now in terms of assistance meetings with
14    supervisors, she didn't have any.  Her meetings were
15    either post-observation conferences or disciplinary
16    conferences and in the post-observation conferences,
17    she was just told about her problems.  There was no
18    recommendations made in any of those.  It was just
19    said that she was going to receive professional
20    development.  Now we found out that she was supposed
21    to receive professional development, but it never
22    actually happened.
23     There was no advice, counsel, instruction
24    certainly no remedial professional development
25    performed for Ms. Legra during that school year, and

                           1849
2     there were no recommendations.  Now that's with
3     respect to the elements of effective lesson planning
4     and execution and with classroom management.  I'm
5     assuming that part C, which is production/maintenance
6     of required records and documents relates to running
7     records during the 2012-2013 school year.
8      Now Ms. Legra provided what she kept as
9     records of her intermediary running records during the
10    2012-2013 school year.  There was not any evidence
11    provided by the Department that what Ms. Legra did to
12    track and test for running records was improper.
13    There is no information at all about that.  Now again,
14    we requested for the completed running records for
15    this school year once Mr. Goodman said that the
16    records are not discarded.  And they were never
17    provided to us.  So therefore you should draw an
18    inference that had those records been provided that
19    they would have been proper and in the form that they
20    were supposed to be.  So therefore, I say that the
21    Department has failed to carry its burden again with
22    respect to specification ten.

                           1850
11     But they moved her into that classroom and
12    they did nothing to help her when she was having
13    problems in there.  They didn't do anything to help
14    her with the troublesome students.  They didn't do
15    anything to help her in the areas where she

16  purportedly had problems with her pedagogy.  Number
17  three, there is a complete failure by the Department
18  to make any attempt, any legitimate attempt at
19  remediation of Ms. Legra's deficiencies.
20      Almost all of the professional development
21  that was testified about was actually grade level
22  professional development provided to every teacher at
23  PS 173.  Every teacher's file at PS 173 would look the
24  same in terms of professional development as Ms.
25  Legra's did.  There was nothing individual about it.

1851

2   When you look at the scanned instances of professional
3   development, there is one demo lesson from Ms.
4   Francisco [phonetic], the literacy coach, which is
5   Department's Exhibit 42, which Ms. Legra was present
6   for the demo lesson, was watching the demo lesson, and
7   then Ms. Francisco testified that Ms. Legra wasn't
8   paying any attention.
9       But then she also testified that Ms. Legra
10  asked her questions about what happened and the demo
11  lesson, and specific questions about things happening.
12  Clearly Ms. Francisco's testimony about Ms. Legra not
13  paying attention but Ms. Legra also being able to ask
14  questions about what happened doesn't comport with
15  each other.  Then, and also Ms. Boursiquot and Mr.
16  Goodman both testified that they never saw anything
17  about this demo lesson provided by Ms. Francisco.
18      They couldn't even identify that it happened
19  or when it happened, or what the subject was about.
20  Even though Ms. Francisco was the literacy coach, Mr.
21  Goodman was the literacy assistant principal, he
22  didn't know anything about it.

1852

4       And again, Ms. Boursiquot and Mr. Goodman
5   testified that they didn't see any documentation about
6   that lesson either.  They didn't do anything to follow
7   up on the professional development that they were
8   claiming they provided to Ms. Legra.  And then
9   furthermore, Ms. Boursiquot said that she assigned the
10  math coach and the literacy coach to work with Ms.
11  Legra during the 2011-2012 school years.  But then we
12  found out through testimony after that from Mr.
13  Goodman and from the coaches themselves that they
14  would have been assigned to Ms. Legra no matter what

15    because she was new to kindergarten in 2011-2012 and
16    because she was new to first grade in 2012-2013.
17       So Ms. Boursiquot's testimony about the fact
18    that she did this is totally disingenuous. And again,
19    Ms. Boursiquot and Mr. Goodman spoke at length about
20    the individual professional development that was
21    provided by Ms. Legra, provided to Ms. Legra by
22    Monique Knight. Now there is not a shred of evidence
23    other than a blank sheet of paper about a day that Ms.
24    Knight was supposed to do a lab site in Ms. Legra's
25    class to substantiate of their testimony about

                                                         1853

2    that…

12       There are no written logs or assistance.
13    You have to take the Department witness's word for
14    everything that they said, because they don't have any
15    documentary proof. There is no written plan of
16    assistance that they worked together with Ms. Legra to
17    develop a program to improve her purported
18    deficiencies. There was no teacher improvement plan.
19    There was no professional improvement plan. These are
20    all things that they could have done to try to remedy
21    some of the problems that they claim that Ms. Legra
22    had that they didn't even make an attempt to do.

    b.      Classroom Management are DOE 3, 5, 13, 16, 17, 19C, 20, 21B, 23, 33, 34 and 42

and testimony of Principal Boursiquot, Assistant Principal Goodman and Coach Francisco in

support. The Exhibits have been referenced previously.

    c.      Production/maintenance of required records/documents are DOE 6, 10, 12, 16, 17, 18,

20, 31, 33, 34 and 36 and testimony of Principal Boursiquot, Assistant Principal Goodman and

Coach Serratty in support.

    DOE 12, Bates No. 337 and 338, dated November 18, 2011 is a two page letter to Teachers

by Ms. Francisco, Ms. Serratty and Mr. Goodman referencing "Portfolio Components as of

December 1st". The second page references Grade Kindergarten through 5th grade. The first page

includes

> In an effort to ensure that *all* student portfolios are up to date and that all of the components are in place, we are going to conduct periodic "Portfolio Check-ins" over the course of the school year. During the "Portfolio Check-in," we will examine random portfolios in your classroom. We will then provide you with feedback and next steps as necessary.
>
> Below, you will find a list of future "Portfolio Check-in" dates. On the following page, you will find a list of the pieces that are required to be in place during our initial visit in early December. Thank you for your attention to this very important work.

**December 1ST and 2nd, 2011**
**March 1ST and 2nd, 2012**
**May 31st and June 1st, 2012**

## DISCUSSION

The record includes 98 Exhibits [page 8 through 11, above] and 1905 pages of Transcript (from the 17 hearing dates reflected above on the first page).

References herein to "pages" are to this Opinion, unless preceded by a "T" when it is to the Transcript or in an excerpt thereof.

I have considered the relevant portions of the foregoing with regard to each of the 17 Specifications, dated October 9, 2013, (above on pages 2 and 3), in determining whether each has been proven by a preponderance of the evidence and support a disciplinary finding against Respondent Teacher.

Each Specification must be considered based upon the evidence presented supporting it as well on the evidence presented that does not support it. DOE must achieve a level of preponderance of evidence to support a finding for it on a Specification. When there is a direct conflict of evidence the motivation of a witness may affect the weight accorded to that evidence.

Counsel for Respondent argued

1811

18       Ms. Legra was a kindergarten teacher during
19    the 2011-2012 school year. There is not a single
20    letter to file or observation report in this case
21    regarding Ms. Legra that occurred prior to when
22    Respondent's Exhibit 14 was written. The first
23    observation that ended up with a report in this case
24    was conducted four days after Respondent's 14 was
25    written. This is clearly when Ms. Boursiquot and Mr.

1812

2    Goodman had decided that they were going to target Ms.
3    Legra.
4       They decided that they were going to take
5    severe measures to eradicate Ms. Legra from PS 173
6    and that therefore they were predisposed to not find
7    anything good with Ms. Legra's teaching and that they
8    papered her file accordingly in an attempt to get rid
9    of her. This is the epitome of unfairness in the
10    workplace. They decided prior to any of the documents
11    that we've heard about in this case, that Ms. Legra
12    was neglecting her duties and that they were going to
13    build a file to reflect that.
14       Now Ms. Legra's workplace at PS 173 was
15    filled with severe difficulties during the 2012 and
16    2013, school year. As you heard from Ms. Legra, Mr.
17    Goodman used to stand outside of her classroom on an
18    almost daily basis. You also heard from Ms. Legra
19    that he had never done this prior to the 2012-2013
20    school year. He used to come to her classroom on a
21    weekly basis like he did with every other teacher. He
22    changed his behavior, and the reason being was because
23    they were trying to find ways to document Ms. Legra.
24       Mr. Goodman used to promise Ms. Legra that
25    he was going to perform a formal observation of her,

1813

2    in particular in the middle of the 2012-2013 school
3    year. He never followed up on his promise. This
4    would have allowed Ms. Legra the ability to come up
5    with a formal lesson plan in conjunction with the
6    school administrators at PS 173 in order to show them
7    that she was implementing the items that she was
8    learning and the grade level professional development
9    in her classroom.
10       She was never given that opportunity.
11    Instead, Mr. Goodman would just come to her class on

12    what was labeled an informal observation but at the
13    same time he would call those informal observations
14    routine classroom visits and would send her
15    disciplinary notices for the same day.  Ms. Legra
16    would call the office to complain about student
17    behavior and then Mr. Goodman would come to her class
18    and write her up for something.  He was constantly
19    summoning Ms. Legra to the office for disciplinary
20    conferences.
21         Moreover, Ms. Boursiquot and Mr. Goodman
22    would promise Ms. Legra individual professional
23    development and then they never actually assigned it
24    to her.  And then there's the comments that Mr.
25    Goodman made to Ms. Legra on February 4th, 2013, about

1814

2    Ms. O'Neal [phonetic]...

7         And what did Mr. Goodman say to Ms. Legra?
8    He said that she was going to go the way of Ms. O'Neal
9    and then he waved bye-bye to her in a sarcastic
10    manner.

1815

24         There is Respondent's Exhibit 14, which
25    proves that they were singling out particular

1816

2    kindergarten teachers, of which Ms. Legra was one...

11         The test is whether or not Ms. Legra
12    provided her students with a valid educational
13    experience.

1817

6    ...Now with respect to the...
7    ...timeline in this
8    case, the charges really only cover the time period
9    from May 2012 until June 2013.
10         Prior to May 2012, there is almost nothing
11    in evidence that shows of any problem that Ms.
12    Boursiquot or Mr. Goodman were having with regard to
13    Ms. Legra's performance.  There is no letters to file
14    before May 2012.  There's not even a counseling memo
15    before May of 2012.  She has worked for the Department
16    for 23 years, and up until this time she hasn't been

```
17     brought up on 3020-a charges with respect to
18     incompetency.  This is her first time.
```

                                                                1818
```
3      But with respect to the 2011-2012 school year, there
4      is only one date.  There are not multiple dates.  And
5      it's towards the end of the school year.
6          It's from May 9th, 2012, which is
7      Department's Exhibit 3.  That report, if you will
8      recall correctly, was not given to Ms. Legra until
9      June 25th, 2012.  There is no notice of any of these
10     ...purported deficiencies of Ms. Legra's
11     pedagogy that occur prior to this date.  This is the
12     first time that we are receiving any evidence of
13     problems with Ms. Legra being able to effectively plan
14     or execute her lessons.  To say that for the entire
15     2011-2012 school year, Ms. Legra was not able to
16     properly or adequately or effectively plan and execute
17     her lessons is disingenuous.
```

                                                                1819
```
7      ...that's the only observation for the 2011-2012
8      school year, and that the observation occurred four
9      days after Respondent's Exhibit 14, when they decided
10     that there was going to be a crackdown.  Clearly there
11     was a predisposition to find that Ms. Legra wouldn't
12     do a good job on this lesson...

16     ...Now this is
17     occurring in the context of Ms. Legra recently taken
18     over this class, it's about a month and a half after
19     she had taken over this first grade class, which was
20     difficult to start off with.
```

The Respondent believes she was targeted by the Principal and Assistant Principal for

termination.  Respondent 14, referencing a "crackdown" on "some K teachers" and the "bye bye" to

her by Mr. Goodman (page 30, above and R16, page 32, above) support her argument.  Counsel for

DOE commented Mr. Goodman was not asked about it in his cross-examination.  This is true.

However, Mr. Goodman was not recalled in rebuttal.

I have previously commented on this and concluded it was accurate.  I conclude the goal of

the Principal and Assistant Principal was to terminate Ms. Legra, who was no longer Kindergarten teacher.

## COMMENTS, CONCLUSIONS AND FINDINGS

My comments and conclusions on each Specification follow:

A.    Regarding Specification 1a:

Regarding lesson plans the Principal presented conflicting testimony. Initially she said Respondent was unable to provide a lesson plan. Later she referred to a "plan that she submitted.

From the foregoing I conclude Respondent had a plan.

Her execution of the lessons, as described by the Principal, do not appear to be effective. However, the descriptions may have been affected by the termination goal.

The record reflects the following timing: On May 3, 2012 Respondent was advised of a pre observation on May 7th (DOE 3); two days later, on May 5th, Mr. Goodman sent the "crackdown" e-mail to Ms. Knight (R Exhibit 14); and the Observation was on May 9th.

The Principal stated she had a concern from the beginning of the school year (September, 2011). I believe her aspirations and goals for the kindergartners in Respondent's class were admirable. That, in the opinion of the Principal, they were not met was disappointing.

Taking into consideration the above timing, the May 9, 2012 Observation and the evidence presented, contested by Respondent, do not rise to the level needed to support "a" of Specification "1)" and I so find.

B.    Regarding Specification 1b:

The November 30, 2012 Observation, DOE 5, was conducted less than two months after Respondent was assigned a first grade class. The record reflects she had difficulty with the

class. The difficulties included non established routines. The Principal believed Respondent was not "at a disadvantage" when not assigned a class "at the beginning of a school year". [T273, starting on Line 23].

The Principal may have been "predisposed to find" Respondent would not "do a good job" as argued by her counsel.

Her observational testimony does not create a presentation of facts favorable to Respondent. However, taking into account this observation occurred less than two months after Respondent was assigned this first grade class, and the termination goal of the observing Principal, I conclude the observation and evidence presented do not rise to the level needed to support "b" of Specification "1)" and I so find.

C.     Regarding Specification 1c:

The February 1, 2013 Informal Observation, DOE 19C, was referenced by testimony of Assistant Principal Goodman.

He did not conduct any formal observations or reports of her and he visited her classroom between 25 and 30 times during the 2011-12 school year.

He did not intend the visit to be an observation. Instead of spending from 3 to 15 minutes, he was there for 45 minutes.

He concluded Respondent was "improvising during the lesson", he saw students "not engaged in learning" or "idle", not reading or holding books.

Respondent stated in her e-mail to Ms. Cruz (R16) that Mr. Goodman was in her room for "two hours" on February 1st. She said she knew she "was a target" after she heard Mr. Goodman's reference to Ms. O'Neill and his waiving his fingers "in a motion of saying bye-bye". She testified he stood outside of her room "almost daily".

The Observation (DOE 19C) reflects Mr. Goodman requested Respondent's lesson plans and he commented that she was "unable to produce" it (page 3, top paragraph).

Respondent testified she had given him her notebook with the plan and he did not return it. She also referenced her February 1st oral request and her February 4, 2013 e-mail to him requesting a return (R7).

There is a conflict in the evidence about the existence of a lesson plan for February 1, 2013. I conclude it existed.

Taking into consideration the "targeting" of Respondent by Mr. Goodman, the comments made by him in the observation, and the record, I conclude the evidence does not rise to the level needed to support "c" of Specification "1" and I so find.

D.     Regarding Specification 1d:

The March 21, 2013 Informal Observation, DOE 20, was referenced by testimony of Assistant Principal Kevin Goodman.

He intended to stay "Just a few minutes" but "was there for approximately 45 minutes". He observed the struggle Respondent was having with her student Ja. He said it "didn't appear to be...dangerous" and he "was a little unsure why the struggle was taking place".

The struggle was over a juice box Ja was using to "wet" other children. Respondent testified Ja had thrown things, turned desks over and the children were "way off task".

Mr. Goodman had been in Respondent's classroom "four or five times because of behavioral issues...of Ja".

Respondent received a copy of DOE 20 on April 10, 2013. The following day, she sent Mr. Goodman an e-mail (R12) referencing his March 21st visit.

When Mr. Goodman observed the struggle between Respondent and a student he

knew had behavioral issues he should have either stepped in to assist the teacher or at least inquired about it so he could be informed. The record does not reflect Respondent asked for his help, but that should not excuse him from taking the reasonable response of making an inquiry. I infer he was too focused on making an observation, to support his termination goal of Respondent, to make the inquiry.

In the Instructions for Improvement, Mr. Goodman said he was "going to require" her to submit lesson plans. The record reflects she had a plan for the period she was observed. Respondent testified "everything was planned for March 21, 2013".

Respondent had a valid reason, or excuse, for the scheduled lesson not being executed during the period observed.

I conclude the evidence does not rise to the level needed to support "d" of Specification "1)" and I so find.

     E.     Regarding Specification 1e:

The June 4, 2013 formal observation, DOE 6, was referenced by testimony of both Principal Boursiquot and Assistant Principal Goodman.

On April 10, 2013 Respondent received a copy of DOE 20. In it she was told lesson plans were going to be required.

A Lesson Plan for June 4, 2013 was submitted. It was referenced twice on page 3 of DOE 6. The same page states Respondent has "been required to submit your lesson plans for review every Monday in the weeks leading up to this lesson...you only submitted your Lesson Plans for the week on one occasion following your last Unsatisfactory observation".

The Principal stated the plans were required to be submitted to her and she believed one was submitted.

Other than as referenced above, the record does not reflect the period of time for which the lesson plans were to be submitted, the number of lesson plans Respondent submitted nor the dates thereof. The effect of non-submission was not specified.

It can be concluded Respondent failed to submit a written lesson plan on some unspecified occasions for an unspecified period of time prior to June 4, 2013.

The purpose for which the plans were to be submitted, as stated on page 1 in DOE 6, is "to facilitate professional assistance relevant to your teacher practice, you have failed to take advantage of this opportunity for professional development".

This subject, failure to submit lesson plans, is covered in Specification "7)".

Taking into consideration the "targeting" of Respondent by the Principal and Assistant Principal, the comments made by them in the observation and the record, I conclude the evidence does not rise to the level needed to support "d" of Specification "1)" and I so find.

F.    Regarding Specification 5

DOE 16, 18 and 36 and the testimony of Assistant Principal Goodman and Literacy Coach Francisco were submitted as supporting this Specification, related to "running records", as referenced in letter dated June 22, 2012".

The June 22, 2012 letter, DOE 18, is quoted above on page 98.  It references a February 1, 2012 meeting Mr. Goodman and Ms. Boursiquot had on that date with Respondent and her UFT Representative to discuss a classroom visit the prior day.

Counsel for Respondent argued the "letter should not have been placed in Ms. Legra's file".

The CBA, Joint Exhibit 1 (page 8) provides on its page 110

## ARTICLE TWENTY-ONE
## DUE PROCESS AND REVIEW PROCEDURES
### A. Teacher Files

Official teacher files in a school shall be maintained under the following circumstances:

1. No material derogatory to a teacher's conduct, service, character or personality shall be placed in the files unless the teacher has had an opportunity to read the material...However, an incident which has not been reduced to writing within three months of its occurrence, exclusive of the summer vacation period, may not later be added to the file.

Clearly the June 22, 2012 letter was not written "within three months of its occurrence" on February 1, 2012. Therefore, I find DOE 18 is excluded from the record and is not being considered.

DOE 16 is a package of memo's. The relevant portions of the two memo's referencing Running Records, dated November 20, 2011 and January 21, 2012, are on page 99. The relevant portion of undated DOE 36 is also on pages 99 through 100.

DOE 10, a February 7, 2013 letter from the Principal to Classroom Teachers references Running Records Placement Charts due by February 15, 2013. This exhibit is not relevant to this Specification and is considered in connection with Specification 10c.

Ms. Francisco testified DOE 36 is a "guideline" or "an overview of ideas" to be held onto or paid "attention to", which she created and is "a reminder of what our literacy curriculum looks like pretty much".

She called Running record "a formal assessment" on which "the teacher takes note on what the child is able to do with no assistance".

Mr. Goodman's testimony reflected Running Records are an assessment tool, used in the school for a long time, which are analyzed to make instructional decision, maintained by the teacher and administration.

Respondent could not produce her Running Records on February 1, 2012 when asked

for by Mr. Goodman. He said it was possible, but unlikely, the records could have been completed on February2nd, and she probably turned them in.

Respondent submitted R24 and R27, Running Record Placement Charts.

Based upon the foregoing I find the evidence presented does not rise to the level to support Specification "5)".

      G.    Regarding Specification 6:

DOE 5, 19C, 20 and 21B and the testimony of Principal Boursiquot and Assistant Principal Goodman were submitted as supporting this Specification relating to supervising students.

The Exhibits were considered in connection with Specification 1. They do not support a finding for this Specification.

DOE 21B, a January 22, 2013 letter referring to a January 15, 2013 observation and a disciplinary conference on January 16, 2013, is quoted on page 105.

Respondent testified she responded the same day by a letter she placed in his mailbox, and referenced her letter, R11.

She did not "at any point ask Mr. Goodman if he had in fact received it" [T1205 L.15 and 1206 L.2].

She did not recall if she requested her letter to "be placed in" her "file alongside" his letter [T1206 L.4-7].

The record does not reflect evidence of Mr. Goodman's receipt of her letter or of it being in her file.

In DOE 21B Mr. Goodman referenced "excessive noise and sounds", "students up out of their seats", "one was running", and "karate moves on the closet door", which he called "chaos" and "mayhem".

Respondent's letter referenced students "walking around the room" and "moving activities".

Respondent's testimony is generalized and not an adequate explanation.

I credit the description provided by Mr. Goodman.  It supports her failure to effectively supervise students.  I find it supports Specification "6)".

H.     Regarding Specification 7:

DOE 6, 19C and 20 and the testimony of Principal Boursiquot and Assistant Principal Goodman were submitted as supporting this Specification relating to lesson plans.

The Exhibits were considered in connection with Specification 1.  They do not support a finding for this Specification.

The previously referenced testimony of the Principal and Assistant Principal do not support a finding for this Specification.

Based upon the foregoing I find the evidence presented does not rise to the level to support Specification 7.

I.     Regarding Specification 8:

DOE 5, 6, 16, 17, 20, 24, 30, 31, 34 and 35 and the testimony of Principal Boursiquot, Assistant Principal Goodman, Coach Francisco and Coach Serratty were submitted as supporting this Specification relating to classroom environment.

The Exhibits were considered in connection with other Specifications.  They do not support a finding for this Specification.

Principal Boursiquot, referencing her November 30, 2012 Observation (DOE 5) said "there were" "piles" "stacks" of paper.  It was disorderly" and was "void of routines".

During cross examination she described components of classroom environment and on June

21, 2013 she stated she "would assign Ms. Zenos to work with Respondent "for the purpose of addressing the issues that exist with her classroom environment", "it would get straightened up and then it would unravel to a point where it became messy".

The date of June 21, 2013, referenced above, was the date of DOE 6. On its page 5 was the language stating Ms. Zenos "will be assigned".

Mr. Goodman, while testifying regarding his February 1, 2013 Observation (DOE 19C) commented that the floor...was such a mess, books, papers pencils, etc., strewn under desks and chairs, the "classroom environment" was in "disarray" with "scattered materials and things of that nature", and he recalled Respondent "having issues with just basic classroom management practices.

Ms. Francisco, when asked about classroom management, said "having routines established would in fact help with classroom management".

Mr. Rodriguez said "you have to instill routines" and if you get "a new assignment in October and November", you are "already six weeks behind" (page 90).

I conclude the evidence does not rise to the level needed to support Specification 8, and I so find.

J.     Regarding Specification 9:

DOE 9 and 46 and the testimony of Principal Boursiquot and School Payroll Secretary Vargas were submitted as supporting this Specification, relating to excessive lateness and absence.

The Agenda in DOE 9 does not appear to relate to this Specification.

DOE 46 relates to the absence on May 6, 2013.

DOE 7, the letter dated June 17, 2013 to Respondent from Principal Boursiquot, with eight pages of Time and Attendance, from September 1, 2012 to June 5, 2013, is relevant.

Ms. Vargas, the School Payroll Secretary, described her responsibilities. I credit her

testimony.

Respondent submitted documents as Exhibit R30, lettered A through K, as follows:

A - Absence Request for "early leave" on January 8, 2013, which was "rejected" by the Principal, with the comment "Denied, You arrived <u>late</u> this morning and have not indicated any emergency requiring you to leave at 11:45" and "If there is no emergency, then you are required to give <u>advance</u> notice.

B - Absence Request for January 29, 2013, dated January 22, 2013, stating as a reason "Court Appearance". It was Rejected by the Principal with the comment "You do not have any Personal days".

C - January 28, 2013 three day excuse letter with return to work on 1/30/13 from Dr. Guerra.

D - February 21, 2013 excuse letter for February 21 to February 26 from unidentified person at Manhattan Physicians Group.

E - Court Summons to Jose Morel for February 28, 2013 at 10 a.m.

F - March 1, 2013 excuse letter for February 26 through March 5, 2013 reflecting a "Nurse visit" from unidentified person at Manhattan Physicians Group.

H - May 6, 2013 e-mail to Respondent from Office of Academics, Performance and Support reflecting she was "PRESENT" at a scoring on May 6, 2013.

I - May 14, 2013 two day excuse letter with return to work on May 16, 2013 from Dr. Pinkhasova.

J - Court Summons to Jose Nelson Morel for June 3, 2013 at 10 a.m.

K - June 12, 2013 letter of office visit for "Lab testing/vaccine administration" by a nurse from RN Coordinator Samuel.

Mr. Bush described the attendance procedures for teachers who are assigned to score as well as correction communications.

The evidence relating to Respondent's attendance for scoring is in conflict. DOE 46 (page 125, 5/7/13 3:11 p.m.) and 48 (described on page 130) both reflect she was absent. DOE 48 confirmed DOE 46. An earlier DOE communication, R30H (5/6/13 9:25 a.m.) reflected she was present. DOE 46 corrected R30H.

The entry on page 2 of the Time and Attendance Inquiry attached to DOE 7 reflects her absence, described as "Self-Treated". The date and entry is referenced in the letter of June 17, 2013 (DOE 7).

Respondent testified she was not absent. I do not credit her testimony. I believe DOE 46 is correct. I conclude she was absent on May 6, 2013.

Exhibits R30A-F and H-K reflect the reasons for her absences. Some were credited as "Med. Certified" in DOE 7, although they appear to be from a nurse, not a medical doctor. That distinction was referenced in the testimony of Ms. Vargas. However, during her testimony the record clearly reflects that the reason for an absence, described as an "Event Description" in the eight pages attached to DOE 7, affect payment to Respondent.

Ms. Vargas' testimony reflected that DOE 7 is accurate in its listings of lateness and absence.

The record reflects that my observation that an excuse reflects payment and does not "deal with whether you're there or not" (i.e.. presence or absence) was confirmed as "correct" by counsel for Respondent on page 141.

I conclude the record supports Specification "9)" and I so find.

K.   Regarding Specification 10a:

DOE 3, 5, 6, 10, 13, 14, 15, 16, 17, 19C, 20, 21B, 22, 23, 28, 29, 30, 31, 32, 33, 34,

35, 36, 38, 39, 40, 41 and 42 and the testimony of Principal Boursiquot, Assistant Principal Goodman, Coach Serratty and Coach Francisco were submitted as supporting this Specification, relating to lesson planning.

DOE 38, 40 and 41 could have been the subject of comments.

DOE 42 was a report of a demo lesson in Respondent's class.

Some of the Exhibits were considered in connection with other Specifications. Some do and some do not support a finding for this Specification.

There is a conflict of evidence presented by Principal Boursiquot, Assistant Principal Goodman and Respondent regarding lesson plans, including when they were required to be submitted, the form thereof as well as if and when they were submitted.

I credit the testimony of Respondent that she had handwritten lesson plans in her book, (R37A) and that she gave Mr. Goodman her lesson plan when she left early and that it was not returned even though requested.

I infer that his request for it the next day was disingenuous because he had it. To fault her in his observation for not having it was not appropriate.

However, despite the foregoing, I conclude other evidence in the record does support Specification 10a, and I so find.

L.    Regarding Specification 10b:

DOE 3, 5, 13, 16, 17, 19C, 20, 21B, 23, 33, 34 and 42 and the testimony of Principal Boursiquot, Assistant Principal Goodman and Coach Francisco were submitted as supporting this Specification, relating to classroom management.

Some of the Exhibits were considered in connection with other Specifications. Some do and some do not support a finding for this Specification.

However, despite the foregoing I conclude other evidence in the record does support Specification 10b, and I so find.

M.    Regarding Specification 10c:

DOE 6, 10, 12, 16, 17, 18, 20, 31, 33, 34 and 36 and the testimony of Principal Boursiquot, Assistant Principal Goodman and Coach Serratty were submitted as supporting this Specification, relating to "records/documents".

The Exhibits were considered in connection with other Specifications. My comments there apply here. They do not support a finding for this Specification.

I conclude other evidence does not rise to the level needed to support Specification 10c, and I so find.

## SUMMARY OF FINDINGS

My findings of support are for Specifications 6, 9, 10a and 10b. They relate to supervising student excessive lateness and absence, lesson planning and classroom management in the 2012-2013 school year.

Based upon the foregoing conclusions, I find that discipline of Respondent Teacher is appropriate

Counsel for Respondent argued

1854

```
2       However, if you decide that there should be
3    some imposition of discipline in this case, then we
4    argue that there is a lack of progressive discipline.
5    This is Ms. Legra's first 3020-a for incompetency
6    charges.  She has been an employee of the New York
7    City Department of Education for 23 years.  And now
8    for some portion of that she was a paraprofessional.
9       But for 15 plus years she has been a teacher
10   for the Department.  And she has never been brought up
11   on these charges before.  And the only other formal
12   discipline against Ms. Legra was for time and
```

13    attendance that resulted in a settlement in April of
14    2013. So in terms incompetency and Ms. Legra's
15    pedagogy, this is a matter of first instance.

1855

3    ...This is all based off of 13
4    months. That's it. It would take a 23 year career
5    with the Department of Education, wrap it up into 13
6    months and throw it out. That's not proper in this
7    case. A proper penalty, if you do decide to impose
8    penalty, would be a letter of reprimand or a fine with
9    some assigned professional development to Ms. Legra in
10    the areas where she purportedly has deficiencies.

Counsel for DOE argued

1901

21    ...In this case we have seen
22    not only Ms. Legra's failures to improve her teaching
23    practice over a two year period, we have also seen her
24    failure to improve her attendance. But this is not
25    Ms. Legra's first chance to improve. She's been U

1902

2    rated for six years. Six years of failing her
3    students. She's been given ample opportunity to
4    improve, and she has shown herself incapable of doing
5    so...

13    ...Ms. Legra has shown that she cannot or
14    will not improve. And I know that you will agree that
15    it is time to tell Ms. Legra that her excuses do not
16    work anymore, and that termination is the only just
17    result in this case.

The DOE Specifications are stated to be "just cause for disciplinary action..." "3. Incompetence..." and "9. Just cause for termination." [page 3, above].

The CBA Joint Exhibit 1, in "ARTICLE TWENTY-ONE DUE PROCESS AND REVIEW PROCEDURES" (page 110), "G. Education Law §3020-a Procedure" (page 113), "9. Incompetence

Cases" referencing a first time unsatisfactory rating (not this case) uses the phrase "the parties agree

that in the spirit of progressive discipline" (page 118).

The cases provided to me, post-hearing by counsel for both parties, reflect discipline less than

termination.

In DISCIPLINE AND DISCHARGE IN ARBITRATION, Second Edition, edited by Brand

and Biren, (BNA Books, 2008) the following is to be found starting on page 65:

### III. PROGRESSIVE DISCIPLINE AS AN ELEMENT OF JUST CAUSE

Discipline is an adverse action taken by an employer against an employee because of the employee's behavior. Just cause principles require that the discipline imposed upon an employee be just and fair. (citation omitted) Just cause, therefore, requires "reasonable proportionality between the offense and the penalty" (citation omitted) and consideration of any mitigating factors or extenuating circumstances that are reflected in the record, such as employee's length of service, performance, prior disciplinary history, as well as management fault. (citation omitted).

Just cause also includes principles of progressive discipline. (citation omitted). Progressive discipline is a system of addressing employee behavior over time, through escalating penalties. The purpose of progressive discipline is to correct the employee's unacceptable behavior. Employers impose some penalty less than discharge to convey the seriousness of the behavior and to afford employees an opportunity to improve. The discharge penalty is reserved for very serious incidents of misconduct and for repeated misconduct. (citation omitted).

The concept of progressive discipline is based on the premise that both employers and employees benefit when an employee can be rehabilitated and retained as a productive member of the work force. (citation omitted) The trained employee is seen as a valuable resource, making it economically prudent to attempt rehabilitation of a current employee. (citation omitted) The expected result of progressive discipline is that the employee will recognize he has engaged in unacceptable conduct and will correct his future behavior (citation omitted).

\*\*\*

## C. Steps of Progressive Discipline

All progressive discipline systems use a series of steps, or disciplinary actions, which increase in severity.  The generally accepted forms of discipline prior to discharge are oral warnings, written warnings, and suspensions. (citation omitted).

\*\*\*

3.   *Suspension.*  Suspensions are typically the next step following oral or written warnings in progressive discipline and may be imposed following one or more incidents of less serious misconduct for which the employer has issued warnings. (citation omitted) They result in the employee being removed from the work place for a designated period of time, in loss of pay, and sometimes in loss of seniority for the period of the suspension.  The suspension places a blemish on the employee's employment record and, like warnings, can serve as a basis for more severe discipline in the future.

\*\*\*

Some arbitrators emphasize that suspensions should be corrective or rehabilitative, not punitive. For example, one arbitrator observed:   "Suspensions are corrective measures designed to rehabilitate a miscreant employee; to restore him/her to acceptable levels of production and/or behavior." (citation omitted)   A suspension may be overturned or reduced if found to be unduly harsh or retaliatory, rather than corrective.  (citation omitted)

\*\*\*

4.   *Discharge.*  Discharge is the most extreme industrial penalty since the employee's job, seniority, and other contractual benefits and reputation are at stake. (citation omitted) It was once referred to as "industrial capital punishment," but at least one arbitrator has suggested that "a more accurate equivalent to discharge is permanent exile.   (citation omitted) One arbitrator has distinguished discharge from all other forms of discipline.

> While arbitrators often speak of discharge as part of a disciplinary progression-a penalty which is a step above lesser penalties-the perception is flawed. Discharge and suspension are separate and distinct penalties.  Suspensions are corrective measures designed to rehabilitate. Discharge on the other hand is the severance of an employment relationship. An

> employer has no legitimate interest in whether or not a discharged employee ever achieves rehabilitation. Its sole purpose is to unburden the work force of an individual whose conduct has become intolerable. In other words, discharge is designed to abolish the employment relationship; disciplinary suspension is designed to improve it. (citation omitted)

***

Where discharge is the final step in the progressive discipline process, the employee will usually have received several warnings and often at least one suspension. (citation omitted)

***

## IV. ARBITRAL CONCEPTS OF FAIRNESS

***

### C. Appropriateness of the Penalty

Collective bargaining agreements usually do not limit the arbitrator's power to formulate remedies in discharge or discipline cases. The arbitrator, therefore, has the authority to order the remedy that he or she deems appropriate. (citation omitted)...Most arbitrators will evaluate the discipline imposed by the employer to determine whether the penalty (or corrective measure) is excessive. Discipline may be considered excessive if it is disproportionate to the degree of the offense, if it is out of step with the principles of progressive discipline, if it is punitive rather than corrective, or if mitigating circumstances were ignored.

***

Arbitrators have consistently held that an excessively harsh penalty for misconduct violates the requirement that discipline be imposed only for just cause. "Inherent in the right to discipline for just cause is the requirement that the form and degree of discipline be reasonable both as regards the basis for discipline and the penalties assessed." (citation omitted) One arbitrator wrote:

> [C]onsideration has to be given to whether a lesser penalty will serve the employer's purpose, especially since discharge makes it difficult, if not impossible, for a person to obtain other employment. Where the

>employee has a long record of service without any
>previous discipline, a lesser, but nonetheless severe,
>punishment will ordinarily preclude repetition of the
>offense...

In considering the discipline to be imposed in this case I have been provided with

Respondent's prior discipline. It was a Stipulation of Settlement of a disciplinary proceeding under

Education Law §3020(4)(a) based upon her record of time and attendance. She admitted excessive

absence "during the 09-10, 10-11, and 11-12 school years." She agreed to pay a $2,500 fine "through

payroll deductions...over a twenty-four (24) month period."

## DISCIPLINARY PENALTY

Taking all of the foregoing into consideration, including Respondent's employment by DOE

for twenty-three (23) years and her prior disciplinary record, I conclude that the appropriate

disciplinary penalty is a suspension of forty-five (45) days, without pay.

Date: May 14, 2014

Eugene S. Ginsberg, Hearing Officer